# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RUBEN GUTIERREZ, | : | |
| Plaintiff, | : | Civil Case No. |
| | : | |
| v. | : | |
| | : | |
| LUIS V. SAENZ, Cameron County | : | |
| District Attorney; | : | THIS IS A CAPITAL CASE |
| | : | |
| FELIX SAUCEDA, JR., Chief, | : | ***EXECUTION SET FOR*** |
| Brownsville Police Department; | : | ***October 30, 2019*** |
| | : | |
| BRYAN COLLIER, Executive | : | |
| Director, Texas Department of | : | |
| Criminal Justice, Huntsville, Texas; | : | |
| | : | |
| LORIE DAVIS, Director, Texas | : | |
| Department of Criminal Justice, | : | |
| Correctional Institutions Division, | : | |
| Huntsville, Texas; and | : | |
| | : | |
| BILLY LEWIS, Warden, Texas | : | |
| Department of Criminal Justice, | : | |
| Huntsville Unit, Huntsville, Texas, | : | |
| Defendants. | : | |

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Peter Walker
Assistant Federal Defender
Federal Community Defender for the
  Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
peter_walker@fd.org

Richard W. Rogers, III
3636 S. Alameda St., Ste. D191
Corpus Christi, TX 78411
(361) 888-7620
rwrogersiii@aol.com

**INTRODUCTION**

*The DNA Claims*

1.      Plaintiff Ruben Gutierrez has been convicted of capital murder and is currently scheduled to be executed by the State of Texas on October 30, 2019. The State intends to carry out Mr. Gutierrez's death sentence in spite of the facts that physical evidence is available that has never been DNA tested, and that such testing could prove that Plaintiff was not a principal in the murder of Escolastica Harrison. This suit is brought to enjoin Defendants from violating Plaintiff's federal constitutional rights by denying him access to that evidence for purposes of forensic DNA testing.

2.      The State of Texas collected physical evidence that could have been DNA tested at the time of trial. The State chose not to test that evidence.

3.      "Modern DNA testing can provide powerful new evidence unlike anything known before." *Dist. Attorney's Office v. Osborne*, 557 U.S. 53, 62 (2009). Since he was convicted, Mr. Gutierrez has demanded that the evidence be tested to prove he did not commit the killing and identify another man as the murderer, but the State has opposed such testing (with one exception) and Texas courts have repeatedly denied requests for such testing.

4.      The Texas legislature has recognized the utility of DNA evidence in the post-conviction context, and passed Chapter 64 of the Texas Code of Criminal

Procedure in 2001 because prior laws relating to the use of biological evidence, "particularly evidence containing DNA, have been surpassed by developments in the science of biological evidence and other related technologies, unnecessarily inhibiting the use of such evidence." Tex. Bill Analysis, S.B. 3, Jan. 25, 2001.

5.      Mr. Gutierrez properly filed a motion for DNA testing under Chapter 64 of the Texas Code of Criminal Procedure ("Chapter 64") almost ten years ago, but his request was denied after lengthy proceedings—including two appeals to the Texas Court of Criminal Appeals ("CCA"). Following changes in Chapter 64, the development of advanced scientific testing techniques, and the disclosure of new exculpatory evidence, Mr. Gutierrez again sought DNA testing earlier this year, but was again denied.

6.      This action under 42 U.S.C. § 1983 ("Section 1983") challenges the constitutionality of Chapter 64 both on its face and as applied by the CCA. Given the unique ability of DNA evidence to identify the actual killer in this case, the State's refusal to allow Mr. Gutierrez to test key evidence in its possession denies him due process of law and access to the courts.

7.      Defendants' refusal to release the biological evidence for testing violates Plaintiff's Fourteenth Amendment right to due process, his First Amendment right to access the courts, and his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff requests of this Court an order

declaring that Defendants' continued withholding of the evidence violates Plaintiff's constitutional rights and requiring that Defendants release the evidence to Plaintiff under a reasonable protocol regarding chain of custody and preservation of the evidence, in order that Plaintiff can have the evidence tested at his own expense. Relief is necessary here to preserve Plaintiff's liberty interest in accessing the Texas statutory procedure to conduct forensic DNA testing.

*The First Amendment and Related Claims*

8.     Plaintiff Gutierrez is a Christian. On October 30, 2019, Mr. Gutierrez will be executed under conditions that violate the First Amendment's Free Exercise and Establishment Clauses and substantially burden the exercise of his religious beliefs as protected by the Religions Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* Mr. Gutierrez's request for a reasonable accommodation to have a Christian chaplain in the execution chamber when he is executed has been denied. Relief is necessary to ensure that he is executed only in a manner that does not substantially burden the exercise of his religious beliefs, does not violate his rights under the Establishment Clause, and complies with RLUIPA.

## JURISDICTION

9.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983. *See also Skinner v. Switzer*, 562 U.S. 521,

3

534 (2011) (convicted state prisoner may seek DNA testing of crime-scene evidence in § 1983 action).

## VENUE

10.    Venue lies in this Court under 28 U.S.C. § 1391 because Defendants reside in the Southern District of Texas. Venue is also proper because the execution will occur in this district.

## PARTIES

11.    Plaintiff Ruben Gutierrez is a United States citizen and resident of the State of Texas. He is currently incarcerated, under a sentence of death imposed by the 107th Judicial District Court of Texas (the "107th District Court") at the Allan B. Polunsky Unit of the Texas Department of Criminal Justice ("TDCJ") in Livingston, Texas. He is scheduled to be executed on October 30, 2019.

12.    Defendant Luis V. Saenz is the District Attorney for the 107th Judicial District of Texas, and maintains an office in that district in the city of Brownsville. He is being sued in his official capacity. Defendant Saenz has custody and/or control of the DNA evidence that is the subject of the DNA claim. Defendant Saenz has opposed Mr. Gutierrez's request to conduct DNA testing on the items of evidence at issue in this case. A district attorney who opposes DNA testing is a proper defendant in a section 1983 action seeking DNA testing. *Skinner*, *supra*.

13.     Defendant Felix Sauceda, Jr., is the Chief of the Brownsville Police Department. Defendant Sauceda has custody of certain evidence designated below. Defendant Sauceda is sued in his official capacity.

14.     Bryan Collier is the executive director of the TDCJ. He is being sued in his official capacity. He is responsible for the oversight and enforcement of policies and procedures generally applicable to all prisons and all prisoners and is responsible for carrying out Mr. Gutierrez's execution.

15.     Lorie Davis is the director of the Correctional Institutions Division (the "CID") of the TDCJ. She is being sued in her official capacity. In her capacity as director of the CID, she adopted TDCJ's Execution Procedure, effective April 2, 2019. Ms. Davis is also the person charged by the trial court's order to execute the judgment of death against Mr. Gutierrez.

16.     Billy Lewis is the senior warden of the Huntsville Unit, the unit at which TDCJ executes inmates. He is being sued in his official capacity. As the warden of the Huntsville Unit, Mr. Lewis is the TDCJ official who supervises Texas executions.

## PROCEDURAL BACKGROUND

*The DNA Claims*

17.     Plaintiff was one of three men indicted for the robbery/murder of Escolastica Harrison: Ruben Gutierrez, Rene Garcia, and Pedro Gracia. Pedro

Gracia was released on bond and disappeared. Rene Garcia pled guilty and was sentenced to life imprisonment. Ruben Gutierrez pled not guilty and his case was tried by a jury in the 107th District Court of Cameron County, Texas.

18.     The State's main theory of the case at trial was that Mr. Gutierrez was a principal in the murder of Escolastica Harrison in order to prevent her from identifying him as one of the robbers. In opening argument the State argued to the jury:

> The evidence will show . . . without any statements, that Ruben and Rene killed Ms. Harrison. . . . Ruben's statements . . . show[] beyond a reasonable doubt that he's involved in killing Ms. Harrison and robbing Ms. Harrison, killed her in the course of a theft.

17 RR 33.[1]

19.     In closing argument the State argued to the jury:

> [W]hat [Ruben] tells you in the confession, which you also need to be sure that you pay close attention to, is what he says is that, "We got two screwdrivers out of that toolbox, two screwdrivers out of that toolbox." Think about it and read between line[s], ladies and gentlemen. What he's telling you is that, "Rene had the flat tip, and we got two out, and I had the other one. I had the star shaped one."

20 RR 72.

20.     On direct appeal, the State argued to the Court of Criminal Appeals: "Mrs. Harrison was attacked by two adult men. The two men were armed with screwdrivers." Appeal Brief at 19.

---

[1] The trial testimony will be cited as volume number, followed by RR (Reporter's Record) followed by the page number.

21.     Under the State's theory of the case at trial, the two men present at the scene of the offense were Rene Garcia (who pled guilty) and Ruben Gutierrez. Pedro Gracia (who absconded) was the getaway driver. Avel Cuellar—the victim's nephew who resided with her and "discovered" her body—was not, according to the State, involved in the crime.

22.     Mr. Gutierrez maintained throughout trial proceedings that although he was aware of a burglary, he was not present at the scene of the offense, did not enter the victim's home, did not plan the victim's murder, did not participate in the victim's murder, did not know that his co-defendants intended to commit murder, and could not have reasonably anticipated that his co-defendants intended to commit murder.[2] The defense argued that the two men observed at the scene of the offense who went inside the victim's house were Rene Garcia and Pedro Gracia; because Mr. Gutierrez was not inside the home, he had no idea the robbery had resulted in Ms. Harrison's death.

23.     In 1999, Plaintiff was convicted and sentenced to death by a jury in the107th District Court for the murder of Ms. Harrison. The conviction and sentence were upheld by a divided Texas Court of Criminal Appeals ("CCA") on direct

---

[2] Mr. Gutierrez maintained that his statement—referenced by the prosecutor in closing argument—was false and was obtained by coercion.

appeal, with one justice dissenting. *Gutierrez v. State*, No. 73,462 (January 16, 2002) (unpublished).

24.     On July 31, 2002, Plaintiff initiated state court habeas corpus proceedings pursuant to Art. 11.071 of the Texas Code of Criminal Procedure. After the state habeas court initially denied relief, the CCA denied all but two claims for relief and remanded the case to the trial court to supplement the record with affidavits from trial and appellate counsel. *Ex parte Gutierrez*, No. 59,552-01, 2004 WL 7330936, at *1 (Tex. Crim. App. Sept. 15, 2004). Following the remand and supplementation, the CCA denied the remaining claims. *Ex parte Gutierrez*, No. 59,552-01, 2008 WL 2059277, at *1 (Tex. Crim. App. May 14, 2008).

25.     On January 26, 2009, Mr. Gutierrez timely filed a federal petition for writ of habeas corpus with this Court. *See Gutierrez v. Stephens*, No. 1:09-cv-00022 (S.D. Tx.) (Doc. 1). Mr. Gutierrez was represented by attorney Margaret Schmucker. Mr. Gutierrez then sought, and the court granted, a stay and abeyance so that Mr. Gutierrez could file a successive state writ to exhaust additional claims in accordance with *Rhines v. Weber*, 544 U.S. 269 (2005). *Id.* (Doc. 10).

26.     Upon returning to state court, Mr. Gutierrez sought the appointment of counsel and DNA testing pursuant to a version of Texas Code of Criminal Procedure Chapter 64 that was later superseded by amendment. The trial court initially denied only the motion for appointment of counsel and Mr. Gutierrez appealed. The CCA

dismissed the appeal for lack of jurisdiction because the denial of counsel was found not to be an immediately appealable order. *Gutierrez v. State*, 307 S.W.3d 318, 319 (Tex. Crim. App. 2010). The trial court subsequently denied the motion for DNA testing under Chapter 64; Mr. Gutierrez appealed the denial of counsel and post-conviction DNA testing. On May 4, 2011, the CCA affirmed, finding that Mr. Gutierrez was not entitled to the appointment of counsel or to post-conviction DNA testing under Chapter 64. *Ex parte Gutierrez*, 337 S.W.3d 883, 886 (Tex. Crim. App. 2011).

27.     The CCA's affirmance was based in part on a finding that Mr. Gutierrez was at fault for not seeking DNA testing at trial. *Id.* at 895 (citing Tex. Crim. Proc. Code art. 64.01(b)(1)(B)), *repealed by* Acts 2011, 82nd Leg., ch. 366 (S.B. 122), § 1. The CCA also affirmed the lower court on the ground that Plaintiff had failed to show by a preponderance of the evidence that he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing. *Gutierrez*, 337 S.W.3d at 901.

28.     Mr. Gutierrez filed a successive state application for writ of habeas corpus. The writ was ultimately dismissed on procedural grounds as an abuse of the writ. *Ex parte Gutierrez*, WR-59, 55-02 (August 24, 2011) (per curiam).

29.     Mr. Gutierrez returned to federal court and raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), regarding the State's tardy disclosure to trial

counsel that it was in sole possession of biological evidence collected from the victim and the scene of the offense. In the amended brief supporting his claim for federal habeas relief, Mr. Gutierrez specifically requested post-conviction DNA testing.

30.     This Court issued a judgment denying federal habeas relief on procedural grounds. *Gutierrez v. Stephens*, No. 1:09-CV-22 (S.D. Tex. Oct. 3, 2013).

31.     Mr. Gutierrez filed an application for Certificate of Appealability to the United States Court of Appeals for the Fifth Circuit, seeking review of the denial of the *Brady* claim. During oral argument, counsel for Mr. Gutierrez again argued that DNA testing would demonstrate that Mr. Gutierrez was not death eligible. The Fifth Circuit denied Mr. Gutierrez's request for a certificate of appealability on procedural grounds. *Gutierrez v. Stephens*, 590 F. App'x 371, 373 (5th Cir. 2014), *cert. denied*, 136 S. Ct. 35 (2015).

32.     On November 4, 2015, Mr. Gutierrez filed a Motion for Miscellaneous Relief in the state trial court, seeking independent DNA testing of potentially exculpatory material under *Brady*. In its response to this motion, filed on February 2, 2016, the State did not oppose Mr. Gutierrez's request for DNA testing. On April 11, 2018, however, the State presented and the court signed a proposed order denying the motion.

33.     On April 18, 2018, without giving Plaintiff's attorneys any notice or an opportunity to be heard, the 107th District Court signed Mr. Gutierrez's Warrant of Execution, directing that he be executed by intravenous injection "at any time after the hour of 6:00 P.M. on September 12, 2018."

34.     In the meantime, but unbeknownst to Mr. Gutierrez, appointed counsel Margaret Schmucker was removed from the Fifth Circuit's CJA appointment panel on December 15, 2017. *See Gutierrez v. Stephens*, No. 1:09-cv-00022 (S.D. Tx.) (Doc. 63). On July 24, 2018, Ms. Schmucker filed a motion seeking to be relieved as counsel in this case. *Id.* (Doc. 56). On August 6, 2018, this court granted the motion to withdraw and appointed Richard W. Rogers, III, as counsel. *Id.* (Doc. 63). On August 14, 2018, the court appointed the FCDO as co-counsel. *Id.* (Doc. 71).

35.     On August 15, 2018, Mr. Gutierrez filed a motion for stay of execution in this Court. *Id.* (Doc. 73). The State opposed the motion, arguing that this Court lacked jurisdiction and that Mr. Gutierrez was not entitled to a stay. *Id.* (Doc. 74). This Court granted the stay of execution on August 22, 2018. *Id.* (Doc. 79).

36.     Following the stay, the FCDO sought records from the Brownsville Police Department, the Texas Department of Public Safety, and the Cameron County District Attorney's Office. While discussions about those requests were ongoing, on April 30, 2019, the Cameron County District Attorney's Office filed a motion to set a new execution date. That motion was granted on May 1, 2019.

11

37.     On June 8, 2019, Mr. Gutierrez filed an "Agreed Upon Motion to Recall Order Setting Execution Date and Warrant of Execution," due to defects in the warrant. On June 14, 2019, after review of partial files made available by the Brownsville Police Department and the Cameron County District Attorney's Office, Mr. Gutierrez filed a renewed Motion for Post-Conviction DNA Testing Pursuant to Chapter 64.

38.     On June 20, 2019, the court granted the motion to recall the execution date, and granted the motion for DNA testing. *Ex parte Gutierrez*, No. 98-CR-1391-A, Order (Tex. 107th Judicial Dist. Ct. June 20, 2019), A1-2.[3]

39.     On June 21, 2019, the Cameron County District Attorney's Office moved to set a new execution date of October 30, 2019. On that same date, Mr. Gutierrez objected to the proposed new execution date and moved for a hearing.

40.     On June 25, 2019, apparently not realizing that the court had already granted the motion, the State filed its opposition to the motion for DNA testing. On June 27, 2019, the 107th District Court granted the motion to set a new execution date of October 30, 2019, and denied the defense motions. The court signed without

---

[3] Plaintiff is filing an Appendix of relevant documents together with this Complaint. Documents included in the Appendix are cited as "A" followed by the page number.

change the State's proposed orders withdrawing the previous order granting DNA testing and denying DNA testing. A3-4.

41.     Mr. Gutierrez timely appealed. The appeal has been briefed and is now pending before the CCA. In light of the fact that Mr. Gutierrez's execution is scheduled in slightly over a month, he brings this action now and will withdraw or supplement it following any ruling by the CCA.

*The First Amendment and Related Claims*

42.     On April 2, 2019, TDCJ adopted a revised execution procedure prohibiting any religious or spiritual advisors from entering the execution chamber at the time of an execution: "TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness rooms." A12. The previous execution policy allowed TDCJ-approved chaplains in the execution chamber. The amendment appears to be in response to the Supreme Court's order granting a stay in *Murphy v. Collier*, 139 S. Ct. 1475, 1475 (2019). Indeed, the revised policy appears to adopt reasoning from Justice Kavanaugh's concurring statement. *See id.* at 1475-76.

43.     On July 30, 2019, undersigned counsel informed Sharon Howell, general counsel of TDCJ, that Mr. Gutierrez was requesting a reasonable accommodation to have a Christian chaplain present in the execution chamber during his execution and had submitted an I-60 "Offender Request to Official" form.

A14-15. Mr. Gutierrez did not receive a written response to his I-60, but when talking to a TDCJ chaplain on July 28, 2019, he was told that there would be no chaplain in the chamber in accordance with the new TDCJ policy. Ms. Howell responded to undersigned counsel on July 31, 2019, stating that TDCJ could not accommodate Mr. Gutierrez's request as it would violate TDCJ policy. A14.

44.     On August 19, 2019, months before his scheduled execution, Mr. Gutierrez filed an "Offender Grievance" form. A16-17. Mr. Gutierrez explained that having a Christian chaplain present in the chamber would help to ensure his path to the afterlife. He also noted that TDCJ's previous policy allowed a TDCJ-approved chaplain to be present inside the execution chamber at the time of execution, and that both TDCJ Chaplains J. Guy and Wayne Moss had indicated that they were willing to be present in the chamber at his execution (but for TDCJ's April 2019 Execution Procedure).

45.     TDCJ has not yet granted or denied Mr. Gutierrez's grievance. Mr. Gutierrez is filing these claims now in light of the fact that his execution is scheduled in little over a month, and particularly in light of Justice Kavanaugh's statement that a claim filed over a month before an execution is "sufficiently timely," *Murphy*, 139 S. Ct. at 1475, 1476 n.* (implying that a claim filed later likely would not be timely). Plaintiff will withdraw or supplement these claims once TDCJ rules on the grievance.

## FACTUAL BACKGROUND OF DNA CLAIM

46.    The evidence presented at trial showed that the victim had suffered several puncture wounds, 19 RR 234-42, but had died from a blow to the head. 19 RR 224-25, 266-67. The medical examiner testified that the puncture wounds had been made by two screwdrivers. 19 RR 234-45. He did not estimate Ms. Harrison's time of death. 19 RR 215-82; SX 73 (autopsy report).[4]

47.    The medical examiner testified that Ms. Harrison had struggled with her assailant(s) for at least a few minutes during which time she sustained defensive wounds to her right wrist, right elbow, and right hand. 19 RR 245-247, 257, 263, 272. He stated that defensive wounds are "almost always found" on "the fingers of the hands, and the hands, and the forearms as they try to ward off blows." 19 RR 245. The medical examiner also testified that Ms. Harrison fought her attacker with her hands. *Id.*

48.    The medical examiner testified at trial that biological evidence— namely scrapings taken from underneath Ms. Harrison's fingernails—was preserved as evidence. 19 RR 245. According to the medical examiner, the purpose of taking nail scrapings during an autopsy is to determine whether the victim had tissue from any other individual besides herself. 19 RR 264. Furthermore, when a person is

---

[4] Exhibits introduced at trial by the State are cited as "SX." They are contained in volume 30 of the record.

attempting to defend themselves, there is also a "distinct possibility" that the person would grab the assailant's hair and then have that hair on his or her hand. *Id.*

49.     The medical examiner found a single loose hair around the third digit of Ms. Harrison's left hand. 19 RR 263.

50.     The untested evidence in the possession of the State can not only prove Mr. Gutierrez was not in the victim's house, it can show who actually killed Ms. Harrison. Specifically,

- blood sample taken from Ms. Harrison retained by the Texas DPS McAllen Laboratory pending pick up by the District Attorney;

- nightgown belonging to Ms. Harrison that may have touch DNA from her assailant(s);

- shirt belonging to Ms. Harrison's nephew and housemate, Avel Cuellar, containing apparent blood stains retained by the Texas DPS McAllen Laboratory pending pick up by the District Attorney;

- nail scrapings in which "[a]pparent blood was detected" were taken from Ms. Harrison during an autopsy and submitted to Det. Hernandez as part of rape examination kit;

- blood samples collected from a bathroom, from a raincoat located in or just outside Avel Cuellar's bedroom, and from the sofa in the front room of Ms. Harrison's house; and

- a single loose hair found around the third digit of the victim's left hand recovered during an autopsy and submitted to Det. Hernandez as part of rape examination kit. 19 RR 263.

51.     DNA testing of the blood sample taken from the victim Escolastica Harrison is necessary to establish a known sample for purposes of including or excluding her as the source of biological evidence according to standardized scientific DNA testing protocols.

52.     "Touch DNA testing"—a new, advanced DNA testing procedure—of the decedent's nightgown is necessary because her assailant(s) likely touched the nightgown, and thus would likely reveal the identity of those assailant(s). *See* Affidavit of Huma Nasir, A21-23; Declaration of Dr. Randall Libby, A38-39.

53.     DNA testing of the shirt belonging to the victim's nephew and housemate is necessary to determine whether it was contaminated by biological evidence (blood) not belonging to himself or Ms. Harrison between the time he arrived home and discovered her body and the time police arrived, and, if so, whether it matches one, two, or all three of the co-defendants.

54.     DNA testing of the nail scrapings taken from Ms. Harrison during the autopsy is necessary to determine whether, during the struggle with her assailant(s), she collected biological material from their skin under her fingernails, and, if so, whether it matches one or more of her assailants.

55.     DNA testing of the blood samples collected from the bathroom, the raincoat, and the sofa is necessary to determine whether they matched just Ms. Harrison or whether they contained DNA from one or more of the co-defendants.

56.     DNA testing of the loose hair is necessary to determine whether it matched just Ms. Harrison or whether it contained DNA from one of her assailants. Using advanced new DNA testing procedures, including mitochondrial DNA testing, this can be done even if there is no root material attached to the hair. A22.

57.     The jury, when deciding if Mr. Gutierrez was guilty of capital murder, never heard the results of any testing of this forensic evidence. The jury, when it sentenced Mr. Gutierrez to die, never heard the results of any testing of this forensic evidence. This is because the State never tested this evidence, and has opposed Mr. Gutierrez's efforts to test it (with one brief exception).

58.     Instead, the State assumed that blood found on Ms. Harrison's clothes and biological evidence collected during the autopsy—including fingernail scrapings—contained no DNA from Ms. Harrison's assailant(s), despite the medical examiner's testimony concerning the presence of defensive wounds on her body. It further assumed that blood found elsewhere in the house belonged to Ms. Harrison, despite the fact that fresh blood stains were found in areas of the house the victim could not have reached, and clearly did not go, either during or after the fatal assault.

59.     No evidence submitted at trial proved that Mr. Gutierrez actually stabbed or ever laid a hand on Ms. Harrison. His conviction was based primarily on a photo identification of Mr. Gutierrez by an eyewitness (Julio Lopez), who claimed to have observed him outside the victim's house at the time the murder occurred but

who, at trial, did not identify Mr. Gutierrez as the person he observed, 18 RR 72-94; testimony that Mr. Gutierrez led police to the location where his co-defendants showed him they had disposed of items taken from the victim's home, 18 RR 179-93; and statements by Mr. Gutierrez coerced by police in which he admitted to planning a burglary (not a robbery and murder) and to being present at the scene, but not to any direct involvement in the victim's murder. SX 45.

## CLAIMS FOR RELIEF

60.     Mr. Gutierrez re-alleges and incorporates herein by reference all the allegations contained in the preceding paragraphs of this Complaint.

### First Claim for Relief: Denial of Due Process

61.     Pursuant to Chapter 64, when an individual sentenced to death, such as Mr. Gutierrez, presents a motion that requests DNA testing of biological material which both still exists in a condition that makes testing possible and could yield exculpatory results, he or she is entitled to have the evidence tested. Tex. Code Crim. Proc. art. 64.03 (2017). If testing successfully produces an unidentified DNA profile, that profile must be compared to the FBI's CODIS database, and the database established by the Department of Public Safety. Art. 64.035 (2011). Exculpatory results obtained under Chapter 64 are considered by the trial court.

62.     Exculpatory DNA results are accepted under Texas law as evidence that can be used to prove a claim for habeas relief based on innocence, innocence of the

death penalty, false or misleading testimony, and other constitutional violations brought under Articles 11.071 and 11.073 of the Texas Code of Criminal Procedure. Exculpatory DNA results may also be considered by the Board of Pardons and Paroles and the Texas Governor in an available request for executive clemency. *See State v. Holloway*, 360 S.W.3d 480, 489 n.58 (Tex. Crim. App. 2012), *abrogated on other grounds*, *Whitfield v. State*, 430 S.W.3d 405 (Tex. Crim. App. 2014).

63.    Because the State of Texas has created a procedure through which convicted persons can obtain DNA testing and then utilize exculpatory results from that testing to secure habeas relief, executive clemency and potentially other relief from their convictions and death sentences, the process employed by the State for obtaining access to DNA must not violate fundamental fairness. *See Osborne*, 557 U.S. at 69; *Skinner*, *supra*; *Elam v. Lykos*, 470 F. App'x 275, 276 (5th Cir. 2012) ("While there is no freestanding right for a convicted defendant to obtain evidence for post-conviction DNA testing, Texas has created such a right, and, as a result, the state provided procedures must be adequate to protect the substantive rights provided."); *Emerson v. Thaler*, 544 F. App'x 325, 327 (5th Cir. 2013) ("Although states are under no obligation to provide mechanisms for postconviction relief, when they choose to do so, the procedures they create must comport with due process and provide litigants with a fair opportunity to assert their state-created rights.").

64.     Chapter 64 as construed by the CCA violates fundamental fairness in at least two ways.

65.     First, Article 64.03(a)(1)(C) requires a court to find that identity is an issue before DNA testing can be ordered. As construed by the CCA, Chapter 64 precludes testing on the grounds that identity is not in issue if there is *some* evidence of the defendant's guilt, regardless of the admissibility and reliability of such evidence. Here, the CCA relied on a pre-trial identification by Julio Lopez, Mr. Gutierrez's third statement, and the statements of Mr. Gutierrez's co-defendants to find that identity was not in issue. *Gutierrez*, 337 S.W.3d at 891-900. If such evidence is enough to show that identity is not in issue, however, it is hard to imagine when identity would ever be in issue.

66.     This was true even at the time of the CCA's 2011 ruling. The problems with eyewitness identification are well enough understood that a single such identification cannot preclude identity being at issue if Chapter 64 is to have any meaning. Mr. Gutierrez always contended that his third statement was coerced. And the statements of co-defendants implicating an alleged cohort are excluded from consideration at trial precisely because of their unreliability. *See Bruton v. United States*, 391 U.S. 123, 136 (1968) (discussing unreliability of such evidence). Using such unreliable evidence as the basis for finding that identity is not an issue violates

fundamental fairness. This is even more true now, given the showing Plaintiff made in the 107th District Court and in his pending appeal.

67.     In those proceedings, Plaintiff submitted a report from an expert in eyewitness identification, describing the many ways in which Julio Lopez's pre-trial identification of Mr. Gutierrez was unreliable. Report of Professor Jennifer Dysart, A57-75. Additionally, while the lead detective reported that Mr. Lopez's sister, Veronica, who was with him at the time, was "unable to identify" Mr. Gutierrez, Ms. Lopez actually saw Mr. Gutierrez's photo in an array but picked out two other photos as the men she saw that day. Decl. of Veronica Lopez, A98-101. Furthermore, new evidence supports Mr. Gutierrez's claim that his statement was coerced. Decl. of Erika Martinez, A102-03 (describing her experience of police coercion). In light of this new evidence casting doubt on the evidence relied on by the CCA, it is even more clear that identity was and is in issue. As construed by the CCA, the statute effectively precludes DNA testing.[5]

68.     Second, Article 64.03(a)(2) requires the movant to show by a preponderance of the evidence that she would not have been convicted if exculpatory results had been obtained by DNA testing. Again, as construed by the CCA, that

---

[5] Notably, in the recent proceedings in the 107th District Court, the State did not contend, nor did the District Court find, that identity was not in issue. *See* A4.

provision effectively precludes testing to establish innocence, and further precludes testing to establish innocence of the death penalty.

69.     The CCA acknowledged that a DNA match between the fingernail scrapings taken from Ms. Harrison during the autopsy and co-defendant Pedro Gracia would be potentially exculpatory. *Gutierrez*, 337 S.W.3d at 901. Nevertheless, the court construed Chapter 64 as precluding potentially exculpatory testing where an exculpatory result does not appear "plausible" to a reviewing court. *Id.* But a court's speculation as to the likelihood that testing *will* produce a particular result cannot reasonably be a basis for concluding that testing that *does* produce that result would not change the outcome at trial. Again, this is even more true now, given the showing Plaintiff made in the 107th District Court and in his pending appeal.

70.     Avel Cuellar, the decedent's nephew, lived at Ms. Harrison's trailer and was the initial suspect in the crime. A DNA profile tying Mr. Cuellar to the crime would be especially likely to have changed the outcome of the trial. It is likely that if he was one of the people in the trailer who attacked Ms. Harrison, he would have been touched at some point by one of the co-assailants. That person could have left touch DNA on his clothing. A21-23. Evidence that Rene Garcia's DNA, or Pedro Gracia's DNA, was deposited onto Mr. Cuellar's clothing, would be consistent with

one of them committing the murder with Mr. Cuellar, *id.*, and would likely have resulted in acquittal of Mr. Gutierrez.

71. Blood was found on Mr. Cuellar's shirt, and may also be present on his jeans. DNA testing could be conducted on the blood stains. Decl. of Prof. Timothy Palmbach, A26; A34. If the blood came from the decedent, and pattern interpretation shows that the blood was a spatter stain, that would be strong evidence that Mr. Cuellar committed the murder. *See* A22-3, 25.

72. Given that Ms. Harrison was stabbed, the assailant(s) would have needed to be very close to her. A21-22, 27. Simply by touching an item, individuals leave behind skin cells that can yield a DNA profile when tested. *Id.* As a result of recent advances in DNA technology, there is a reasonable likelihood of obtaining a DNA profile from touch DNA left on the victim's nightgown by the perpetrator(s). A20, 38. An exculpatory result from such testing almost certainly would have resulted in a different outcome at trial.

73. The Texas Department of Public Safety reported that "apparent blood was detected in the victim's fingernail scrapings." Crime Lab Report, A45. The presence of blood in these scrapings makes them particularly likely to contain probative biological evidence. *See* A21-22, 26. The presence of DNA in the fingernail scrapings from a person(s) other than Ms. Harrison and Mr. Gutierrez would be highly exculpatory.

74.     Samples were collected from blood stains in a bathroom. Any profiles obtained from the blood could be compared to known samples of the victim, Avel Cuellar, Rene Garcia, Pedro Gracia, and Ruben Gutierrez. A22, 26. The presence of blood from any two people other than Ruben Gutierrez and the victim would further support the conclusion that Mr. Gutierrez was not the perpetrator.

75.     A hair was collected from the decedent's hand. The forensic pathologist testified that the hair could well have come from the assailant. 19 RR 264. Even if the hair lacks a root, recent advances mean that mitochondrial DNA testing would likely reveal a genetic profile. A22, 26-27, 37. A DNA result for a person other than Mr. Gutierrez would likely have resulted in a different outcome.[6]

76.     In summary, there is a plethora of biological evidence that, if tested and exculpatory, would have resulted in a different outcome at trial. Moreover, even if it is assumed that Mr. Gutierrez could still have been convicted of first degree murder under Texas's law of parties, *see Gutierrez*, 337 S.W.3d at 901, it still would have supported a determination that Mr. Gutierrez was not eligible for the death penalty

---

[6] As to the hair, the CCA accepted a representation by the State that the hair had not been collected as evidence. *Gutierrez*, 337 S.W.3d at 897-98. The record does not support that determination. The pathologist reported that the hair was collected as part of the sexual assault biological evidence. Final Pathology Report, A48. That evidence remains sealed and untouched at the Brownsville Police Department, where counsel reviewed the sealed box containing it with the chain of custody undisturbed.

under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987).

77.     Third, the CCA has construed the statute as precluding "testing when exculpatory testing results might affect only the punishment or sentencing that [the defendant] received." *Gutierrez*, 337 S.W.3d at 901. This means, however, that a defendant could never obtain testing in order to establish that he is ineligible for the death penalty, and thus "'actually innocent' of the death penalty to which he has been sentenced . . . ." *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992). The execution of a person who is innocent of the death penalty, however, would be a fundamental miscarriage of justice. *See id.* at 339 (actual innocence of crime or death penalty as a miscarriage of justice); 345 (defining innocence of death penalty as a "showing that there was no aggravating circumstance or that some other condition of eligibility had not been met"). As construed by the CCA, Chapter 64 does not permit DNA testing to establish that a defendant is ineligible for the death penalty.

78.     By refusing to release the biological evidence for testing, and thereby preventing Plaintiff from gaining access to exculpatory evidence that could have led to his acquittal and/or demonstrated that he is not death eligible because he was not a principal in Ms. Harrison's murder, Defendants have deprived Plaintiff of his liberty interests in utilizing state procedures to obtain an acquittal and/or reduction

of his sentence, in violation of his right to Due Process of Law under the Fourteenth Amendment to the Constitution of the United States.

## Second Claim for Relief: Access to Courts

79.     Mr. Gutierrez has a fundamental right to access the courts, rooted in the First and Fourteenth Amendments, which requires that the states make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies. State law must ensure that prisoners like Mr. Gutierrez have meaningful access to post-conviction remedies in order to vindicate this right. *Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to effectuate their constitutional right of access to courts).

80.     As alleged above, Mr. Gutierrez has available remedies under Texas law for access to post-conviction DNA testing, to judicial relief from his conviction and death sentence, and to executive clemency, based on the exculpatory results of such testing. And, as alleged above, Texas's restrictive procedure for obtaining access to DNA testing under Article 64, and the CCA's interpretation thereof, is not adequate, meaningful, or effective.

81.     Mr. Gutierrez incurred actual injury when the CCA denied his request for DNA testing that could potentially produce exculpatory evidence, and thus provide him with relief from his conviction and death sentence.

82.     As stated above, the CCA's unreasonable interpretation of Article 64 has prevented Mr. Gutierrez from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder, and that he is innocent of the death penalty. These failures have deprived Mr. Gutierrez of his fundamental right to access the courts under the First and Fourteenth Amendments.

## Third Claim for Relief: Cruel and Unusual Punishment

83.     Mr. Gutierrez re-alleges and incorporates herein by reference all the allegations contained in the preceding paragraphs of this Complaint.

84.     The Eighth Amendment's prohibition on cruel and unusual punishment prevents the execution of a prisoner, like Mr. Gutierrez, who has viable claims of innocence of the death penalty, or to establish mitigation related to the circumstances of the offense, without first affording the opportunity to prove innocence or mitigation. As construed by the CCA, Chapter 64 bars DNA testing where the evidence could change the outcome at capital sentencing, even if it did not also change the outcome at trial. Because Texas law does not allow for DNA testing under such circumstances, Article 64 violates the Eighth Amendment prohibition on cruel and unusual punishment.

## Fourth Claim for Relief: Establishment Clause

85.     The First Amendment of the United States Constitution commands that "Congress shall make no law respecting an establishment of religion." U.S. Const.,

amend. I. This command is similarly binding on the states. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). It is well-settled that the Establishment Clause not only prohibits governmental entities from passing laws that prefer one or more religions over others, but also those that demonstrate a hostility toward religion. *See Larson v. Valente*, 456 U.S. 228, 246 (1982); *Zorach v. Clauson*, 343 U.S. 306, 313-15 (1952); *Everson v. Bd. Of Ed. Of Ewing Twp.*, 330 U.S. 1, 15 (1947) ("Neither a state nor the Federal Government . . . can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.").

86.     By precluding all chaplains and spiritual advisors from being present in the execution chamber, Defendants' amended policy violates the Establishment Clause, because it is not neutral between religion and non-religion and inhibits the practice of religious beliefs. *See Comm. for Public Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 788 (1973) (noting that, to maintain an attitude of neutrality toward religion, government cannot "advance[]" or "inhibit[]" religion).

87.     A law or policy that is not neutral between religion and non-religion, like TDCJ's amended policy, is inherently suspect. *See Larson*, 456 U.S. at 246. Such a law or policy may only be upheld if it passes strict scrutiny—in other words, if it is narrowly tailored to a compelling interest. *Id.* at 246-47. It is unclear what interest TDCJ believes this discriminatory policy serves.

88. Put in context of the Supreme Court's order in *Murphy v. Collier*, 139 S. Ct. 1475 (2019), Defendants' decision to prohibit all religious and spiritual advisers from entering the execution chamber demonstrates a hostility toward religion generally. Under the previous policy, Defendants followed a procedure to approve chaplains who were not a security threat to be present in the execution chamber. After the Supreme Court halted Patrick Murphy's execution on March 28, 2019, finding that the previous policy discriminated by denomination, Defendants chose not to apply that same process to approve spiritual advisers of other faiths but instead to bar all religious and spiritual advisers from the execution chamber. This action was hostile to religion generally. By denying all religious inmates access to a spiritual advisor at the time they are dying and when many believe they will be entering some form of an afterlife, TDCJ's policy favors non-religious inmates.

## Fifth Claim for Relief: Free Exercise of Religion

89. The First Amendment also commands that "Congress shall make no law . . . prohibiting the free exercise of" religion. U.S. Const., amend. I. Like the Establishment Clause, the Free Exercise Clause's command is binding on the states. *See Cantwell*, 310 U.S. at 303.

90. TDCJ's policy will prohibit Mr. Gutierrez's free exercise of his Christian faith in the crucial moments leading to his passage to the afterlife. The level of scrutiny to be applied when reviewing policies that hinder an individual's

ability to freely exercise his religion depends on whether the law is neutral and generally applicable. As Justice Kennedy explained in *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), "a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. A law that does not satisfy both of these requirements "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.*; *see also Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1734 (2018) (Gorsuch, J., concurring).

91. TDCJ's policy is not neutral because it evinces a hostility toward religion and thereby favors non-religious inmates over religious inmates. Accordingly, the policy is permissible only if it can survive strict scrutiny. The policy cannot survive strict scrutiny, at least not in cases like Mr. Gutierrez's, where the TDCJ already has chaplains who have been approved to enter execution chambers, have been present in the chamber for past executions, and are willing to do so for Mr. Gutierrez's execution.

### Sixth Claim for Relief: RLUIPA

92. If this Court finds that TDCJ's policy does not interfere with Mr. Gutierrez's rights pursuant to the Free Exercise Clause, it should nonetheless find that the policy violates RLUIPA.

31

93. "In RLUIPA, in an obvious effort to effect a complete separation from the First Amendment case law, Congress deleted reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-5(7)(A)). Accordingly, if the Court concludes that TDCJ's policy does not violate Mr. Gutierrez's rights pursuant to the Free Exercise Clause because the presence of a Christian chaplain at his death is not compelled by his religion, the Court should nevertheless find that TDCJ's policy violates RLUIPA. Prohibiting Mr. Gutierrez from being guided at the time of death by a Christian chaplain is an explicit and substantial burden on religious exercise. *See, e.g.*, *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (where prisoner shows exercise of religion "grounded in a sincerely held religious belief," enforced prohibition "substantially burdens his religious exercise").

**Request for Injunctive Relief: Release of Evidence for Testing**

94. For the reasons stated above, the Constitution requires declaratory relief that the denial of DNA testing to Mr. Gutierrez violates the Constitution and that Mr. Gutierrez be afforded the opportunity to conduct DNA testing on the evidence identified in this Complaint. Further, Mr. Gutierrez requests injunctive relief compelling those Defendants who are custodians of the evidence identified in this

Complaint to release the evidence designated below for DNA testing. Accordingly, Mr. Gutierrez asks this Court to grant prospective injunctive relief compelling the Defendants to release the evidence identified in this Complaint so that the requested DNA testing can be accomplished.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide relief as follows:

1.     A declaratory judgment that Article 64 of the Texas Code of Criminal Procedure, as applied by the CCA, is unconstitutional because:

  a.     It imposes a fundamentally unfair limitation, in violation of due process and the First Amendment right of access to the courts, upon Plaintiff's access to statutory remedies available under Texas law, and deprives Plaintiff of adequate, effective and meaningful access to such remedies. Those remedies include: (1) the statutory right to access post-conviction DNA testing pursuant to Article 64; (2) the statutory right to habeas relief for constitutional violations pursuant to Articles 11.071 and 11.073 of the Texas Code of Criminal Procedure based on exculpatory DNA evidence; and (3) executive clemency based on exculpatory DNA results.

  b.     It denies Plaintiff the protection of the Eighth Amendment of the Constitution, which requires that death sentences be reliable, and therefore guarantees persons facing the death penalty access to test evidence where realistically possible exculpatory results can prove innocence of the crime, innocence of the death penalty, or relevant mitigating factors concerning the circumstances of the offense.

2.     A preliminary and permanent injunction requiring Defendants to produce and release for DNA testing the evidence set forth below, pursuant to an

appropriate protocol regarding chain of custody and preservation and return of such evidence after testing has been completed:

- blood sample taken from the victim Escolastica Harrison retained by the Texas DPS McAllen Laboratory pending pick up by the District Attorney;

- nightgown belonging to Ms. Harrison that may have touch DNA from her assailant(s);

- shirt belonging to the victim's nephew and housemate, Avel Cuellar, containing apparent blood stains retained by the Texas DPS McAllen Laboratory pending pick up by the District Attorney;

- nail scrapings taken from victim during an autopsy and submitted to Det. Hernandez as part of rape examination;

- blood samples collected from a bathroom, from a raincoat located in or just outside Avel Cuellar's bedroom, and from the sofa in the front room of the victim's house; and

- a single loose hair found around the third digit of the victim's left hand recovered during an autopsy but never submitted to any lab for analysis.

3.   A declaratory judgment that TDCJ's policy violates Mr. Gutierrez's rights under the First Amendment's Establishment and Free Exercise Clauses.

4.   A declaratory judgment that TDCJ's policy violates RLIUPA.

5.     A preliminary and permanent injunction prohibiting Defendants from executing Mr. Gutierrez until they can do so in a way that does not violate his rights.

Respectfully submitted,


/s/  Peter Walker
Peter Walker
Assistant Federal Defender
Federal Community Defender for the
  Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
peter_walker@fd.org

/s/  Richard W. Rogers, III
Richard W. Rogers, III
3636 S. Alameda St., Ste. D191
Corpus Christi, TX  78411
(361) 888-7620
rwrogersiii@aol.com


Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I served the foregoing pleading and the attachments thereto on the following person by ECF filing and first class mail:

Jefferson David Clendenin
Fredericka Sargent
Edward Larry Marshall
Assistant Attorneys General
Office of the Attorney General of Texas
Post Office Box 12548
Austin, Texas 78711-2548


/s/ Peter Walker
Peter Walker


Dated:        September 26, 2019