IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RUBEN GUTIERREZ, | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 1:19-CV-185 |
| v. | § | *DEATH PENALTY CASE* |
| | § | |
| LUIS V. SAENZ, et al., | § | |
| *Defendants*. | § | |

_____

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED
COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION
AND FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF
CAN BE GRANTED**

_____

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

JAY CLENDENIN
Assistant Attorney General
State Bar No. 24059589
    *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *jay.clendenin@oag.texas.gov*

EDWARD SANDOVAL
First Assistant District Attorney,
Cameron County, Texas

RENE DE COSS
City Attorney, Brownsville, Texas

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF THE CASE ....................................................................... 2

I.    Facts of the Crime ............................................................................... 2

    A.    The capital murder ..................................................................... 2

    B.    The punishment-phase ................................................................ 5

        1.    The State's punishment case .............................................. 5

        2.    Plaintiff's punishment evidence ........................................ 6

II.   Trial, Direct Appeal, and Postconviction Proceedings ............................ 7

SUMMARY OF THE ARGUMENT ............................................................. 10

ARGUMENT ............................................................................................... 11

I.    The Standards of Review ................................................................... 11

    A.    Federal Rule of Civil Procedure 12(b)(1) ...................................... 11

    B.    Federal Rule of Civil Procedure 12(b)(6) ...................................... 12

II.   The Court Should Deny Plaintiff's Request for a Stay of Execution .... 13

III.  Plaintiff Lacks Standing to Bring Suit Against Defendants Because His Requests for Relief Are, in Fact, a Mandamus Request Beyond this Court's Jurisdiction ................................................................................ 17

IV.   Plaintiff's Chaplain Claims Should Be Dismissed for Failure to Exhaust Administrative Remedies ...................................................................... 20

V.    Plaintiff's Claims Should Be Dismissed for Lack of Subject Matter Jurisdiction .......................................................................................... 26

i

A.  Defendants are entitled to Eleventh Amendment immunity to the extent Plaintiff seeks anything beyond declaratory and injunctive relief ............................................................... 26

    1.  Eleventh Amendment immunity standard ........................ 26

    2.  Plaintiff fails to establish an exception to Defendants' Eleventh Amendment immunity ......................................... 27

B.  Plaintiff's DNA claims are barred by the *Rooker-Feldman* doctrine ................................................................. 30

VI.  Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim ................................................................. 33

A.  Plaintiff's DNA claims are barred by the applicable statute of limitations ...................................................... 33

B.  Saenz has absolute immunity from suit ...................................... 36

C.  Plaintiff's due process claims are barred by the doctrine of issue preclusion ........................................................ 37

D.  Plaintiff's claims alleging that his execution would be unconstitutional are only cognizable in habeas corpus .............. 38

E.  Plaintiff's DNA claims are patently meritless ............................ 39

    1.  Texas's statutory framework adequately protects inmates' rights during postconviction DNA proceedings ................. 40

    2.  The CCA's well-founded conclusion that Plaintiff failed to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results were obtained does not offend fundamental fairness ................................. 46

    3.  Relief cannot be granted on Plaintiff's access-to-courts claim because it fails as a matter of law ...................................... 60

    4.  Relief cannot be granted on Plaintiff's Eighth Amendment claim because it fails as a matter of law ............................. 61

F.    Plaintiff's Chaplain claims fail as a matter of law........................ 62

    1.    Background ................................................................ 62

    2.    The RLUIPA claim...................................................... 63

    3.    The Establishment Clause claim ........................................ 69

    4.    The Free Exercise Clause claim......................................... 72

CONCLUSION........................................................................ 73

CERTIFICATE OF SERVICE.......................................................... 75

# TABLE OF AUTHORITIES

**Cases**                                                           **Page**

*Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004)......................................... 63, 64

*Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d 507 (5th Cir. 2017)........... 29

*Alexander v. Tippah Co., Mississippi*, 351 F.3d 626 (5th Cir. 2003) .............. 25

*Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593 (5th Cir. 2017)............... 35

*Alvarez v. Attorney Gen. for Fla.*, 679 F.3d 1257 (11th Cir. 2012)..........*passim*

*Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067 (2019) ................... 70, 72

*Amir-Sharif v. Gonzalez*, 2007 WL 1411427 (N.D. Tex. May 14, 2007) ......... 25

*Anderson v. State*, 831 A.2d 858 (Del. 2003) ..................................................... 52

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................. 12

*Atkins v. Virginia*, 536 U.S. 304 (2002) ........................................................... 44

*Barefoot v. Estelle*, 463 U.S. 880 (1983) .......................................................... 14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................. 12, 13

*Blacklock v. State*, 235 S.W.3d 231 (Tex. Crim. App. 2007) ........................... 51

*Bobby v. Bies*, 556 U.S. 825 (2009).................................................................... 44

*Booth v. Churner*, 532 U.S. 731 (2001) ....................................................... 20, 22

*Brookins v. Bristol Tp. Police Dept.*, 642 F. App'x 80 (3d Cir. 2016)............... 35

*Brown v. Collier*, 929 F.3d 218 (5th Cir. 2019) ........................................*passim*

*Burden v. Maness*, 2014 WL 4651609 (E.D. Tex. Sept. 17, 2014) ................... 60

*Burton v. Stewart*, 549 U.S. 147 (2007) ........................................................... 39

iv

*Campos v. Yenne*, 699 F. App'x 323 (5th Cir. 2017) ........................................ 52

*Cantwell v. Sterling*, 2016 WL 7971768 (W.D. Tex. May 18, 2016) ............... 25

*Carty v. Tex. Dep't of Pub. Safety*, 2006 WL 3332589 (E.D. Tex. 2006) ........ 27

*Cooper v. Ramos*, 704 F.3d 772 (9th Cir. 2012) ........................................ 32, 33

*Cory v. White*, 457 U.S. 85 (1982) .................................................................. 27

*Coury v. Prot*, 85 F.3d 244 (5th Cir. 1996) ...................................................... 11

*Cromartie v. Shealy*, 941 F.3d 1244 (11th Cir. 2019) ................... 40, 45, 52, 61

*Cruz v. Beto*, 405 U.S. 319 (1972) .................................................................. 68

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ...................................................... 49

*Cunningham v. Dist. Attorney's Office for Escambia County*, 592 F.3d 1237 (11th Cir. 2010) ............................................................................................... 43

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ............................................ 66, 67, 69

*Davis v. Lansing*, 851 F.2d 72 (2d Cir. 1988) ................................................. 19

*Dawson v. Suthers*, 2015 WL 5525786 (D. Colo. Sept. 21, 2015) ................... 58

*Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010) ............................................... 21

*District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009) ..................................................................................................... *passim*

*District of Columbia Court of Appeals v. Feldman*, 460 U.S. 476 (1983) ....... 30

*Dunning v. State*, 572 S.W.3d 685 (Tex. Crim. App. 2019) ............................ 57

*Edelman v. Jordan*, 415 U.S. 651 (1974) ........................................................ 26

*Elam v. Lykos*, 470 F. App'x 275 (5th Cir. 2012) ............................................ 59

*Emerson v. Thaler*, 544 F. App'x 325 (5th Cir. 2013) ................................ 29, 38

*Engle v. Isaac*, 456 U.S. 107 (1982) ................................................... 46

*Esteves v. Brock*, 106 F.3d 674 (5th Cir. 1997) ................................. 37

*Ex parte Pruett*, 458 S.W.3d 535 (Tex. Crim. App. 2015) ................. 51

*Ex parte Young*, 209 U.S. 123 (1908) ........................................ 27, 28

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005) ............ 30

*Faulder v. Texas Bd. of Pardons & Paroles*, 178 F.3d 343 (5th Cir. 1999) ..... 61

*Fegans v. Johnson*, 2010 WL 1425766 (S.D. Tex. Apr. 8, 2010) ..................... 21

*Ford v. Wainwright*, 477 U.S. 399 (1986) ......................................... 61

*Garcia v. Castillo*, 431 F. App'x 350 (5th Cir. 2011) ........................... 16, 41, 42

*Garcia v. Sanchez*, 793 F. Supp. 2d 866 (W.D. Tex. 2011) ............................. 43

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) ...................................... 24

*Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012) ........................................ 20, 25

*Gonzalez v. Wyatt*, 157 F.3d 1016 (5th Cir. 1998) ............................... 34

*Hall v. State*, 569 S.W.3d 646 (Tex. Crim. App. 2019) ........................... 57

*Harris v. Lykos*, 556 F. App'x 351 (5th Cir. 2014) .............................. 52

*Harris v. Lykos*, 2013 WL 1223837 (5th Cir. 2013) ........................... 13

*Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320 (5th Cir. 2005) ................................................. 37

*Heck v. Humphrey*, 512 U.S. 477 (1994) ................................... 38, 62

*Hicks v. Lingle*, 370 F. App'x 497 (5th Cir. 2010) .................... 24, 25

*Hicks v. Quaker Oats Co.*, 662 F.2d 1158 (5th Cir. 1981) ................. 37

*Hill v. McDonough*, 547 U.S. 573 (2006) .............................................. 13, 14, 15

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ........................................ 14

*Holberg v. State*, 425 S.W.3d 282 (Tex. Crim. App. 2014) ............................... 48

*Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006 (5th Cir. 1998) ...................................................................... 11

*House v. Bell*, 547 U.S. 518 (2006) ............................................ 43, 49

*Howery v. Allstate Ins. Co.*, 243 F.3d 912 (5th Cir. 2001) ............................. 11

*In re Katrina Canal Breaches Litig*, 495 F.3d 191 (5th Cir. 2007) .......... 12, 13

*In re Moore*, 1990 WL 165776 (4th Cir. Nov. 1, 1990) ..................................... 19

*In re Morton*, 326 S.W.3d 634 (Tex. Crim. App. 2010) ............................... 51, 57

*In re Pruett*, 784 F.3d 287 (5th Cir. 2015) ................................................. 39, 62

*In re Smith*, 349 F. App'x 12 (6th Cir. 2009) ..................................... 32

*Jefferson v. Loftin*, 2005 WL 4541891 (N.D. Tex. March 16, 2005) ............... 25

*Johnson v. Cheney*, 313 F. App'x 732 (5th Cir. 2009) ...................................... 25

*Jones v. Bock*, 549 U.S. 199 (2007) ................................................... 20

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) ............................. 34

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) ................................... 28

*Kentucky v. Graham*, 473 U.S. 159 (1985) .......................................... 27

*Kutzner v. State*, 75 S.W.3d 427 (Tex. Crim. App. 2002) ................................. 58

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ......................................... 70

*Lewis v. Casey*, 518 U.S. 343 (1996) ................................................... 60

vii

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................ 17

*Lyng v. Nw. Indian Cemetery Protective Assoc.*, 485 U.S. 439 (1988)............. 64

*Marks v. State*, 2010 WL 598459 (Tex. Crim. App. 2010) ......................... 16, 36

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004) ................................................................................................................ 12

*Martinez v. Tex. Dep't of Criminal Justice*, 300 F.3d 567 (5th Cir. 2002) ...... 27

*McDaniel v. Suthers*, 335 F. App'x 734 (10th Cir. 2009) ................................. 44

*McKithen v. Brown*, 626 F.3d 143 (2nd Cir. 2010)........................ 32, 44, 61, 62

*Medina v. California*, 505 U.S. 437 (1992) ................................................. 45, 47

*Meinhard v. State*, 371 P.3d 37 (Utah 2016) .................................................... 52

*Mesquiti v. Gallegos*, 2010 WL 2928168 (S.D. Tex. June 23, 2010)............... 25

*Moore v. Brown*, 295 F. App'x 176 (9th Cir. 2005) ......................................... 37

*Moon v. City of El Paso*, 906 F.3d 352 (5th Cir. 2018).............................. 27, 37

*Moore v. La. Bd. of Elementary and Secondary Educ.*, 743 F.3d 959 (5th Cir. 2014) ................................................................................................................ 27

*Moore v. Lockyer*, 2005 WL 2334350 (N.D. Cal. Sept. 23, 2005).................... 35

*Morrison v. Peterson*, 809 F.3d 1059 (9th Cir. 2015) ................................. 43, 51

*Mount v. Court of Criminal Appeals*, 2017 WL 6761860 (S.D. Tex. Nov. 20, 2017) ................................................................................................................ 19

*Moye v. Clerk, Dekalb Cnty. Superior Court*, 474 F.2d 1275 (5th Cir. 1973) . 18

*Murphy v. Collier*, 139 S. Ct. 1475 (2019) .................................................*passim*

*Murphy v. Collier*, 942 F.3d 704 (5th Cir. 2019) .......................................*passim*

*Murphy v. Collier*, 919 F.3d 913 (5th Cir. 2019) ............................................... 22

*Murphy v. Collier*, 423 F. Supp. 3d 355 (S.D. Tex. 2019) ............................... 22

*Murphy v. Collier*, 376 F. Supp. 3d 734 (5th Cir. 2019) ................................. 22

*Murray v. Giarratano*, 492 U.S. 1 (1989) .................................................. 49, 61

*Nelson v. Campbell*, 541 U.S. 637 (2004)........................................ 13, 14, 21, 23

*Nken v. Holder*, 556 U.S. 418 (2009).................................................................. 14

*Norton v. Enns*, 2014 WL 3947158 (N.D. Tex. 2014) ...................................... 18

*Ochoa v. Collier*, 2020 WL 582397 (5th Cir. Feb. 4, 2020) ............................ 61

*Okpalobi v. Foster*, 244 F.3d 404 (5th Cir. 2001) ............................................ 28

*Osborne v. Dist. Attorney's Office for the Third Judicial*, 521 F.3d 1118 (9th Cir. 2008) ................................................................................................................ 49

*Padilla v. Watkins*, No. 3:11-CV-2232-M, 2012 WL 1058143 (N.D. Tex. Feb. 2, 2012) ................................................................................................................ 35

*Pennhurst State Sch. & Hosp. v. Haldeman*, 465 U.S. 89 (1984).................... 26

*Pennsylvania v. Finley*, 481 U.S. 551 (1987) .................................................. 49

*Pettway v. McCabe*, 510 F. App'x 879 (11th Cir. 2013).................................... 35

*Powe v. Ennis*, 177 F.3d 393 (5th Cir. 1999) .................................................... 25

*Pruett v. Choate*, 711 F. App'x 203 (5th Cir. 2017) .................................*passim*

*Pruett v. Choate*, 2017 WL 4277206 (S.D. Tex. Sept. 25, 2017) ..................... 19

*Quinonez v. Texas*, No. H-16-0822, 2016 WL 2894920 (S.D. Tex. May 17, 2016) ................................................................................................................ 35

*Raby v. State*, 2015 WL 1874540 (Tex. Crim. App. Apr. 22, 2015) ................. 48

*Raby v. State*, 2005 WL 8154134 (Tex. Crim. App. 2005) ............................... 51

*Ramirez v. McCraw*, 715 F. App'x 347 (5th Cir. 2017) ............................*passim*

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) .............................. 11

*Raulerson v. Warden*, 928 F.3d 987 (11th Cir. 2019)....................................... 44

*Reed v. State*, 541 S.W.3d 759 (Tex. Crim. App. 2017) .................................... 48

*Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*,
428 F.3d 1139 (8th Cir. 2005)........................................................................ 29

*Rivera v. Illinois*, 556 U.S. 148 (2009) ............................................................. 46

*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) ........................................... 30

*Ross v. Blake*, 136 S. Ct. 1850 (2016)......................................................... 21, 23

*Roughley v. Watkins*, 2014 WL 5313957 (N.D. Tex. Sept. 22, 2014) ............. 59

*Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008)............................... 51

*Russell v. Board of Trustees*, 968 F.2d 489 (5th Cir. 1992) ............................ 34

*Ryan v. Gonzales*, 568 U.S. 57 (2013) .............................................................. 49

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) .................................. 70

*Savory v. Lyons*, 469 F.3d 667 (7th Cir. 2006) .................................... 34, 35, 36

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996) ................................................. 26

*Sepulvado v. Louisiana Bd. of Pardons and Parole*, 114 F. App'x 620 (5th Cir.
2004) .............................................................................................................. 61

*Sherbert v. Verner*, 374 U.S. 398 (1963) ......................................................... 64

*Skinner v. State*, 484 S.W.3d 434 (Tex. Crim. App. 2016)........................ 16, 36

*Skinner v. Switzer*, 562 U.S. 521, 532 (2011) .................................. 31, 38, 40, 41

*Smith v. Phillips*, 455 U.S. 209 (1982)................................................................ 50

*Smith v. State*, 165 S.W.3d 361 (Tex. Crim. App. 2005)................................. 51

*State v. Long*, 2015 WL 2353017 (Tex. App.—Waco, May 14, 2015) ............. 51

*State v. Patrick*, 86 S.W.3d 592 (Tex. Crim. App. 2002) ................................. 16

*Steph v. Scott*, 840 F.2d 267 (5th Cir. 1988)..................................................... 31

*Stockman v. Fed. Election Comm'n*, 138 F.3d 144 (5th Cir. 1998)............ 11, 26

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................... 53

*Swearingen v. Sharon Keller, et. al.*, No. A-16-CV-1181 (W.D. Tex. July 7, 2017)
.......................................................................................................................... 18, 59

*Thacker v. State*, 177 S.W.3d 926 (Tex. Crim. App. 2005).............................. 48

*Thompson v. Rundle*, 393 F. App'x 675 (11th Cir. 2010)................................ 52

*Trevino v. Thaler*, 569 U.S. 413 (2013) ........................................................... 49

*Turner v. Safley*, 482 U.S. 78 (1987) ........................................................... 71, 72

*Underwood v. Wilson*, 151 F.3d 292 (5th Cir. 1998) ....................................... 25

*United States v. Bagley*, 473 U.S. 667 (1985) .................................................. 53

*United States v. Jordan*, 594 F.3d 1265 (10th Cir. 2010)............................... 52

*United States v. Shepherd*, 23 F.3d 923 (5th Cir. 1994) ................................. 30

*Valentine v. Collier*, --- F.3d ---, 2020 WL 1934431 (5th Cir. Apr. 22, 2020).. 23

*Vogt v. Board of Comm'rs, Orleans Levee Dist.*, 294 F.3d 684 (5th Cir. 2002) 27

*Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380 (5th Cir. 1989). 12

*Wade v. Monroe County Dist. Att'y*, 2020 WL 639207 (3d Cir. Feb. 11, 2020) 32

*Walker v. Epps*, 550 F.3d 407 (5th Cir. 2008) ................................................. 34

*Walker v. Epps*, 287 F. App'x 371 (5th Cir. 2008) ........................................... 15

*Warnoch v. Pecos*, 88 F.3d 341 (5th Cir. 1996) ................................................ 27

*Waters v. Texas*, 747 F. App'x 259 (5th Cir. 2019) ......................................... 19

*Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017) .......................................... 60

*Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013) ..................................... 60

*Whitley v. Albers*, 475 U.S. 312 (1986) ........................................................... 66

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .................................................... 17

*Willis v. Nelson*, 56 F.3d 1386, 1995 WL 337909 (5th Cir. 1995) .................. 34

*Wilson v. Epps*, 776 F.3d 296 (5th Cir. 2015) .................................................. 24

*Wilson v. Garcia*, 471 U.S. 261 (1985) ............................................................ 34

*Woodford v. Ngo*, 548 U.S. 81 (2006) .............................................................. 20

*Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir. 2001) ................................... 21

**Statutes, Rules, and Constitutional Provisions**

18 U.S.C. § 3626(a)(1)(A) ................................................................................. 68

28 U.S.C. § 1658 ............................................................................................... 34

28 U.S.C. § 2244(b)(3)(A) ................................................................................ 39

42 U.S.C. § 1983 ............................................................................................... 13

42 U.S.C. § 1997e(a) ......................................................................................... 20

42 U.S.C. § 2000 ............................................................................................ 1, 63

Colo. Rev. Stat. § 18-1-413 ............................................................................... 44

Fed. R. Civ. P. 12(b)(1) .................................................................. *passim*

Federal Rule of Civil Procedure 12(b)(6) ................................. 2, 12, 23

N.H. Rev. Stat. Ann. § 651-D:2(III) ......................................... 44

Tex. Civ. Prac. & Rem. Code § 16.003(a) ................................. 34

Tex. Code Crim. Proc. art. 38.43(c)(2)(A) ............................... 41

Tex. Code Crim. Proc. art. 64.01(a-1) ..................................... 41

Tex. Code Crim. Proc. art. 64.01(b)(1) .................................... 41

Tex. Code Crim. Proc. art. 64.01(b)(2)(A) ............................... 41

Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(i) ........................... 42

Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii) .......................... 42

Tex. Code Crim. Proc. art. 64.03(a)(1)(B) ............................... 42

Tex. Code Crim. Proc. art. 64.03(a)(2) .................................... 42

Tex. Code Crim. Proc. art. 64.03(a)(2)(A) ............................... 46

Tex. Code Crim. Proc. art. 64.035 ........................................... 28

Tex. Code Crim. Proc. art. 64.04 ............................................. 42

Tex. Code Crim. Proc. art. 64.05 ............................................. 42

Tex. Const. art. 5, § 5 .............................................................. 27

Tex. Gov't Code § 501.008 ....................................................... 21

U.S. Const. amend. I ................................................................ 69

U.S. Const. amend. XI .............................................................. 26

Va. Code Ann. § 19.2-327.1(A) ................................................ 44

Va. Code Ann. § 19.2-327.1(D) ........................................................................ 44

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RUBEN GUTIERREZ, | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 1:19-CV-185 |
| v. | § | *DEATH PENALTY CASE* |
| | § | |
| LUIS V. SAENZ, et al., | § | |
| *Defendants*. | § | |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED
COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION
AND FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF
CAN BE GRANTED**

Plaintiff Ruben Gutierrez is a Texas death row inmate who is currently

scheduled to be executed after 6:00 p.m. (CDT) on June 16, 2020. Plaintiff has

filed an amended civil-rights complaint asserting a denial of his rights under

the First, Eighth, and Fourteenth Amendments and the Religious Land Use

and Institutionalized Persons Act of 2000 (RLUIPA). [1] *See generally* Pl.'s

Amended Compl. Plaintiff specifically seeks prospective relief in the form of a

declaratory judgment that Texas Code of Criminal Procedure article 64 is

unconstitutional facially and as-applied to Plaintiff and that the Texas

Department of Criminal Justice's (TDCJ) execution protocol violates Plaintiff's

rights under the First Amendment and RLUIPA. Pl.'s Amended Compl. 36–38.

Plaintiff also seeks prospective injunctive relief in the form of a stay of

---

[1]     42 U.S.C. § 2000cc et seq.

1

execution and release of evidence for DNA testing. Pl.'s Amended Compl. 37–38. Defendants[2] respectfully move to dismiss the complaint for lack of subject matter jurisdiction and for failing to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(1), (6) (West 2020).

## STATEMENT OF THE CASE

## I.    Facts of the Crime

### A.    The capital murder

[Plaintiff] was convicted of capital murder and sentenced to death for his participation in the robbery and murder of eighty-five-year-old Escolastica Harrison. Mrs. Harrison lived with her nephew, Avel Cuellar, in a mobile-home park in Brownsville. She owned the mobile-home park, and her home doubled as the park's office. Mrs. Harrison did not trust banks, and, at the time of her murder, she had about $600,000 in cash hidden in her home. [Plaintiff] was one of the few people who knew about Mrs. Harrison's money. Mrs. Harrison had befriended [Plaintiff] because he was friends with her nephew, Avel. [Plaintiff] sometimes ran errands for Mrs. Harrison, and he borrowed money from her. [Plaintiff], Avel, and others routinely gathered behind Mrs. Harrison's home to drink and visit.

[Plaintiff], then 21 years old, orchestrated a plan to steal her money. On September 5, 1998, he and an accomplice, Rene Garcia—whom Mrs. Harrison did not know—entered Mrs. Harrison's home to carry out this plan. A third accomplice, Pedro Gracia, was the driver. When [Plaintiff] and Rene Garcia left with Mrs. Harrison's money, she was dead. Avel Cuellar found her body late that night—face down in a pool of blood. She had been severely

---

[2]    Defendants are Luis Saenz, Cameron County District Attorney, Felix Sauceda, Jr., Chief, Brownsville Police Department, Bryan Collier, Executive Director, TDCJ, Lorie Davis, Director, TDCJ, and Billy Lewis, Warden, TDCJ. Plaintiff sued each Defendant in his or her official capacity. Pl.'s Amended Compl. 4–5.

beaten and stabbed numerous times. Mrs. Harrison's bedroom was in disarray, and her money was missing.

The next day, detectives canvassed the area for information. Detective Garcia, the lead investigator, already knew that [Plaintiff's] drinking buddies—Avel Cuellar, Ramiro Martinez, and Crispin Villarreal—had all said that [Plaintiff] was in the trailer park the evening of the murder. Another witness, Julio Lopez, also said [Plaintiff] was there.[3]

On September 8, 1998, detectives went to [Plaintiff]'s home. He was not there, but his mother said she would bring him to the police station. The next day, [Plaintiff] voluntarily came to the police station to make a statement. He gave an alibi.  He said he had seen Avel Cuellar and another friend, Ramiro Martinez, at the trailer park on the Friday before the murder, but on the Saturday of the murder, he drove around with Joey Maldonaldo in Maldonaldo's Corvette all day long. They were nowhere near Mrs. Harrison's mobile-home park. When police asked him if he had his days mixed up, [Plaintiff] cut off questioning. The alibi did not pan out. Joey Maldonaldo's statement did not mesh with [Plaintiff]'s.

Four days later, as a result of statements given by [Plaintiff's] two accomplices, Rene Garcia and Pedro Gracia, and their own investigation, the police obtained an arrest warrant for [Plaintiff]. He made a second statement.  This time, he admitted that he had planned the "rip off," but said that he had waited at a park while Rene Garcia and Pedro Gracia did it. He said that when his two cohorts came to pick him up, Rene Garcia was holding a screwdriver covered in blood and said that he had killed Mrs. Harrison. Rene Garcia and Pedro Gracia had taken a blue suitcase and a tackle/tool box full of money. [Plaintiff] said, "There was no doubt about the fact that I planned the whole rip off but I never wanted for either one of them to kill Mrs. Harrison. When I saw that Pedro was grabbing the money from the tackle/tool box and heard some crumbling plastic I decided that I did not want any

---

[3]     Mr. Lopez did not know [Plaintiff]. The police showed him some "loose photos," and he picked out [Plaintiff] in "a few seconds" and was "absolutely positive" about that identification. But by the time of trial, Mr. Lopez was not able to identify [Plaintiff] in person.

money that they had just ripped off." [Plaintiff] told the police that his accomplices had told him where they had thrown the blue suitcase away. [Plaintiff] led the detectives to a remote area, but when the officers could not find the blue suitcase, [Plaintiff] was allowed out of the car, and he walked straight to it.

The next day [Plaintiff] made a third statement, admitting that he had lied in his previous one "about being dropped off in the park, about not being with Rene." He said Pedro Gracia drove the truck and dropped him and Rene Garcia off at Mrs. Harrison's home. The initial plan was for Rene Garcia to lure Mrs. Harrison out of her home by asking to see a trailer lot. Then [Plaintiff] would come around from the back of her home, run in, and take the money without her seeing him. But when [Plaintiff] ran around to the front, Rene Garcia and Mrs. Harrison were still inside the house. [Plaintiff] said Rene Garcia knocked out Mrs. Harrison by hitting her, and then he repeatedly stabbed her with a screwdriver. The screwdriver "had a clear handle with red, it was a standard screwdriver. We had got the screwdriver from the back of the truck in a tool box along with another screwdriver, a star type." [Plaintiff] gathered the money. "When he started stabbing her, I pulled out the blue suitcase from the closet and the black tool box fell. It opened when it fell and I saw the money." [Plaintiff] tossed the tool box to Rene Garcia, and headed out the door with the blue suitcase. Rene Garcia followed, and Pedro Gracia pulled the truck around to pick them up. Pedro Gracia dropped them off down a caliche road and [Plaintiff] filled "up the little tool box with the money that was in the suitcase," while Rene Garcia filled up his shirt. They abandoned the suitcase, and Pedro Gracia picked them up and drove [Plaintiff] home.

Much of the money was recovered. [Plaintiff's] wife's cousin, Juan Pablo Campos, led police to $50,000 that [Plaintiff] had given him to keep safe. . . .

The jury was instructed that it could convict [Plaintiff] of capital murder if it found that [Plaintiff] "acting alone or as a party" with the accomplice intentionally caused the victim's death. The jury returned a general verdict of guilt, and, based on the jury's findings at the punishment phase, the trial judge sentenced [Plaintiff] to death.

*Ex parte Gutierrez*, 337 S.W.3d 883, 886–88 (Tex. Crim. App. 2011) (footnote

omitted).

## B.   The punishment-phase

### 1.   The State's punishment case

At punishment, the prosecution presented evidence of [Plaintiff]'s
involvement with the criminal justice system since he was 14-
years old. As a juvenile, [Plaintiff] committed several burglaries,
he assaulted a police officer, and he threatened to kill a teacher
and a security officer. Attempts to rehabilitate [Plaintiff] in
various juvenile detention facilities were unsuccessful. [Plaintiff]
was a disciplinary problem in these facilities and he often escaped
from them.

As an adult, [Plaintiff] committed various misdemeanor offenses.
He also was convicted of forgery. While doing time in Cameron
County Jail on this state jail conviction, [Plaintiff] instigated an
"almost riot" because county jail employees would not give him any
Kool-Aid. Shortly thereafter [Plaintiff] complained about cold
coffee and threw it at a guard.

While awaiting trial for this offense, [Plaintiff] was assigned to the
"high risk" area of the Cameron County Jail from where [Plaintiff],
the accomplice, and another individual attempted an escape
during which [Plaintiff] told a guard not to interfere or he would
be "shanked." Immediately following the jury's guilt/innocence
verdict in the instant case, [Plaintiff] said that he might kill an
assistant district attorney.

*Gutierrez v. State*, No. 73,462, slip op. at 6 (Tex. Crim. App. 2002)

(unpublished opinion).

### 2.     Plaintiff's punishment evidence

The defense presented the testimony of Dr. Jonathan Sorenson, an expert on future dangerousness. 24 RR 4–47.[4] Dr. Sorenson testified regarding the actuarial method of assessing an inmate's potential for future dangerousness. 24 RR 13–15. He stated that data indicates murderers made the best inmates. 24 RR 17. He also testified regarding studies that had been conducted showing that inmates who were incarcerated for homicide were at a very low likelihood of committing another homicide. 24 RR 19–22. Moreover, Dr. Sorenson testified that an inmate's age was the best predictor of future dangerousness. 24 RR 24. Finally, Dr. Sorenson testified that a twenty-one-year-old inmate with a prior criminal record was not more likely than not to commit violent acts. 24 RR 27.

The defense also presented the testimony of Plaintiff's aunt, Hilda Garcia. 24 RR 49–70. She testified that Plaintiff was easy-going and was a responsible husband and father. 24 RR 56. She also testified that Plaintiff was lovable and caring and helpful to people who need help. 24 RR 57.

---

[4]     "RR" refers to the "Reporter's Record," the state record of transcribed trial and punishment proceedings, preceded by volume number and followed by the internal page number(s).

## II.     Trial, Direct Appeal, and Postconviction Proceedings

Plaintiff was convicted and sentenced to death for the murder of Escolastica Harrison. The Texas Court of Criminal Appeals (CCA) upheld Plaintiff's conviction and death sentence. *Gutierrez v. State*, No. 73,462, slip op. at 21. Following a remand to the trial court regarding claims of ineffective assistance of counsel,[5] the CCA denied Plaintiff's state habeas application based on the trial court's findings of fact and conclusions of law and based on its own review. *Ex parte Gutierrez*, 2008 WL 2059277, at *1 (Tex. Crim. App. May 14, 2008); SHCR-01 at 86-94.[6]

Plaintiff then filed his federal petition. Pet., *Gutierrez v. Stephens*, No. 1:09-CV-22 (S.D. Tex. Jan. 26, 2009). This Court granted Plaintiff a stay of the proceedings so that he could return to state court to pursue additional claims. Order, *Id*. (S.D. Tex. Apr. 28, 2009).

Plaintiff sought the appointment of counsel for purpose of filing a motion for DNA testing. Plaintiff's request was denied. *Gutierrez v. State*, 307 S.W.3d 318, 319 (Tex. Crim. App. 2010). Thereafter, Plaintiff unsuccessfully sought DNA testing in state court. *Ex parte Gutierrez*, 337 S.W.3d at 901–02. He then filed a subsequent state habeas application, which was dismissed as an abuse

---

[5]     *Ex parte Gutierrez*, 2004 WL 7330936, at *1 (Tex. Crim. App. Sept. 15, 2004).

[6]     "SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court.  *See generally Ex parte Gutierrez*, No. 59,552-01.

of the writ. Order, *Ex parte Gutierrez*, No. 59,552-02 (Tex. Crim. App. Aug. 24, 2011).

This Court then lifted its stay and denied habeas corpus relief and a certificate of appealability (COA). Order, *Gutierrez v. Stephens*, No. 1:09-CV-22 (S.D. Tex. Oct. 3, 2013). The Fifth Circuit denied Plaintiff's application for a COA. *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014), *cert. denied*, 136 S. Ct. 35 (2015).

In April 2018, the state trial court scheduled Plaintiff's execution. Plaintiff's appointed counsel later filed a motion to withdraw and for substitution of counsel, which this Court granted. Order, *Gutierrez v. Davis*, No. 1:09-CV-22 (S.D. Tex. Aug. 6, 2018). Plaintiff's substituted counsel then filed a motion for appointment of supplemental counsel, which this Court granted. Order, *Id.* (S.D. Tex. Aug. 14, 2018). Plaintiff filed a motion for a stay of execution, which this Court granted. Order, *Id.* (S.D. Tex. Aug. 22, 2018). The Fifth Circuit denied the Respondent's motion to vacate the stay of execution. Order, *Gutierrez v. Davis*, No. 18-70028 (5th Cir. Sept. 10, 2018).

In June 2019, Plaintiff moved in the state trial court for DNA testing. The court initially granted the motion but later withdrew its order and denied Plaintiff's motion. Pl.'s App. at 001–004. Plaintiff appealed the trial court's denial of his motion for DNA testing, and the CCA affirmed the trial court's

order.[7] *Gutierrez v. State*, 2020 WL 918669, at *9 (Tex. Crim. App. Feb. 26, 2020).

On or about August 19, 2019, Plaintiff filed with TDCJ an Offender Grievance form requesting that a Christian chaplain be allowed to be present in the execution chamber during the execution. Pl.'s App. at 016–17. Plaintiff states that "TDCJ has not yet granted or denied" the grievance. Pl.'s Amended Compl. 15.

Plaintiff filed in this Court a civil-rights complaint. Plaintiff later requested, and was granted, a stay of these proceedings to await the CCA's decision in his appeal of the trial court's order denying his request for DNA testing. Order, *Gutierrez v. Saenz, et al.*, No. 1:19-CV-185 (S.D. Tex. Jan. 7, 2020). This Court lifted the stay following the CCA's decision, Order, *Id.* (S.D. Tex. March 9, 2020), and Plaintiff filed an Amended Complaint. Defendants move to dismiss Plaintiff's Amended Complaint.

---

[7]     The trial court scheduled Plaintiff's execution for October 30, 2019. Plaintiff filed in the CCA a motion for leave to file an application for a writ of mandamus challenging the validity of the then-pending execution warrant. The CCA stayed Plaintiff's October 30, 2019 execution and ordered the trial court and District Clerk to provide additional information. Order, *In re Gutierrez*, No. 59,552-03 (Tex. Crim. App. Oct. 22, 2019). The CCA dismissed Plaintiff's motion as moot on February 26, 2020. Order, *Id.* (Tex. Crim. App. Feb. 26, 2020). Plaintiff also filed a direct appeal of the trial court's order denying his motion to recall the order and warrant related to the scheduled October 30, 2019 execution. Plaintiff withdrew the appeal, and the CCA dismissed it. Op., *Gutierrez v. State*, No. AP-77,090 (Tex. Crim. App. Oct. 11, 2019).

## SUMMARY OF THE ARGUMENT

Plaintiff raises two challenges. The first is to the constitutionality of Texas's postconviction DNA statute, Chapter 64 of the Texas Code of Criminal Procedure, as construed by the CCA and asks that this Court order DNA testing (DNA claims). Pl.'s Amended Compl. 19–32. The second challenge asks this Court to invalidate TDCJ's execution protocol and order that TDCJ permit the presence of a Christian chaplain in the execution chamber during Plaintiff's execution (Chaplain claims). Pl.'s Amended Compl. 32–36.

Plaintiff's DNA claims must be dismissed for lack of jurisdiction. The claims fundamentally request mandamus relief—to force state and county actors to release evidence for DNA testing—but this Court has no jurisdiction to so order. The Court also lacks jurisdiction because Plaintiff is simply attacking a state court's opinion rather than the State's postconviction DNA testing statutory scheme.

Plaintiff's DNA claims should also be dismissed for failure to state a claim upon which relief may be granted. His claims are undeniably untimely under the applicable two-year statute of limitations. Plaintiff also fails to state a claim for which relief may be granted because the state court's denial of DNA testing did not violate fundamental fairness, it did not bar him access to the courts, it does not constitute cruel and unusual punishment, and it did not deny him the opportunity to prove his innocence.

Plaintiff's Chaplain claims must be dismissed for lack of jurisdiction because they also seek mandamus relief, i.e., to compel a state actor to behave in a particular manner. Plaintiff's Chaplain claims must also be dismissed because they were brought prior to exhaustion. Lastly, Plaintiff's Chaplain claims must be dismissed for failing to state a claim for which relief may be granted. For these reasons, Plaintiff's request for a stay of execution should be denied.

## ARGUMENT

## I.    The Standards of Review

### A.    Federal Rule of Civil Procedure 12(b)(1)

"It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). The party seeking to invoke jurisdiction bears the burden of demonstrating its existence. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "[T]here is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court." *Coury v. Prot*, 85 F.3d 244, 248 (5th

11

Cir. 1996) (citation omitted). An action may be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) on any of three separate bases: (1) the complaint standing alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint, the undisputed facts, and the court's resolution of disputed facts. *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1384 (5th Cir. 1989).

### B. Federal Rule of Civil Procedure 12(b)(6)

In analyzing a claim under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). However, "the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

"The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the

complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 544 U.S. at 555). It is insufficient, then, to plead facts that are merely consistent with wrongful conduct; a plaintiff must instead plead facts that plausibly suggest that he or she is actually entitled to relief. *Twombly*, 550 U.S. at 556–57. Further, the pleading must contain something more than a recitation of facts that merely creates a suspicion of a legally cognizable right of action on the assumption that all the allegations in the complaint are true. *Id*. In challenging a state court's denial of relief from postconviction DNA testing, the plaintiff must demonstrate that "the postconviction relief procedures . . . were 'fundamentally inadequate to vindicate the substantive rights provided.'" *Harris v. Lykos*, 2013 WL 1223837, at *1 (5th Cir. 2013) (citing *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009)).

## II.   The Court Should Deny Plaintiff's Request for a Stay of Execution.

"Filing an action that can proceed under § 1983 does not entitle the [plaintiff] to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). A request for a stay "is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id*. (citing *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004)). Rather,

13

Plaintiff must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits. *Id.* (citing *Barefoot v. Estelle*, 463 U.S. 880, 895–96 (1983)). When the requested relief is a stay of execution, a court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Importantly, a federal court must consider "the State's strong interest in proceeding with its judgment" and "attempt[s] at manipulation," as well as "the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson*, 541 U.S. at 649–50. Indeed, "there is a strong presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.* at 650.

First, as discussed below, the Court lacks jurisdiction to grant Plaintiff the relief he requests. He is, consequently, disentitled to a stay of execution because he cannot make a strong showing that he is likely to succeed on the merits of claims seeking relief that the Court lacks jurisdiction to grant. *See Nken*, 556 U.S. at 434. Second, as discussed below, Plaintiff's claims fail as a matter of law. *See Ramirez v. McCraw*, 715 F. App'x 347, 350–51 (5th Cir.

14

2017); *Pruett v. Choate*, 711 F. App'x 203, 206–08 (5th Cir. 2017) (denying plaintiff's motion for a stay of execution because he failed to show that Texas's postconviction DNA statute violated due process). Plaintiff's DNA claims are plainly barred by limitations, and none of his claims state a facially plausible claim for relief. He cannot justify a stay to litigate patently meritless claims.

For the same reason, Plaintiff cannot show that he would suffer irreparable harm if denied a stay of execution. As the Fifth Circuit has explained, "the merits of [the movant's] case are essential to [the court's] determination of whether he will suffer irreparable harm if a stay does not issue." *Walker v. Epps*, 287 F. App'x 371, 375 (5th Cir. 2008). As discussed below, Plaintiff's complaint is subject to dismissal for a multitude of reasons. Consequently, he cannot show that he would be irreparably harmed if denied additional process to which he has no entitlement. To the extent Plaintiff might argue irreparable harm will occur if he is executed without a chaplain's presence in the execution chamber, he cannot justify a stay. As discussed below, Section VI(F), TDCJ will—consistent with its protocol—permit Plaintiff to visit with a chaplain on the day of the execution, and a chaplain may be present during the execution in the witness room. Pl.'s App. at 012. Consequently, the potential harm has been mitigated and is not substantial enough to overcome the State's and victims' interest "in the timely enforcement of a sentence." *Hill*, 547 U.S. at 548.

Lastly, when Plaintiff most recently requested DNA testing in June 2019, more than eight years had elapsed since the CCA last denied DNA testing. *Ex parte Gutierrez*, 337 S.W.3d at 901–02. Plaintiff faced a scheduled execution in 2018, but he did not file a motion for DNA testing at that time. He did not file such a motion until June 2019. In light of the significant delay in Plaintiff's request for DNA testing, he cannot overcome the strong presumption against granting a stay or demonstrate that the balance of equities entitles him to a stay of execution.[8] Therefore, Plaintiff's request for a stay should be denied. *See Ramirez*, 715 F. App'x at 350 (denying plaintiff's motion for a stay of execution where he filed a motion for DNA testing only fifty-four days before his scheduled execution and nearly twenty years after his conviction); *Garcia v. Castillo*, 431 F. App'x 350, 355 (5th Cir. 2011) (denying stay of execution in civil-rights lawsuit because the requested DNA testing would not establish the

---

[8]     Assuming Plaintiff will argue that the Motion for Miscellaneous Relief he filed in state court in November 2015 tilts the balance of equities in his favor, such an argument should be rejected. First, Plaintiff's motion was not a Chapter 64 motion. *See Skinner v. State*, 484 S.W.3d 434, 437 (Tex. Crim. App. 2016). Rather, the motion sought the disclosure of exculpatory evidence so that Plaintiff could obtain testing of it at his own expense. Consequently, the motion did not imbue the trial court with jurisdiction to grant DNA testing. *Id.*; *see Marks v. State*, 2010 WL 598459, at *1 n.2 (Tex. Crim. App. 2010) ("We note that having found that Marks failed to satisfy Chapter 64, the trial court lacked jurisdiction to alternatively allow Marks DNA testing at his own expense.") (citing *State v. Patrick*, 86 S.W.3d 592, 595 (Tex. Crim. App. 2002) (plurality op.)). Indeed, it appears that Plaintiff did not treat the motion as a Chapter 64 motion because he did not appeal its denial to the CCA. *See* Tex. Code Crim. Proc. art. 64.05. Moreover, as Plaintiff acknowledges, Pl.'s Amended Compl. 11, the motion was denied in April 2018. He then made no efforts for more than a year to seek DNA testing.

plaintiff's innocence of capital murder and because the "balance of equities" weighed against a stay of execution).

**III.   Plaintiff Lacks Standing to Bring Suit Against Defendants Because His Requests for Relief Are, in Fact, a Mandamus Request Beyond this Court's Jurisdiction.**

Plaintiff has not demonstrated standing with regard to his claims. "[B]efore a federal court can consider the merits of a legal claim, the person seeking to invoke jurisdiction must establish the requisite standing to sue." *Whitmore v. Arkansas*, 495 U.S. 149, 154–55 (1990). Standing requires: (1) that the plaintiff establish that he has suffered an "injury in fact"; (2) that there is a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court"; and (3) that it is "likely," as opposed to merely "speculative," the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish the third prong of standing, a plaintiff must plead redressability—the injury complained of must be redressable by the relief sought. *Id.*

This Court lacks jurisdiction to grant the relief Plaintiff requests. Plaintiff asks, *inter alia*, that this Court force state officials to release evidence for DNA testing Pl.'s Amended Comp. 37–38. Plaintiff does not adequately allege, however, that the procedures provided in Chapter 64 are inadequate to

17

protect his due process rights. Rather, the basis of Plaintiff's DNA claims is that the state courts erred in their interpretation and application of state law. Pl.'s Amended Comp. 21–29. That is, dissatisfied with the CCA's decision affirming the trial court's denial of relief, Plaintiff is asking this Court to compel state officials to do what he believes the state court should have held those officials were required to do. Consequently, the bulk of the relief Plaintiff requests is not available to him because it "is in the nature of mandamus." *Norton v. Enns*, 2014 WL 3947158, at *3 (N.D. Tex. 2014). But federal courts "do not have jurisdiction to issue the writ against a state actor or agency." *Id*. (citing *Moye v. Clerk, Dekalb Cnty. Superior Court*, 474 F.2d 1275 (5th Cir. 1973)). "Instead, if relief is available to [Plaintiff], he must obtain it through a mandamus action or other appropriate action in the state courts." *Id*.

In *Swearingen v. Sharon Keller, et. al.*, the plaintiff filed a civil rights action alleging that a due process violation resulted from the CCA's inconsistent and arbitrary rulings during the postconviction DNA testing process and that the state courts had violated his constitutional rights by denying him his ability to establish his innocence. Order, No. A-16-CV-1181 (W.D. Tex. July 7, 2017). The district court held that it lacked jurisdiction because the plaintiff's complaint was "properly construed as a petition for mandamus relief." *Id*. The district court explained that the complaint was "the equivalent of a petition for mandamus relief because it request[ed]" the district

18

court "to direct the state court to require the DNA testing [Swearingen] requested and to direct the custodians of that evidence to release it for testing." *Id.* Plaintiff's DNA claims are materially indistinguishable from the requests at issue in *Swearingen*. *See also Ramirez*, 715 F. App'x at 350 (finding the district court "accurately analyzed" the plaintiff's request for "an injunction requiring the defendants to release the biological material on which he asks for DNA testing" as tantamount to an impermissible writ of mandamus); *In re Moore*, 1990 WL 165776, at *1 (4th Cir. Nov. 1, 1990); *Davis v. Lansing*, 851 F.2d 72, 74 (2d Cir. 1988); *Mount v. Court of Criminal Appeals*, 2017 WL 6761860, at *2 (S.D. Tex. Nov. 20, 2017); *Pruett v. Choate*, 2017 WL 4277206, at *5 (S.D. Tex. Sept. 25, 2017).[9] Therefore, Plaintiff's DNA claims should be dismissed for lack of jurisdiction. Fed. R. Civ. P. 12(b)(1).

Plaintiff's Chaplain claims also improperly seek mandamus relief because he affirmatively seeks to compel state actors to behave in a particular manner. However, this Court lacks jurisdiction to compel TDCJ officials by writ of mandamus. *See, e.g.*, *Waters v. Texas*, 747 F. App'x 259, 260 (5th Cir. 2019) (affirming a jurisdictional dismissal where the plaintiff sought

---

[9]     The Fifth Circuit in *Pruett* described as "well-taken" the district court's conclusion that the plaintiff's "due-process arguments seem[ed] to be dressed-up allegations that the TCCA should be directed to apply Texas law properly." *Pruett*, 711 F. App'x at 206 n.9. Moreover, the Fifth Circuit stated that the plaintiff's "complaint, stripped of a meritorious due-process claim, [could] rest on nothing but a petition for mandamus." *Id.* at 206 n.10.

mandamus relief against "Texas state officials to deregister her as a Tier I sex offender"). Accordingly, dismissal of Plaintiff's Chaplain claims for want of jurisdiction is required.

## IV.   Plaintiff's Chaplain Claims Should Be Dismissed for Failure to Exhaust Administrative Remedies.

Plaintiff asserts that he filed a Step 1 prison grievance requesting that a TDCJ chaplain be present in the execution chamber during his execution. Pl.'s Amended Compl. 14–15; *see* Pl.'s App. 016–17. He also states that, while he has communicated with TDCJ General Counsel via email, he has not obtained a ruling through the grievance process. Pl.'s Amended Compl. 15. Consequently, his Chaplain claims must be dismissed for want of exhaustion.

Section 1997(e) of the Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is *mandatory* "irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 739, 740–40 n.6 (2001); *see Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) ("[T]here can be no doubt that pre-filing exhaustion of [the] prison grievance processes is mandatory." (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)); *Jones v. Bock*, 549 U.S. 199 (2007)). The

PLRA's exhaustion requirement applies to Plaintiff's challenge to TDCJ's execution procedure. *See Nelson*, 541 U.S. at 643 (concluding that a prisoner's complaint about the procedure used to find a vein during the execution process was a § 1983 civil rights complaint and subject to the PLRA exhaustion requirement); *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016) ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.").

Plaintiff's email correspondence with TDCJ General Counsel did not satisfy the mandatory exhaustion requirement under PLRA. *See, e.g., Fegans v. Johnson*, 2010 WL 1425766, at *13 (S.D. Tex. Apr. 8, 2010) (concluding that a prisoner's attorney sending a notice of claims to the jail did not satisfy the PLRA exhaustion requirement). Plaintiff may only exhaust via TDCJ's grievance process. Tex. Gov't Code § 501.008 (West 2020); *see Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("Under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion."). And to properly exhaust, a prisoner must "pursue the grievance remedy to conclusion." *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001). This requires completion of both steps of TDCJ's grievance process before a complaint may be filed. *Id.*; *but see Murphy v.*

*Collier*, 942 F.3d 704, 709 (5th Cir. 2019).[10] Because Plaintiff did not exhaust administrative remedies prior to bringing his Chaplain claims in federal court, PLRA mandates dismissal of the claims.

Plaintiff has argued that the Supreme Court's stay of Patrick Murphy's execution implies that exhaustion of his Chaplain claims was either accomplished or unnecessary. Pl.'s Resp. to Defs' Mot. to Dismiss 7–8 (citing *Murphy*, 942 F.3d at 709). However, in both the Fifth Circuit and Supreme Court, the courts ruled only on the plaintiff's request for a stay.[11] *Murphy v.*

---

[10]    In her dissent in *Murphy*, Judge Elrod explained that the Supreme Court has "not recognized a futility exception to the PLRA's exhaustion requirement." 942 F.3d at 714 (Elrod, J., dissenting); *see Booth*, 532 U.S. at 741 n.6. On the contrary, as noted above, the exhaustion requirement is mandatory. The district court's conclusion in *Murphy* that the plaintiff satisfied "the spirit" of the exhaustion rule without even engaging in TDCJ's grievance process is, therefore, untenable. *Murphy v. Collier*, 423 F. Supp. 3d 355, 359 n.1 (S.D. Tex. 2019). Nor does the district court's reasoning apply here. Plaintiff's execution was stayed on October 22, 2019, yet he made no further attempt to exhaust his administrative remedies regarding his Chaplain claims while his execution was not imminent. *See id.* (rejecting defendants' exhaustion argument, in part, because plaintiff's execution was imminent). And according to Plaintiff, TDCJ's response to his Step 1 grievance was due by September 28, 2019, more than one month prior to his previously-scheduled October 30, 2019 execution. Pl.'s Resp. to Defs' Mot. to Dismiss 9. Yet he did not file a Step 2 grievance after TDCJ did not respond. He did not, therefore, satisfy even the "spirit" of the exhaustion rule. Further, Plaintiff's Amended Complaint does not allege that the grievance process was unavailable to him. *See* Pl.'s Resp. to Defs' Mot. to Dismiss, Ex. 3 at 74 (TDCJ's Offender Orientation Handbook providing that inmates may grieve "[t]he interpretation or application of TDCJ policies, rules, regulations, and procedures").

[11]    Notably, neither the Fifth Circuit nor the district court explicitly addressed prior to the Supreme Court's stay of Murphy's execution the issue of exhaustion of administrative remedies but only the timeliness of his request for a stay. *Murphy v. Collier*, 919 F.3d 913, 916 (5th Cir. 2019); *Murphy v. Collier*, 376 F. Supp. 3d 734, 739 (5th Cir. 2019).

*Collier*, 139 S. Ct. 1475 (2019); *Murphy*, 942 F.3d at 709. And a stay of execution is an equitable remedy. *Nelson*, 541 U.S. at 649. As explained by Justice Kavanaugh, the Supreme Court's stay of Murphy's execution "facilitated the prompt resolution of a significant religious equality problem with the State's execution protocol and should alleviate any future litigation delays or disruptions that otherwise might have occurred as a result of the State's prior discriminatory policy." *Murphy*, 139 S. Ct. at 1476 (Kavanaugh, J., statement respecting grant of stay). The Supreme Court's order granting a stay should not be construed as silently overturning its long-standing precedent regarding exhaustion under the PLRA but rather as what the Court viewed as a necessary, equitable action taken regarding a newly-arisen challenge to Texas's execution protocol and in the interest of avoiding repetitious challenges to a policy it found impermissible. *See id*. Plaintiff offers no reason to conclude that challenges to a State's execution protocol as it relates to the presence of spiritual advisors—and only those challenges—are entirely exempt from the *mandatory* PLRA exhaustion requirement. *See Ross*, 136 S. Ct. at 1858; *Valentine v. Collier*, --- F.3d ---, 2020 WL 1934431, at *5–7 (5th Cir. Apr. 22, 2020) (vacating injunction against TDCJ, in part, because plaintiffs failed to exhaust under PLRA); *Murphy*, 942 F.3d at 713 (Elrod, J., dissenting).

Plaintiff has also argued previously that he should be deemed to have exhausted his administrative remedies because TDCJ did not respond to his first grievance. Pl.'s Resp. to Defs' Mot. to Dismiss 8–9 (quoting *Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015)). However, in *Wilson*, the Fifth Circuit explained that the administrative-exhaustion requirement "does not fall by the wayside in the event that the prison fails to respond to the prisoner's grievance at some preliminary step in the grievance process." 776 F.3d at 301. Rather, "the prison's failure to respond simply entitles the prisoner to move on to the next step in the process."[12] *Id*. Indeed, the Fifth Circuit affirmed the district court's dismissal of the plaintiff's complaint where the complaint "made clear that he neither received a final-step response from the prison nor filed a final-step appeal and sued only after the prison failed to timely respond at that point." *Id*. at 302.

Here, Plaintiff has filed only an initial grievance; he has taken no further action either before his previously-scheduled execution or since. Pl.'s Amended Comp. 14–15. The lack of a response to Plaintiff's Step 1 grievance did not satisfy exhaustion or render his administrative remedies unavailable. *See Hicks v. Lingle*, 370 F. App'x 497, 499 (5th Cir. 2010) (affirming dismissal of

---

[12]   The Mississippi prison system's procedures explicitly provided that an inmate could proceed to the next step in the administrative process if no response was timely received. *Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004).

complaint where plaintiff failed to exhaust jail's administrative remedies by not filing a second grievance after receiving no response to his first); *Johnson v. Cheney*, 313 F. App'x 732, 733 (5th Cir. 2009) (same as to TDCJ inmate); *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (holding that TDCJ inmate exhausted his administrative remedies by filing a Step 1 and Step 2 grievance and filing his complaint after the time elapsed for the prison to respond to the Step 2 grievance); *Cantwell v. Sterling*, 2016 WL 7971768, at *3–5 (W.D. Tex. May 18, 2016) (granting summary judgment where plaintiff failed to exhaust TDCJ's administrative remedies because he filed a Step 1 grievance but did not file a Step 2 grievance after receiving no response); *Mesquiti v. Gallegos*, 2010 WL 2928168, at *2 (S.D. Tex. June 23, 2010); *Amir-Sharif v. Gonzalez*, 2007 WL 1411427, at *2 (N.D. Tex. May 14, 2007); *Jefferson v. Loftin*, 2005 WL 4541891, at *5 (N.D. Tex. March 16, 2005) (collecting cases). Therefore, *Wilson* requires dismissal of Plaintiff's Chaplain claims for lack of exhaustion.[13]

---

[13]   Notably, the Fifth Circuit has held that a federal court is not to inquire as to whether the administrative remedies are adequate. *Alexander v. Tippah Co., Mississippi*, 351 F.3d 626, 630 (5th Cir. 2003). Rather, the only inquiry as to exhaustion is whether such remedies were available. *Id.* Further, Plaintiff previously relied on the Fifth Circuit's opinion in *Underwood v. Wilson*, 151 F.3d 292, 295 (5th Cir. 1998), to argue that he should be deemed to have exhausted his administrative remedies because TDCJ did not timely respond to his Step 1 grievance. Pl.'s Resp. to Defs' Mot. to Dismiss 8. However, the Fifth Circuit has overruled *Underwood*, holding that pre-filing exhaustion is mandatory. *Gonzalez*, 702 F.3d at 788. Moreover, *Underwood* is inapposite because the plaintiff in that case exhausted his administrative remedies by filing a grievance and appeal at each step of the process. 151 F.3d at 295; *see Hicks*, 370 F. App'x at 499. As explained above, Plaintiff did not do so.

## V.   Plaintiff's Claims Should Be Dismissed for Lack of Subject Matter Jurisdiction.

The Court should dismiss Plaintiff's claims because Plaintiff cannot establish subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden of establishing federal jurisdiction rests on the party seeking the federal forum. *Stockman*, 138 F.3d at 151. For the reasons discussed below, Plaintiff has failed to satisfy his burden to establish subject matter jurisdiction.

### A.   Defendants are entitled to Eleventh Amendment immunity to the extent Plaintiff seeks anything beyond declaratory and injunctive relief.

Plaintiff states that he is suing each of the named Defendants in his or her official capacity. Pls. Amended Comp. 4–5. Each defendant must be dismissed from this suit because all claims against Defendants are barred by Eleventh Amendment immunity.

#### 1.   Eleventh Amendment immunity standard

The Eleventh Amendment bars a citizen from suing a state in federal court unless the state consents. U.S. Const. amend. XI; *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996). Absent a waiver of immunity by the State or through federal statute, the Eleventh Amendment bars citizens from bringing suit against the states in federal court, regardless of the nature of the remedy sought. U.S. Const. amend. XI; *see, e.g., Pennhurst State Sch. & Hosp. v. Haldeman*, 465 U.S. 89, 100–02 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662–

26

63 (1974). "Federal courts are without jurisdiction over suits against a state, a state agency, or a state official in his [or her] official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary and Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014); *see Warnoch v. Pecos*, 88 F.3d 341, 343 (5th Cir. 1996).

An official capacity suit is to be treated as a suit against the entity. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985). It is undisputed that each of the defendants are state agencies. *See* Tex. Const. art. 5, § 5; *Carty v. Tex. Dep't of Pub. Safety*, 2006 WL 3332589, at *4 (E.D. Tex. 2006). The state agencies have not waived sovereign immunity. As employees of state agencies, as a matter of law, Defendants (sued in their official capacity) have immunity under the Eleventh Amendment. *See Cory v. White*, 457 U.S. 85, 89 (1982); *Moon v. City of El Paso*, 906 F.3d 352, 359–60 (5th Cir. 2018); *Vogt v. Board of Comm'rs, Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002); *Martinez v. Tex. Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002). Consequently, Plaintiff's claims against Defendants must be dismissed because Plaintiff has not identified any exception to the Eleventh Amendment's bar.

### 2. Plaintiff fails to establish an exception to Defendants' Eleventh Amendment immunity.

The Supreme Court has recognized an exception to the Eleventh Amendment's bar, but the exception does not apply here. *See Ex parte Young*,

209 U.S. 123, 155–56 (1908). To overcome the Eleventh Amendment's bar, a plaintiff must demonstrate that the defendant has some connection with the enforcement of the disputed state statute. *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010).

Here, Plaintiff argues that the state courts' application in his case of Chapter 64 was improper. Pls. Amended Comp. 19–32. But Defendants have no connection with the state courts' construction of state law. *See Ex parte Young*, 209 U.S. at 157 (holding "neither of the state officers named held any relation to the particular statute alleged to be unconstitutional" because, in part, "[t]hey were not expressly directed to see its enforcement"). None of the defendants in this case have authority to direct or compel the state court in its interpretation or application of state law. *Okpalobi v. Foster*, 244 F.3d 404, 416–17 (5th Cir. 2001) (holding that, for the *Ex parte Young* exception to apply, the state official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty").

Under article 64.03, a state court "may order" DNA testing to be conducted. Following an order under article 64.03, a state court "shall order" any DNA profiles identified through the previously-ordered DNA testing to be compared with DNA profiles maintained by the FBI and DPS. Tex. Code Crim. Proc. art. 64.035 (West 2020). Any duty to conduct such testing or comparison is contingent and arises only after a state court orders testing. Because

28

Defendants have not been directed to take any additional action pursuant to Chapter 64, there is no connection between Plaintiff's claims and the enforcement of Chapter 64. *See Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005) (holding that plaintiffs failed to establish an exception under *Ex parte Young* where state law first required the governor to direct a state official to take action, and a state official had not been directed to take action). Moreover, as explained below, Plaintiff's amended complaint fails to identify any plausible constitutional violation. Consequently, Plaintiff has not adequately alleged that Defendants have committed a violation of federal law. Accordingly, Plaintiff's claims against Defendants should be dismissed.

Indeed, to the extent Plaintiff names Director Lorie Davis, Executive Director Bryan Collier, and Warden Bill Lewis as defendants, there is no doubt that they are not proper parties because they do "not have custody of the evidence and had no role in granting or denying [Plaintiff] the DNA testing he sought." *Emerson v. Thaler*, 544 F. App'x 325, 328 n.2 (5th Cir. 2013). Conversely, Defendants Saenz and Sauceda have no hand in TDCJ's execution protocol. To the extent Plaintiff seeks relief beyond what he has assigned to each defendant, the *Ex parte Young* exception does not apply, and they are exempt from suit. *See Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d 507, 516–19 (5th Cir. 2017).

29

**B.     Plaintiff's DNA claims are barred by the *Rooker-Feldman* doctrine.**

The *Rooker-Feldman*[14] doctrine bars a federal court from entertaining collateral attacks on state court judgments. *United States v. Shepherd*, 23 F.3d 923, 924 (5th Cir. 1994). "If the district court is confronted with issues that are 'inextricably intertwined' with a state judgment, the court is 'in essence being called upon to review the state-court decision,' and the originality of the district court's jurisdiction precludes such a review." *Id.* (citing *Feldman*, 460 U.S. at 482 n.16). Thus, the *Rooker-Feldman* doctrine prohibits "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

Here, Plaintiff's DNA claims challenge the CCA's application of Chapter 64 to him. *See, e.g.*, Pl.'s Amended Compl. 31 ("[T]he CCA's unreasonable interpretation of Chapter 64 has prevented Mr. Gutierrez from gaining access to exculpatory evidence that could demonstrate that he is not guilty of murder, and that he is innocent of the death penalty."). Plaintiff's DNA claims allege

---

[14]     *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415 (1923) (holding that the jurisdiction of the district court is strictly original; *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 476, 482 (1983) (holding a United States district court has not authority to review final judgments of a state court in judicial proceedings).

that the CCA erroneously concluded he could not establish by a preponderance of the evidence that he would not have been convicted with exculpatory DNA evidence and that he was not entitled to DNA testing for the purpose of showing he was not death eligible. Pl.'s Amended Compl. 19–31. The claims mirror his complaints in state court. *See Gutierrez v. State*, 2020 WL 918669, at *5; *Ex parte Gutierrez*, 337 S.W.3d at 899–902. Therefore, his DNA claims regarding the postconviction DNA proceedings amount only to a collateral attack against the state court judgment. Such an attack is impermissible. *See Steph v. Scott*, 840 F.2d 267, 270 (5th Cir. 1988) (holding that a federal court cannot entertain a collateral attack on a state court judgment unless the state court lacked jurisdiction, or the state court lacked the capacity to act as a court).

Unlike in *Skinner v. Switzer*, Plaintiff does not attack the statute providing for postconviction DNA testing but the CCA's interpretation of it. 562 U.S. 521, 532 (2011) (holding the *Rooker-Feldman* doctrine did not bar plaintiff's constitutional challenge to Chapter 64).[15] Indeed, the Court in *Skinner* acknowledged that "a state-court decision is not reviewable by lower federal courts." *Id.* at 532–33. Here, Plaintiff's DNA claims take issue only with

---

[15]     The plaintiff in *Skinner* "clarified the gist of" his claim—he did not challenge the CCA's decisions, but instead targeted Chapter 64 itself as unconstitutional. *Skinner*, 562 U.S. at 532.

the CCA's decisions, not the adequacy of Chapter 64. Accordingly, Plaintiff's DNA claims are barred by the *Rooker-Feldman* doctrine and must be dismissed. *See Alvarez v. Attorney Gen. for Fla.*, 679 F.3d 1257, 1262–64 (11th Cir. 2012) (barring under the *Rooker-Feldman* doctrine a "procedural due process challenge [that] boil[ed] down to a claim that the state court judgment itself caused him constitutional injury by arbitrarily denying him access to the physical evidence he seeks"); *see also Wade v. Monroe County Dist. Att'y*, 2020 WL 639207, at *3–4 (3d Cir. Feb. 11, 2020); *Cooper v. Ramos*, 704 F.3d 772, 781 (9th Cir. 2012); *McKithen v. Brown*, 626 F.3d 143, 154–55 (2d Cir. 2010); *In re Smith*, 349 F. App'x 12, 14–15 (6th Cir. 2009).

As in *Alvarez*, Plaintiff's as-applied procedural due process claim invites federal court review of a state court's judgment and, if successful, would "effectively nullify" the CCA's judgment and would succeed only to the extent that the CCA wrongly decided the issues. 679 F.3d at 1264; *see Cooper*, 704 F.3d at 780–81 (distinguishing *Skinner* and holding that plaintiff's claims challenging the state court's denial of his request for DNA testing were barred by the *Rooker-Feldman* doctrine because his complaint "explicitly attack[ed] both the prosecutor's conduct in his specific case and the state court's application in his specific case of the statutory factors governing entitlement to DNA testing"). Unlike in *Skinner*, Plaintiff's amended complaint does not assert that Chapter 64 was constitutionally inadequate as to *any* movant but

32

only as to himself. *See Cooper*, 704 F.3d at 780. Consequently, Plaintiff's claims fall squarely within *Rooker-Feldman* and are subject to dismissal on that basis.

Moreover, Plaintiff's inability, discussed below, to identify any defect in Chapter 64's procedures reveals that his amended complaint does not mount a facial challenge to Chapter 64 but instead only raises complaints about the CCA's decision in his case. Consequently, Plaintiff's DNA claims are barred by the *Rooker-Feldman* doctrine and should be dismissed for want of jurisdiction. *See Alvarez*, 679 F.3d at 1263–64.

## VI.   Plaintiff's Amended Complaint Should Be Dismissed for Failure to State a Claim.

Even assuming this Court has jurisdiction to consider Plaintiff's amended complaint, his claims are subject to dismissal because they fail to state a claim for relief. Fed. R. Civ. P. 12(b)(6). As discussed below, Plaintiff's claims are barred by the applicable statute of limitations, are barred by issue preclusion, not cognizable in a civil-rights action, and fail to state a facially plausible claim for relief. Therefore, his complaint should be dismissed.

### A.   Plaintiff's DNA claims are barred by the applicable statute of limitations.

Claims brought via § 1983 are best characterized as personal injury actions and are therefore subject to a state's personal injury statute of

limitations. *See Wilson v. Garcia*, 471 U.S. 261, 279 (1985);[16] *Walker v. Epps*, 550 F.3d 407, 412–14 (5th Cir. 2008). Texas's limitations period is two years. Tex. Civ. Prac. & Rem. Code § 16.003(a) (West 2020).

While state law provides the applicable limitations period, federal law determines when the limitation period accrues. *Willis v. Nelson*, 56 F.3d 1386, 1995 WL 337909, at *2 (5th Cir. 1995). Claims complaining of the denial of DNA testing accrue on the date when such request was *first* denied by a state court. *See Savory v. Lyons*, 469 F.3d 667, 673 (7th Cir. 2006); *cf. Gonzalez v. Wyatt*, 157 F.3d 1016, 1020 (5th Cir. 1998) (noting that a cause of action accrues, so that the two-year statute of limitations begins to run, when the plaintiff knows or has reason to know of the injury that is the basis of the action); *Russell v. Board of Trustees*, 968 F.2d 489, 493 (5th Cir. 1992) ("Under federal law, the [limitations] period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.") (quotation marks and citation omitted). "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the

---

[16]     Congress enacted 28 U.S.C. § 1658, which overturned *Wilson* by imposing a four-year statute of limitations for civil actions, but that limitations period applies only to causes of action that arise under Federal statutes that were enacted after December 1, 1990. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83 (2004).

pleadings fail to raise some basis for tolling or the like." *Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593, 597 (5th Cir. 2017).

The trial court first denied Plaintiff's DNA testing motion on July 27, 2010. Order, *Ex parte Gutierrez*, No. 98-CR-1391-A (107th Dist. Ct. Cameron County, Tex.). Even if the CCA's affirmance—on May 4, 2011—of the denial of DNA testing is the appropriate accrual date for Plaintiff's DNA claims, Plaintiff's lawsuit is more than six years untimely. *See Brookins v. Bristol Tp. Police Dept.*, 642 F. App'x 80, 81 (3d Cir. 2016) ("[Plaintiff's] challenge to the Government's failure to test evidence for DNA accrued, at the latest, when the state court denied his request for testing on April 28, 2011.") (citing *Savory*, 469 F.3d at 672–73); *Quinonez v. Texas*, No. H-16-0822, 2016 WL 2894920, at *1–2 (S.D. Tex. May 17, 2016) (dismissing as legally frivolous a § 1983 lawsuit challenging state court's denial of DNA testing where state court DNA appeal ended in 2012 and § 1983 action was filed in 2016); *Padilla v. Watkins*, No. 3:11-CV-2232-M, 2012 WL 1058143, at *3 (N.D. Tex. Feb. 2, 2012); *see also Moore v. Lockyer*, 2005 WL 2334350, at *5 (N.D. Cal. Sept. 23, 2005); *but see Pettway v. McCabe*, 510 F. App'x 879, 879–80 (11th Cir. 2013) (stating that the limitations period began at the end of the state litigation in which the inmate unsuccessfully sought access to evidence).

Any assertion that the trial court's most recent denial or the CCA's affirmance of that denial of Plaintiff's motion for DNA testing—in June 2019

35

and February 2020, respectively—is the appropriate accrual date should be rejected. *See Savory*, 469 F.3d at 673 ("[Plaintiff's] continued lack of access to the evidence is not a fresh act on the part of [Defendant]. Rather, it is the natural consequence of the discrete act that occurred when [Defendant] first denied access to the evidence."). As the CCA's most recent opinion shows, Plaintiff's arguments as to the denial of DNA testing have remained almost unchanged since his prior unsuccessful attempt at DNA testing.[17] *Compare Gutierrez v. State*, 2020 WL 918669, at *7–9, *with Ex parte Gutierrez*, 337 S.W.3d at 900–02. A contrary holding would plainly incentivize repeated, dilatory, and incremental requests for DNA testing. Therefore, Plaintiff's DNA claims should be dismissed because they are barred by limitations.

## B.    Defendant Saenz has absolute immunity from suit.

Although Plaintiff asserts that he is suing District Attorney Saenz in his official capacity and for only declaratory relief, Pl.'s Amended Compl. 4, to the extent that he challenges Saenz's actions as the Criminal District Attorney for Cameron County, Saenz is entitled to absolute prosecutorial immunity. *See*

---

17      As noted above, any argument that Plaintiff's Motion for Miscellaneous Relief he filed in state court in November 2015 constitutes a new accrual date should be rejected. Plaintiff's motion was not a Chapter 64 motion. *See Skinner*, 484 S.W.3d at 437; *Marks*, 2010 WL 598459, at *1 n.2. Moreover, as Plaintiff acknowledges, Pl.'s Amended Compl. 11, the motion was denied in April 2018. He then made no efforts for more than a year to seek DNA testing.

*Moon*, 906 F.3d at 569–60; *Esteves v. Brock*, 106 F.3d 674, 677 (5th Cir. 1997). And to that extent, the claim fails as a matter of law and must be dismissed.

### C.   Plaintiff's due process claims are barred by the doctrine of issue preclusion.

Issue preclusion, or collateral estoppel, is a doctrine designed to preclude relitigation of claims already decided. The elements of issue preclusion under federal law require the movant establish three conditions: (1) that the issue at stake is identical to the one involved in the prior litigation; (2) that the issue was actually litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation was a critical and necessary part of the judgment in that earlier action. *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 323 (5th Cir. 2005); *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1166 (5th Cir. 1981).

Plaintiff alleges that he was denied due process during the 2011 and most recent postconviction DNA proceedings in state court. Pls. Amended Comp. 19–31. These complaints were resolved adversely to Plaintiff by the CCA. *Gutierrez v. State*, 2020 WL 918669, at *5–9; *Ex parte Gutierrez*, 337 S.W.3d at 899–902. Relitigation of those complaints is impermissible. *See Moore v. Brown*, 295 F. App'x 176, 177–78 (9th Cir. 2005). Consequently, Plaintiff is precluded from collaterally attacking the CCA's decisions, and his DNA claims necessarily fail to state a claim for relief.

**D.   Plaintiff's claims alleging that his execution would be unconstitutional are only cognizable in habeas corpus.**

Plaintiff argues that his execution would constitute cruel and unusual punishment because he has viable claims of actual innocence of the crime and of the death penalty. Pl.'s Amended Comp. 31–32. These claims constitute a challenge to the validity of Plaintiff's conviction and sentence. Therefore, those claims are only cognizable in habeas corpus and do not state a claim for relief in these proceedings. *Skinner*, 562 U.S. at 534–36.

To the extent Plaintiff challenges the validity of his sentence, he does not seek DNA testing. *See* Pl.'s Amended Comp. 31–32. Rather, he seeks to obtain relief from his sentence based on his claims that he is actually innocent of the death penalty and that new mitigating evidence developed from DNA testing would change the sentencing verdict. Pl.'s Amended Comp. 31–32. These claims necessarily imply that his conviction and sentence are unconstitutional due to the State's actions. *Heck v. Humphrey*, 512 U.S. 477, 485–88 (1994). Indeed, Plaintiff explicitly seeks through these claims to avoid his sentence by obtaining what could only be construed as a permanent stay of execution. *See Emerson*, 544 F. App'x at 327 n.1 ("[T]hose claims of *Brady* violations, prosecutorial misconduct, and actual innocence, which necessarily imply the invalidity of his conviction are not cognizable under § 1983 but must be brought in a habeas petition."). A judgment favorable to Plaintiff would accomplish just

that, a permanent stay. To the extent Plaintiff challenges the validity of his conviction and sentence, his complaint must be dismissed for failing to state a cognizable claim.

Additionally, Plaintiff's federal petition for a writ of habeas corpus was denied. *Gutierrez v. Stephens*, 590 F. App'x at 384. Therefore, Plaintiff's habeas claims are successive, and he must move first in the Fifth Circuit for an order authorizing this Court to consider the claims. 28 U.S.C. § 2244(b)(3)(A). Consequently, insofar as Plaintiff raises claims challenging his conviction and sentence, his complaint may be treated as a petition for a writ of habeas corpus and dismissed for want of jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *In re Pruett*, 784 F.3d 287, 290–91 (5th Cir. 2015); *see also Burton v. Stewart*, 549 U.S. 147, 152 (2007).

### E.    Plaintiff's DNA claims are patently meritless.

Plaintiff claims that Chapter 64 violates due process because the CCA erred in (1) concluding that the he failed to establish he would not have been convicted if exculpatory DNA results had been obtained and (2) affirming the denial of DNA testing on the ground that Chapter 64 does not provide for testing for the purpose of affecting punishment. Pl.'s Amended Compl. 19–30. Such claims do not allege that the procedures provided by Chapter 64 were inadequate so as to give rise to a procedural due process violation. Rather, such claims allege violations of a substantive right to due process, a right that does

39

not exist in postconviction DNA proceedings. *Skinner*, 562 U.S. at 525. Additionally, Plaintiff's specific as-applied complaints regarding the CCA's decision—e.g., that the CCA erred in concluding that exculpatory results would not have changed the result of his trial, not addressing Plaintiff's proffered evidence of his innocence, and relying on Plaintiff's purportedly coerced confession—do not amount to a challenge to the constitutionality of Chapter 64 but rather only take issue with the state court's application of state law. Pl.'s Amended Comp. 24–25. Such claims necessarily fail to state a claim upon which relief may be granted. *See Cromartie v. Shealy*, 941 F.3d 1244, 1257–58 (11th Cir. 2019) ("[A] state court's misapplication of state law, without more, does not violate the federal Constitution."). Nonetheless, as discussed below, Chapter 64 is plainly adequate to protect an inmate's right to procedural due process and Plaintiff fails to show that the proceedings in his case were inadequate. Consequently, Plaintiff fails to state a claim upon which relief can be granted.

### 1.    Texas's statutory framework adequately protects inmates' rights during postconviction DNA proceedings.

Convicted individuals have no constitutional right to postconviction DNA testing; but if a state provides such a right, the procedures must satisfy due process. *See Osborne*, 557 U.S. at 69, 72–74. However, a "criminal defendant proved guilty after a fair trial does not have the same liberty

interests as a free man." *Id.* at 68. Thus, a state "has more flexibility in deciding what procedures are needed in the context of postconviction relief." *Id.* at 69. To demonstrate constitutional infirmity, a convicted individual must show that the postconviction procedures "are fundamentally inadequate to vindicate the substantive rights provided" such that the procedures "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 69–71; *see Garcia*, 431 F. App'x at 353. *Osborne* "left slim room for the prisoner to show that the governing state law denies him procedural due process." *Skinner*, 562 U.S. at 525.

Texas law requires that, to obtain DNA testing, a convicted person move for "forensic DNA testing of evidence that has a reasonable likelihood of containing biological material" in the state trial court.[18] Tex. Code Crim. Proc. art. 64.01(a-1) (West 2020). The statute further requires that the evidence to be tested was in the possession of the State at the time of trial but was not previously subjected to DNA testing or could be "subjected to testing with newer techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." Tex. Code Crim. Proc. art. 64.01(b)(1), (2)(A) (West 2020). The state trial court may order

---

[18]     Texas Code of Criminal Procedure article 38.43 (c)(1) required that evidence containing biological material be retained and preserved in a capital case until the inmate is executed, dies, or is released on parole. The requirement still exists. Tex. Code Crim. Proc. art. 38.43(c)(2)(A) (West 2020).

forensic DNA testing only if it finds the evidence still exists, can be subjected to DNA testing, and has been subjected to a sufficient chain of custody. Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(i), (ii) (West 2020). Most relevant here, the convicted person must also show, *inter alia*, by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing. Tex. Code Crim. Proc. art. 64.03(a)(1)(B) (West 2020). After examining the results of DNA testing, the convicting court is required to "hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted." Tex. Code Crim. Proc. art. 64.04 (West 2020). The convicted person may appeal the trial court's decision. Tex. Code Crim. Proc. art. 64.05. The Supreme Court in *Osborne* held that a similar state law framework was constitutionally adequate. 557 U.S. at 69–70.

Critically, the Texas state law framework for DNA testing permits testing if the convicted person establishes by a "preponderance of the evidence" that he would not have been convicted if exculpatory results had been obtained through DNA testing. Tex. Code Crim. Proc. art. 64.03(a)(2); *see Garcia*, 431 F. App'x at 353 (explaining that a movant must show "there is a greater than fifty percent chance" he would not have been convicted if DNA testing provided

exculpatory results).[19] The Alaska state law at issue in *Osborne* required a greater showing—that "newly discovered evidence" established "by clear and convincing evidence" the convicted person was innocent and that the testing "would likely be conclusive" on the issue of the convicted person's innocence. *Osborne*, 557 U.S. at 65, 68. The Supreme Court's approval of Alaska's procedures is dispositive of Plaintiff's challenge to Chapter 64's preponderance-of-the-evidence standard. Plaintiff, therefore, conclusively fails to state a viable claim regarding Texas's less onerous standard. *See Morrison v. Peterson*, 809 F.3d 1059, 1068–69 (9th Cir. 2015) (rejecting challenge to California's forensic testing statute because Alaska's framework at issue in *Osborne* was "more restrictive, not less restrictive" than California's reasonable probability standard); *Alvarez*, 679 F.3d at 1266 n.2 ("In short, inasmuch as Florida's DNA access procedures either mirror or are more applicant-friendly than the Alaska and federal statutes endorsed in *Osborne*, Florida's postconviction DNA access procedures plainly do not offend [due process]."); *Cunningham v. Dist. Attorney's Office for Escambia County*, 592 F.3d 1237, 1263 (11th Cir. 2010) ("Alabama's procedures pass muster if they

---

[19]     The district court in *Garcia* found that there is "nothing fundamentally unfair" about Texas's statutory preponderance-of-the-evidence standard. *Garcia v. Sanchez*, 793 F. Supp. 2d 866, 891 (W.D. Tex. 2011). Importantly, such a burden is analogous to the burden applied by the Supreme Court in determining whether a habeas petitioner can overcome a procedural default by a showing of actual innocence. *Id*. (citing *House v. Bell*, 547 U.S. 518, 536–37 (2006)).

compare favorably with Alaska's."); *McKithen*, 626 F.3d at 153–54 (holding that New York's statutory framework providing for DNA testing was adequate because its standards were less "restrictive and difficult to meet" than the Alaska standard at issue in *Osborne*).

That some states purportedly apply a burden lower than a preponderance of the evidence to requests for forensic testing, Pl.'s Amended Comp. 22 n.7, does not establish that procedural due process *requires* a more lenient standard.[20] Nor does it establish that a preponderance of the evidence is a "particularly high standard of proof." Pl.'s Amended Comp. 21. As Plaintiff acknowledges, several states apply standards similar to or more onerous than a preponderance of the evidence.[21] Pl.'s Amended Comp. 22 n.7. Virginia and New Hampshire require a movant to satisfy the statutory requirements for DNA testing by clear and convincing evidence. Va. Code Ann. § 19.2-327.1(A), (D); N.H. Rev. Stat. Ann. § 651-D:2(III). Plaintiff simply cannot show that application of a preponderance of the evidence burden of proof to a request for

---

[20]    By way of analogy, the Supreme Court has held that the intellectually disabled are exempt from capital punishment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). However, in doing so, the Court did not—and has not—mandated that states apply a particular burden of proof to *Atkins* claims. *Bobby v. Bies*, 556 U.S. 825, 831 (2009). Consequently, for purposes of habeas review, application of even a reasonable doubt standard to such claims does not violate due process. *See Raulerson v. Warden*, 928 F.3d 987, 1000–04 (11th Cir. 2019), *cert. denied*, 2020 WL 1496646 (March 30, 2020).

[21]    The Tenth Circuit has approved of Colorado's postconviction DNA testing statute, which imposes a preponderance-of-the-evidence burden. *McDaniel v. Suthers*, 335 F. App'x 734, 736 (10th Cir. 2009) (citing Colo. Rev. Stat. § 18-1-413).

DNA testing constitutes a departure from a fundamental principle of justice. *See Osborne*, 557 U.S. at 69–71; *cf. Cromartie*, 941 F.3d at 1252 ("Every court of appeals to have applied the *Osborne* test to a state's procedure for postconviction DNA testing has upheld the constitutionality of it.").

As noted above, federal courts will only intervene where the State's framework for providing access to DNA testing "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Osborne*, 557 U.S. at 69 (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). At best, Plaintiff "provides many arguments as to why the [ ]CCA was incorrect in its application of Chapter 64," but "there is nothing in the [ ]CCA's opinion that 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Pruett*, 711 F. App'x at 206 (quoting *Osborne*, 557 U.S. at 69). "Instead, the [ ]CCA carefully considered each of [Plaintiff's] contentions as to Chapter 64; it reviewed the evidence with due diligence, then found that [Plaintiff] was not entitled to . . . relief under Chapter 64." *Id*. at 206–07. Nonetheless, Defendants address Plaintiff's specific complaints individually.

2.     The CCA's well-founded conclusion that Plaintiff failed to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results were obtained does not offend fundamental fairness.

Plaintiff primarily challenges the CCA's decision that he failed to show by a preponderance of the evidence that he would not have been convicted if exculpatory results were obtained through DNA testing. Pl.'s Amended Compl. 23–25. He argues the CCA's opinion reflects a per se rule that DNA testing through Chapter 64 is not permitted if there is any evidence that the inmate is guilty as a principal or a party. Pl.'s Amended Comp. 25. He also argues the CCA erred in considering purportedly unreliable evidence and in failing to consider evidence of his innocence. Pl.'s Amended Comp. 25. Plaintiff fails to state a viable claim.

In attacking the CCA's conclusion that Plaintiff failed to satisfy his burden under Chapter 64, Plaintiff is attempting to constitutionalize what is truly a state law matter—a state court's interpretation of a state statute. But a "mere error of state law," the Supreme Court has noted, "is not a denial of due process." *Rivera v. Illinois*, 556 U.S. 148, 158 (2009) (quoting *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982)). And that is Plaintiff's complaint—that the CCA erroneously interpreted Chapter 64's materiality requirement. *See* Tex. Code Crim. Proc. art. 64.03(a)(2)(A) (West 2020). He has not briefed whether due process, in the form of fundamental fairness, has anything to say

about a state's postconviction DNA testing scheme vis-à-vis materiality, let alone *requiring* states to adopt his interpretation of that requirement lest their postconviction DNA procedures be declared constitutionally infirm. At base, he complains of the denial of DNA testing. More is needed to show a violation of due process.[22]

Plaintiff alleges that article 64.03(a)(2)'s materiality standard, which requires an inmate to show by a preponderance of the evidence that he or she would not have been convicted if exculpatory DNA results had been obtained, effectively precludes testing. Pl.'s Amended Compl. 23–26. But Plaintiff does not identify any support for the proposition that the CCA misapplied the evidentiary standard in article 64.03(a)(2)(A) or that due process requires a state court to employ a particular standard or method of review in making such an evidentiary evaluation.

"A requirement of demonstrating materiality is [a] common" feature in postconviction DNA testing schemes, *Osborne*, 557 U.S. at 63, and the requirement that the evidence "be sufficiently material" is not inconsistent with the "'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness.'" *Id.* at 70 (quoting *Medina*, 505 U.S. at 446,

---

[22]   This critique is applicable to all elements of Plaintiff's due process claim. For brevity's sake, Defendants asks the Court to consider all of Plaintiff's due process complaints as nothing more than complaints of state law error and inadequately pled.

448). Plaintiff's inability to demonstrate that Chapter 64 violates due process by requiring him to show materiality of exculpatory DNA results leaves him with nothing but a challenge to the CCA's application of the standard to his case. This transforms Plaintiff's claim from process to substance, essentially requiring DNA testing for all items in all cases. But "there is no such substantive due process right." *Id.* at 72.

Moreover, Plaintiff identifies no error in the CCA's limitation of its review in Chapter 64 proceedings. As the CCA has explained, a Chapter 64 proceeding "is not a retrial of the case." *Raby v. State*, 2015 WL 1874540, at *8 (Tex. Crim. App. Apr. 22, 2015). In determining materiality, the CCA "does not consider post-trial factual developments." *Reed v. State*, 541 S.W.3d 759, 774 (Tex. Crim. App. 2017). Instead, the court considers "whether exculpatory results 'would alter the landscape if added to the mix of evidence that was available at the time of trial.'" *Id.* (quoting *Holberg v. State*, 425 S.W.3d 282, 285 (Tex. Crim. App. 2014)). "Chapter 64 is simply a procedural vehicle for obtaining certain evidence 'which might then be used in a state or federal habeas proceeding.'" *Ex parte Gutierrez*, 337 S.W.3d at 890 (quoting *Thacker v. State*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005)).

The Constitution does not require a state to employ an expansive materiality review in postconviction DNA proceedings. Indeed, the Supreme Court in *Osborne* reversed the circuit court where that court framed the

48

materiality analysis as an expansive "forward-looking" inquiry that required a court to consider "all the evidence, old and new, incriminating and exculpatory."' *Osborne v. Dist. Attorney's Office for the Third Judicial*, 521 F.3d 1118, 1135 (9th Cir. 2008) (quoting *House*, 547 U.S. at 538); *id.* at 1140 ("[A]ll new evidence may be considered in assessing the potential materiality of further DNA testing."). Nothing in the Supreme Court's *Osborne* opinion mandates that a state court employ, as the circuit court did, a materiality analysis equivalent to that which would apply to a claim of actual innocence under *House*. *Id.* at 1140.

Indeed, due process does not mandate that states provide *any* postconviction review. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). When a state does, it need not provide an attorney, even in capital cases. *Murray v. Giarratano*, 492 U.S. 1, 10 (1989) (plurality opinion). And due process does not even mandate inmate competence during the postconviction process. *Ryan v. Gonzales*, 568 U.S. 57, 67 (2013). There is simply no precedent to suggest that states must, as a constitutional matter, offer an open-ended factfinding venue when they enact postconviction DNA testing schemes. Direct appeal is generally limited to the record developed at trial even if new evidence arises during the pendency of review. *See, e.g.*, *Trevino v. Thaler*, 569 U.S. 413, 422 (2013). The same is true for federal habeas review. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

49

Plaintiff provides no briefing why a state cannot do what the federal courts do. *See Smith v. Phillips*, 455 U.S. 209, 218 (1982) ("It seems to us to follow 'as the night the day' that if in the federal system a post-trial hearing such as that conducted here is sufficient to decide allegations of juror partiality, the Due Process Clause of the Fourteenth Amendment cannot possible require more of a state court system."). This is especially true as Texas provides a venue for Plaintiff to air his "new" evidence via its habeas corpus process. Plaintiff provides no support for the proposition that due process requires a state court reviewing a request for DNA testing to accept the movant's one-sided interpretation of any new evidence. Consequently, the CCA did not violate Plaintiff's constitutional rights by not accepting his argument that his confession was coerced—a claim that has been repeatedly rejected. *Gutierrez v. Stephens*, 590 F. App'x at 376–77; *Ex parte Gutierrez*, 337 S.W.3d at 892 n.23. Plaintiff's assertion that state courts must consider any and all postconviction factual developments—proven, unproven, or previously rejected—would require an unprecedented expansion of constitutional law. Plaintiff's new-evidence requirement would effectively cause a full-blown retrial with each Chapter 64 motion.

Moreover, the CCA's opinion does not reflect "a per se rule" that DNA testing is disallowed if there is "any" evidence of the inmate's guilt. Pl.'s Amended Comp. 24. Rather, the CCA properly determined that exculpatory

50

DNA results *in this particular case* would not have changed the outcome of Plaintiff's trial where he was tried as a party and the evidence—four eyewitness identifications of Plaintiff and the statements of Plaintiff and his cohorts—"unequivocally" placed him inside Mrs. Harrison's home at the time she was killed.[23] *Gutierrez v. State*, 2020 WL 918669, at *7; *see Morrison*, 809 F.3d at 1068 (rejecting inmate's challenge to state's postconviction DNA statute's reasonable probability burden of proof because "it does not violate due process to evaluate what potential impact a negative DNA test could have").

In the same way, contrary to Plaintiff's assertion, the CCA did not use Plaintiff's confession as the sole basis for denying relief. Pl.'s Amended Comp. 25. It was the circumstances of the offense—an attack by multiple *known* actors and a defendant tried under the law of parties—that compelled the CCA's conclusion.[24] And the CCA's well-justified conclusions did not render

---

[23]   Plaintiff's argument is also belied by the instances in which Texas courts have granted testing. *See, e.g., In re Morton*, 326 S.W.3d 634, 647–48 (Tex. Crim. App. 2010); *Routier v. State*, 273 S.W.3d 241, 259–60 (Tex. Crim. App. 2008); *Blacklock v. State*, 235 S.W.3d 231, 233 (Tex. Crim. App. 2007); *Smith v. State*, 165 S.W.3d 361, 365 (Tex. Crim. App. 2005); *Raby v. State*, 2005 WL 8154134, at *8 (Tex. Crim. App. 2005); *State v. Long*, 2015 WL 2353017, at *1 (Tex. App.—Waco, May 14, 2015); *see also Ex parte Pruett*, 458 S.W.3d 535, 536 (Tex. Crim. App. 2015).

[24]   Relatedly, Plaintiff argues that article 64.03(b) prohibits a court from relying "solely" on an inmate's confession or guilty plea to find that identity was not an issue at trial. Pl.'s Amended Comp. 25. He faults the CCA for relying "heavily" on his confession because doing so is inconsistent with the spirit of Chapter 64. Pl.'s Amended Comp. 25. But again, the CCA did not rely solely on Plaintiff's confession. *Gutierrez v. State*, 2020 WL 918669, at 6–8.

Chapter 64 fundamentally inadequate. *See Cromartie*, 941 F.3d at 1256–57 (relying on *Osborne* to reject inmate's claim that state statute's materiality standard was improperly subjective and did not allow for assessment of weaknesses in the prosecution's evidence); *Campos v. Yenne*, 699 F. App'x 323, 323–24 (5th Cir. 2017); *Harris v. Lykos*, 556 F. App'x 351 (5th Cir. 2014) (affirming dismissal of civil rights complaint because the incriminating evidence presented at trial supported the state court's conclusion that DNA evidence showing that another person was present at the crime scene would not have changed the outcome of the trial); *Thompson v. Rundle*, 393 F. App'x 675, 679 (11th Cir. 2010) ("If there is no possibility that DNA evidence could exonerate the prisoner, no procedural due process right has been violated."); *cf. United States v. Jordan*, 594 F.3d 1265, 1268 (10th Cir. 2010) (affirming the denial of DNA testing where the presence of a third party's DNA on the murder weapon would not exculpate the inmate because it would not "explain away" the evidence of his motive, his statements, or eyewitness testimony).

Importantly, Texas is not alone in limiting the evidence to be considered in a materiality review. *See, e.g.*, *Meinhard v. State*, 371 P.3d 37, 44 (Utah 2016) ("And other provisions of the code make clear that only DNA test results can establish factual innocence under Part 3 of the PCRA."); *Anderson v. State*, 831 A.2d 858, 867 (Del. 2003) ("When deciding whether evidence is materially relevant, the trial court must consider not only the exculpatory potential of a

favorable DNA test result, but also the other evidence presented at trial."). And again, *Osborne* overturned the Ninth Circuit's opinion that criticized the Alaska Supreme Court's materiality review because it "focus[ed] only on the state of the evidence as it existed at trial and whether that trial record would lead one to question the integrity of that evidence." *Osborne*, 521 F.3d at 1135. Moreover, a materiality review that focuses on the effect of trial is a well-worn rule in many constitutional contexts. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 681–82 (1985); *Strickland v. Washington*, 466 U.S. 668, 695–96 (1984). Use of such a materiality review standard in a postconviction DNA testing scheme is not fundamentally unfair. *See Osborne*, 557 U.S. at 70.

Nonetheless, Plaintiff fails to demonstrate any error—much less constitutional error—in the CCA's decision. The CCA explained its inquiry this way: "Will this testing, if it shows that the biological material does not belong to the defendant, establish, by a preponderance of the evidence, that he did not commit the crime as either a principal or a party?" *Ex parte Gutierrez*, 337 S.W.3d at 900. The CCA concluded—twice—that because Plaintiff was undeniably a party to Mrs. Harrison's murder committed during the burglary that he planned, he could not satisfy article 64.03(a)(2)(A). *Id.* at 900–02; *Gutierrez v. State*, 2020 WL 918669, at *6–8.

Plaintiff complains that the CCA improperly speculated in its first opinion as to the likely results of his requested testing of Mrs. Harrison's

53

fingernail scrapings rather than determining whether, assuming exculpatory results were obtained, he established by a preponderance of the evidence that he would not have been convicted with such results. Pl.'s Amended Compl. 23. But the CCA did not rest its decision on such speculation. Rather, the court determined that, "even if one accepted" the "implausible scenario" that Plaintiff was not at the murder scene at the time of the murder, exculpatory results "would not make it less probable that [Plaintiff] 'planned the ripoff' and was a party to Mrs. Harrison's murder." *Ex parte Gutierrez*, 337 S.W.3d at 901. The absence of Plaintiff's DNA "would, at best, show only that Gracia, rather than [Plaintiff], was the second stabber in the house." *Id*. But it would not render Plaintiff a non-party in light of his admission to masterminding the "rip-off" of Mrs. Harrison. *Id*. The CCA explained its reasoning plainly:

> [G]ranting DNA testing in this case would merely "muddy the waters." [Plaintiff] does not seek testing of biological evidence left by a lone assailant, and a third-party match to the requested biological evidence would not overcome the overwhelming evidence of his direct involvement in the multi-assailant murder.

*Id*. at 901–02. The CCA again considered the issue in its most recent opinion, concluding that exculpatory results would not have changed the outcome of Plaintiff's trial. *Gutierrez v. State*, 2020 WL 918669, at *6–8.

The CCA's decisions are firmly supported by the record: (1) Plaintiff admitted to planning the burglary of Mrs. Harrison's home,[25] (2) Garcia and Gracia each placed Plaintiff in Mrs. Harrison's home at the time of the murder, (3) Plaintiff knew Mrs. Harrison kept a large amount of cash in her home, (4) he was seen by several people near Mrs. Harrison's home on the day of the murder, (5) his explanation that he and Garcia carried screwdrivers—one flathead and one Phillips-head—was consistent with the medical examiner's testimony that Mrs. Harrison's injuries were consistent with being caused by those types of screwdrivers, (6) Plaintiff gave a relative $50,000 for safekeeping after the murder, and (7) Plaintiff led the police directly to Mrs. Harrison's discarded suitcase that had held her money.[26] *Ex parte Gutierrez*, 337 S.W.3d at 886–88. Plaintiff's efforts to avoid the obvious import of that evidence is simply unavailing, and he cannot show that the CCA's denial of his request for

---

[25]    Plaintiff's admission came after identifying an alibi witness who soon contradicted Plaintiff's story. *Ex parte Gutierrez*, 337 S.W.3d at 886.

[26]    Notably, Plaintiff asserts that the medical examiner testified that Mrs. Harrison "struggled with her assailant(s) for at least a few minutes" and fought her attacker(s) with her hands. Pl.'s Amended Comp. 15–16. Not so. The medical examiner testified that Mrs. Harrison suffered defensive wounds (wounds suffered while "trying to ward off blows or attacks of some sort" or "dodging"). 19 RR 245–46. She had "some scrapes on her right wrist" and elbow and on one knuckle. 19 RR 245. The medical examiner testified that Mrs. Harrison "struggle[d]," but he did not testify that she fought her attacker(s) or that she struggled with them for several minutes. 19 RR 247. The medical examiner also testified that Mrs. Harrison may have lived "at least for some minutes after the last injury was inflicted" but that she would not have been conscious after receiving the blows to her face. 19 RR 271–72.

DNA testing violated a fundamental principle of justice. *See Ramirez*, 715 F. App'x at 350 (denying a motion for a stay of execution in a civil rights action where DNA testing would not demonstrate the movant's innocence and he had led the police to the victim's body).

Plaintiff's claim represents a disagreement with the CCA as to the proper application of Chapter 64 to his case. His disagreement, however, does not satisfy his "heavy burden" to show that the CCA's decision "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Pruett*, 711 F. App'x at 206 (quoting *Osborne*, 557 U.S. at 69). As a matter of law, there is no due process violation and Plaintiff fails to state a claim for which relief may be granted.

It is also worth noting that Plaintiff suggests the DNA testing he requests would produce definitive results because DNA profiles obtained from the crime-scene evidence could be compared to DNA profiles of Avel Cuellar and Plaintiff's two co-defendants. Pl.'s Amended Compl 27. But Plaintiff does not explain whether any known reference samples from Cuellar, Rene Garcia, or Pedro Gracia exist or could be obtained. And, according to Plaintiff, Gracia absconded long ago. Pl.'s Amended Compl. 7. Consequently, it seems that Plaintiff vastly overstates the probative value of any possible DNA testing.

Moreover, Cuellar lived with Mrs. Harrison. *Gutierrez v. State*, 2020 WL 918669, at *7. As the CCA explained, the presence of his DNA in her home

would be unsurprising. *Id*. Simply put, the touch DNA testing Plaintiff seeks "poses special problems because epithelial cells are ubiquitous on handled materials, because there is an uncertain connection between the DNA profile identified from the epithelial cells and the person who deposited them, and because touch DNA analysis cannot determine when an epithelial cell was deposited." *Dunning v. State*, 572 S.W.3d 685, 693 (Tex. Crim. App. 2019) (cleaned up); *see Hall v. State*, 569 S.W.3d 646, 658 (Tex. Crim. App. 2019). And, notably, Plaintiff does not assert that Cuellar was seen bleeding by the paramedics or police officers who responded to the 911 call.[27] Further, the blood spatter pattern analysis that Plaintiff seeks, Pl.'s Amended Compl. 26, is outside the scope of Chapter 64. *See In re Morton*, 326 S.W.3d at 647 (holding that a request for fingerprint analysis was outside the scope of Chapter 64 because the inmate did not seek testing on blood or skin cells from the fingerprints). To that extent, Plaintiff requests that this Court require a type

---

[27]   Plaintiff also seeks testing of a hair that was collected from Mrs. Harrison's hand and which he asserts his current counsel recently found among the evidence. Pl.'s Amended Compl. 27. Assuming the evidence reviewed by counsel is the same hair that was collected from Mrs. Harrison's hand, he cannot show he was entitled to testing of it. As the CCA determined regarding Mrs. Harrison's fingernail scrapings, the presence of a hair from a third-party would not exculpate Plaintiff. *Gutierrez v. State*, 2020 WL 918669, at *8. Even if the hair belonged to Gracia (a seemingly impossible conclusion given the absence of a reference sample for him), such evidence would not render Plaintiff a non-party to Mrs. Harrison's murder. *See Ex parte Gutierrez*, 337 S.W.3d at 901. And the presence of Cuellar's hair would not be exculpatory to Plaintiff since Cuellar lived in Mrs. Harrison's home.

of testing that Chapter 64 does not provide for, and his request can be based on nothing other than a nonexistent substantive due process right.

Plaintiff also complains that the CCA prevented him from obtaining new DNA results to establish that he is ineligible for the death penalty. Pl.'s Amended Compl. 28–29. But because Chapter 64 does not authorize testing for the purpose of affecting punishment,[28] Plaintiff was not entitled to testing to obtain results that would be only mitigating. *Ex parte Gutierrez*, 337 S.W.3d at 901. In this regard, Plaintiff's claim seeks to graft onto Chapter 64 a provision that does not exist, allowing for DNA testing where the results might only affect the inmate's sentence. Pl.'s Amended Comp. 28–29. As discussed above, to establish a due process violation, Plaintiff must show that the procedures provided in Chapter 64 are "fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69. But Plaintiff does not have a constitutional right to expand the scope of a state's postconviction DNA framework. *Cf. Dawson v. Suthers*, 2015 WL 5525786, at *5 (D. Colo. Sept. 21, 2015) ("It is patently reasonable for the government to grant persons claiming actual innocence more access to postconviction remedies than it grants persons who claim that their culpability for a crime is lessened by a diminished

---

[28]     *Ex parte Gutierrez*, 337 S.W.3d at 901 n.59 (citing *Kutzner v. State*, 75 S.W.3d 427, 437–42 (Tex. Crim. App. 2002)).

capacity."). Consequently, Plaintiff's claim asserts a violation of a non-existent substantive right and fails to state a viable claim.

Nonetheless, the CCA assumed that Chapter 64 permitted such testing and concluded Plaintiff did not show an entitlement to it because exculpatory results would not have negated the requisite culpability for him to be death eligible. *Ex parte Gutierrez*, 337 S.W.3d at 901. He cannot show the CCA's decisions unconstitutionally deprived him of the ability to attempt to establish he was ineligible for the death penalty where the court *assumed the statute permitted such a claim* but found that Plaintiff's showing was insufficient. *Id.*; *Gutierrez v. State*, 2020 WL 918669, at *8.

Plaintiff simply cannot show that the CCA's decision "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Pruett*, 711 F. App'x at 206; *see Ramirez*, 715 F. App'x at 350; *Roughley v. Watkins*, 2014 WL 5313957, at *3 (N.D. Tex. Sept. 22, 2014) ("Because Plaintiff cannot meet the statutory requirements for obtaining post-conviction DNA testing, he cannot complain of the inadequacy of the State's procedures."). His complaint fails to state a claim to relief that is plausible on its face, and it should be dismissed. *See Elam v. Lykos*, 470 F. App'x 275, 275–76 (5th Cir. 2012); Order, *Swearingen*, Civ. Act. No. A-16-CV-1181 (W.D. Tex. July 7, 2017) ("Because no relief could be granted on Swearingen's claims even if his allegations were taken as true, he does not

state a claim upon which relief may be granted."); *Burden v. Maness*, 2014 WL 4651609, at *2 (E.D. Tex. Sept. 17, 2014) (dismissing plaintiff's complaint for failing to state a claim because, "[w]hile plaintiff contends that the interpretation of Article 64.03 has led to an incorrect ruling in his case, he has not demonstrated that the procedures established by Article 64.03 are, in themselves, inadequate to protect a defendant's right to postconviction DNA testing").

> **3.     Relief cannot be granted on Plaintiff's access-to-courts claim because it fails as a matter of law.**

While a state inmate has a "right of access to the courts," that right does not encompass the ability "to *discover* grievances, and to *litigate effectively* once in court." *Lewis v. Casey*, 518 U.S. 343, 350, 354 (1996) (emphasis removed from initial quotation). "One is not entitled to access to the courts merely to argue that there might be some remote possibility of some constitutional violation." *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017) (quoting *Whitaker v. Livingston*, 732 F.3d 465, 467 (5th Cir. 2013)). If a litigant has "not met the pleadings standards for . . . their claims, their access-to-the-courts theory necessarily fails as well." *Id*. Because Plaintiff's due process claim fails, his access-to-courts claims does too. *See id*; *Alvarez*, 679 F.3d at 1265–66 (same as applied to a postconviction DNA testing challenge). It must therefore be dismissed.

Relatedly, Plaintiff makes a conclusory assertion that the CCA's denial of DNA testing prevented him from access to the state clemency process. Pl.'s Amended Comp. 31. But "pardon and commutation decisions are not traditionally the business of courts." *Faulder v. Texas Bd. of Pardons & Paroles*, 178 F.3d 343, 344 (5th Cir. 1999). Plaintiff's access-to-clemency claim—whether alleging a violation of due process or a right to access to the courts—is patently meritless.[29] *Osborne*, 557 U.S. at 67–68; *Cromartie*, 941 F.3d at 1258; *McKithen*, 626 F.3d at 151–52.

### 4. Relief cannot be granted on Plaintiff's Eighth Amendment claim because it fails as a matter of law.

The Eighth Amendment applies primarily to "the trial stage of capital offense adjudication, where the court and jury hear testimony, receive evidence, and decide the questions of guilt and punishment." *Giarratano*, 492 U.S. at 9 (plurality opinion). It does not apply to postconviction procedures. *See id.* at 9–10.[30] And it does not create a claim upon which relief can be granted

---

[29]    Relatedly, the Fifth Circuit recently held that a plaintiff lacked standing to challenge Texas's clemency procedures because he filed his § 1983 lawsuit prior to filing his application for clemency. *Ochoa v. Collier*, 2020 WL 582397, at *2 (5th Cir. Feb. 4, 2020); *see Sepulvado v. Louisiana Bd. of Pardons and Parole*, 114 F. App'x 620, 621 (5th Cir. 2004). Consequently, Plaintiff's access-to-clemency claim is subject to dismissal for want of jurisdiction. Fed. R. Civ. P. 12(b)(1).

[30]    Although the Eighth Amendment prevents the execution of an incompetent individual, it does not "impose[ ] heightened procedural requirements" to determine competence. *Giarratano*, 492 U.S. at 10 (quoting *Ford v. Wainwright*, 477 U.S. 399, 425 (1986) (Powell, J., concurring)).

61

as applied to postconviction DNA testing schemes. *See Alvarez*, 679 F.3d at 1265 ("We can discern no conceivable basis in this case, nor has Alvarez provided us with one, for attempting an end-run around the *Osborne* holding under the cloak of the Sixth or Eighth Amendments."); *McKithen*, 626 F.3d at 155. And because Plaintiff argues that the Eighth Amendment prohibits his execution, it is a challenge to his sentence and is barred from a § 1983 suit under *Heck. See In re Pruett*, 784 F.3d at 290–91. The claim fails as a matter of law and it must be dismissed.

### F.   Plaintiff's Chaplain claims fail as a matter of law.

Plaintiff claims that TDCJ's refusal to allow a chaplain to be present in the execution chamber during Plaintiff's execution violates the Establishment Clause and Free Exercise Clause of the First Amendment and, under RLUIPA, substantially burdens his exercise of religion. Pl.'s Amended Compl. 32–36. Plaintiff's Chaplain claims should be dismissed because they fail to state a claim on which relief may be granted.

#### 1.   Background

In March 2019, the Supreme Court stayed the execution of Patrick Murphy based on his claims challenging TDCJ's refusal to permit a Buddhist spiritual advisor in the execution chamber while permitting Christian or Muslim chaplains to be present during an execution. *Murphy v. Collier*, 139 S. Ct. at 1475. Justice Kavanaugh explained that Murphy's claims could be

mooted if TDCJ allowed "inmates to have a religious advis[o]r, including any state-employed chaplain, only in the viewing room, not in the execution room" *Id*. (Kavanaugh, J., concurring).

Afterward, TDCJ changed its execution protocol such that chaplains are not permitted to be present in the execution chamber. Pl.'s App. at 012. The protocol provides that an inmate may, on the day of the execution, "have visits with a TDCJ Chaplain(s)[ and] a Minister/Spiritual Advisor who has the appropriate credentials." Pl.'s App. at 011. An approved outside spiritual advisor (i.e., a member of the clergy or an individual approved in accordance with policy who serves the inmate in a religious capacity but is not a TDCJ employee) may visit the inmate from 3:00 to 4:00 p.m. on the day of the execution in a holding area at the Huntsville Unit. Pl.'s App. at 011–12. Chaplains and an outside spiritual advisor may also be present in the witness room immediately adjacent to the execution chamber. Pl.'s App. at 012.

## 2. The RLUIPA claim

To state a claim under RLUIPA, Plaintiff must show that the challenged government conduct substantially burdens his religious exercise. 42 U.S.C. § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution."); *see Brown v. Collier*, 929 F.3d 218, 228–29 (5th Cir. 2019); *Adkins v. Kaspar*, 393 F.3d 559, 569–70 (5th Cir. 2004) (adopting the Supreme Court's interpretation

of "substantial burden" as one that forces the person to choose between following the precepts of his religion or receiving some otherwise available benefit, and truly pressures the adherent to substantially modify his or her religious behavior) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)). TDCJ's policy permitting chaplains and spiritual advisors to attend an execution only in the witness room rather than inside the execution chamber is not a substantial burden on Plaintiff's religious exercise.

Plaintiff provides no support for his conclusory assertion that the presence of a TDCJ chaplain in the witness room—rather than the execution chamber and during visitation on the day of the execution—is a substantial burden on his exercise of his religion. Pl.'s Amended Compl. 35. He does not assert that the physical presence of a chaplain in the execution chamber is required for him to exercise his religion or to "guide[ ]" Plaintiff at the time of the execution. Pl.'s Amended Compl. 35–36. Plaintiff's religious behavior will be the same with a chaplain in the witness room. He fails to demonstrate that TDCJ's policy would truly force him to "substantially modify his religious behavior." *Adkins*, 393 F.3d at 570.

Moreover, "[i]ncidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are not a substantial burden within the meaning of RLUIPA. *Lyng v. Nw. Indian*

*Cemetery Protective Assoc.*, 485 U.S. 439, 450–51 (1988). Plaintiff will not be forced to choose between his religious exercise and some benefit; the incidental effect of a chaplain's presence in the witness room rather than in the execution chamber will not cause Plaintiff to substantially alter his religious exercise. Because Plaintiff fails to identify a substantial burden on his religious exercise, the burden does not shift to Defendants to make any showing. *Brown*, 929 F.3d at 229. Consequently, even accepting Plaintiff's allegations as true, he fails to state a claim upon which relief can be granted. His complaint should be dismissed.

Even assuming Plaintiff's conclusory assertions identified a substantial burden on his religious exercise, it is indisputable that TDCJ's penological interest in security is a compelling interest. As Justice Kavanaugh explained,

> A State may choose a remedy in which it would allow religious advis[o]rs only into the viewing room and not the execution room because there are operational and security issues associated with an execution by lethal injection. Things can go wrong and sometimes do go wrong in executions, as they can go wrong and sometimes do go wrong in medical procedures. States therefore have a strong interest in tightly controlling access to an execution room in order to ensure that the execution occurs without any complications, distractions, or disruptions. The solution to that concern would be to allow religious advisors only into the viewing room.

*Murphy*, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring). Despite this, Plaintiff states that it "is unclear what interest" the protocol serves. Pl.'s Amended Compl. 33. The interest is self-evident. Indeed, the Supreme Court

65

has instructed that in applying RLUIPA, courts are to give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). RLUIPA does not prevent a prison from taking prophylactic measures or require them to wait for a security breach before adopting prison policies. *See, e.g., Whitley v. Albers*, 475 U.S. 312, 322 (1986).

Critically, Plaintiff's request to force TDCJ to allow its chaplains into the execution chamber would *create* the very statutory and constitutional violations he purports to solve. He purports to simply request that TDCJ's approved chaplains (as opposed to outside spiritual advisors) be permitted to be present in the execution chamber. Pl.'s Amended Compl. 35. But the relief could not and would not end there. That is, if TDCJ was forced to revert to its previous protocol and permit its chaplains into the execution chamber, TDCJ would be in the position it was *before* the Supreme Court stayed Patrick Murphy's execution. But the Supreme Court signaled that the earlier protocol was impermissible because spiritual advisors not employed by TDCJ could not be present in the execution chamber. *Murphy*, 139 S. Ct. at 1475. Only now, TDCJ would have only one option available to it—to accommodate every denomination. But doing so is plainly infeasible, and neither statute nor the

66

Constitution require TDCJ to approve a spiritual advisor to accommodate every possible denomination. *See Brown*, 929 F.3d at 225 (noting evidence presented in another lawsuit that "there were 217 offender faith preferences represented in the TDCJ system"). And TDCJ's choice of Justice Kavanaugh's other solution—to permit chaplains and spiritual advisors in the witness room—can hardly be the basis of disregarding the deference owed to the prison system. *Murphy*, 139 S. Ct. at 1476 (Kavanaugh, J., statement respecting grant of stay) (stating that TDCJ's revised policy "likely passes muster under" RLUIPA).

While Plaintiff frames the relief he requests as straightforward— because TDCJ has in the past permitted its chaplains to attend executions— he ignores the inevitable consequences of that relief. Pl.'s Amended Compl. 33. The government's interest in maintaining an orderly execution process is indeed compelling. Yet the relief Plaintiff requests would thrust upon TDCJ the requirement that it permit spiritual advisors from any and all conceivable denominations, irrespective of TDCJ's ability to fully ensure they are all suited (i.e., of good judgment, professionalism, behavior, and discretion), trained, and prepared for the task of being present in the execution chamber. In short, Plaintiff's requested relief is unworkable on its face.[31] *See Cutter*, 544 U.S. at

---

[31]     For the same reason, Plaintiff is not entitled under the PLRA to the relief he seeks because "[p]rospective relief in any civil action with respect to prison conditions

726 ("Should inmate requests for religious accommodations . . . jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."). Indeed, the Supreme Court has held that prison facilities are not required to provide "identical facilities or personnel" to "every religious sect or group within a prison." *Cruz v. Beto*, 405 U.S. 319, 325 n.2 (1972) ("A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand.").

TDCJ has—consistent with guidance from the Supreme Court—designed the least restrictive means of furthering its obvious and compelling interest in security. *Murphy*, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring); *id*. at 1476 (Kavanaugh, J., statement respecting grant of stay). In fact, TDCJ allows more by permitting an inmate to visit with a chaplain or his or her spiritual advisor on the day of the execution. Pl.'s App. at 012. And an inmate may visit with TDCJ-employed clergy "until the moment he enters

<hr>

shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). "The Court shall not grant or approve any prospective relief unless the court finds such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id*. Moreover, "[t]he Court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id*.

the execution chamber."[32] *Murphy*, 942 F.3d at 706. RLUIPA envisions that inmates' requests for religious accommodations will be scrutinized in the context of the prison environment and the paramount security concerns involved with incarcerated felons. *See Cutter*, 544 U.S. at 717, 722. Plaintiff's request concerns the weighty process of carrying out an execution. RLUIPA does not elevate accommodation of religious observances over a prison's need to maintain order and safety. *Id*. at 722. TDCJ's execution protocol is the least restrictive means of furthering its compelling governmental interest in security. *Murphy*, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring). Plaintiff fails to state a claim upon which relief can be granted, and his amended complaint should be dismissed.

### 3.    The Establishment Clause claim

The Establishment Clause provides in relevant part that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. This clause applies to the states through the Fourteenth Amendment.

---

[32]    Plaintiff does not allege any claim regarding his exercise of his religion while in the "holding area" prior to his execution, as Murphy alleged in his lawsuit. *See Murphy*, 942 F.3d 706–07. Consequently, the litigation in Murphy's case has little, if any, bearing on Plaintiff's Chaplain claim. *See id*. at 706 ("[T]he focus of the amended complaint shifted to the interaction an inmate has with his spiritual advisor before entering the execution chamber."). Indeed, Murphy's execution was most recently stayed because the Fifth Circuit found he had "a strong likelihood of success on the merits of his claim that the TDCJ policy violates his rights by allowing inmates who share the same faith as TDCJ-employed clergy greater access to a spiritual advisor in the death house." *Id*. at 708.

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000). Governmental action under the Establishment Clause is typically analyzed under a three-prong test: (1) "the statute must have a secular legislative purpose;" (2) "its principal or primary effect must be one that neither advances nor inhibits religion;" and (3) "the statute must not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

Plaintiff alleges that TDCJ's execution protocol prohibiting chaplains from attending his execution favors the non-religious over the religious and thus violates the Establishment Clause. Pl.'s Amended Compl. 32–34. He argues that, because the protocol is not neutral between religion and non-religion, it may only withstand a First Amendment challenge if it is narrowly tailored to a compelling interest. Pl.'s Amended Comp. 33.

However, both the Supreme Court and the Fifth Circuit recently applied the "reasonableness test" rather than the *Lemon* test in Establishment Clause challenges. *Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2087 (2019); *Brown*, 929 F.3d at 243.[33] The Fifth Circuit emphasized that, "to ensure that courts afford appropriate deference to prison officials, we have determined that

---

[33]     Judge King did not concur in Part VI of the *Brown* opinion. However, Judge King specified she did not join Part VI only because she disagreed with the conclusion that TDCJ's housing policy did not violate the Establishment Clause. *Brown*, 929 F.3d at 254 (King, J., concurring in part). Part VI of the *Brown* opinion is cited only for the analysis with which Judge King did not take issue.

prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness test.'" *Brown*, 929 F.3d at 243 (citing *Turner v. Safley*, 482 U.S. 78, 86–87 (1987)). The Fifth Circuit declined to apply strict scrutiny to an inmate's Establishment Clause claim—implicating over 140,000 inmates and more than 200 faith groups—that alleged certain TDCJ religious policies favored some faiths over others. *Id.* at 246–47. Instead, the court applied the more deferential standard under *Turner* and stated that "prison officials must operate within a zone of reasonableness. *Id.* at 244; *see Murphy v. Collier*, 942 F.3d at 714 (Elrod, J., dissenting).

The right asserted by Plaintiff to have a TDCJ chaplain in the execution chamber with him rather than in the witness room "must necessarily be limited in the prison context." *Brown*, 929 F.3d at 246-47.  And the deferential standard applied by the Supreme Court and Fifth Circuit to Establishment Clause claims leads to the conclusion that TDCJ's protocol is plainly permissible.

First, as discussed above, TDCJ's protocol limiting who may be present in the execution chamber is rationally connected to its interest in maintaining security and ensuring an orderly execution process. Indeed, its interest is compelling. *See Murphy*, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring). Second, Plaintiff can practice his religion before and during his execution. He does not adequately allege any way in which he will be prevented from doing

71

so. Third, as discussed above, the necessary consequence of the relief Plaintiff seeks is the compelling of TDCJ to permit spiritual advisors from any and all conceivable denominations, or else recreate the constitutional dilemma the Supreme Court addressed in *Murphy*. Such relief would require TDCJ to permit the attendance of potentially ill-suited individuals in the execution chamber. Fourth, there are no ready alternatives that would alleviate the security risks of allowing such an outsider into the execution chamber during an execution. *See Turner*, 482 U.S. at 90. Under *Turner*, there is no dispute that TDCJ's protocol is reasonably related to its legitimate interest in security.

Moreover, TDCJ's revision of its protocol regarding the presence of chaplains during an execution was in response to the Supreme Court's action in *Murphy*. 139 S. Ct. at 1476 (Kavanaugh, J., statement respecting grant of stay). Plaintiff can in no way show that the revision evinces hostility toward religion or was motivated by discriminatory intent or intent to exclude all religions rather than its obvious secular motivation of maintaining a safe and orderly execution process. *See Am. Legion*, 139 S. Ct. at 2084–85. Therefore, Plaintiff fails to state a claim upon which relief can be granted, and his complaint should be dismissed.

### 4.    The Free Exercise Clause claim.

As discussed above, TDCJ's protocol is rationally related to its legitimate penological interest in security and an orderly execution process. For much the

same reason, Plaintiff's Free Exercise Clause claim does not identify a constitutional violation. TDCJ's protocol allows Plaintiff to meet with a chaplain on the day of the execution, and it permits the chaplain to be present in the witness room. Pl.'s App. at 012. As with Plaintiff's other Chaplain claims, the relief he seeks is untenable and would, in fact, create potential constitutional violations. Plaintiff's conclusory assertions, Pl.'s Amended Compl. at 34–35, cannot establish a viable claim and his complaint should be dismissed.

## CONCLUSION

Plaintiff's amended complaint fails to establish that this Court has jurisdiction to consider it or that it alleges a claim for relief upon which relief can be granted. Plaintiff also fails to establish an entitlement to a stay of execution. Therefore, Defendants respectfully request that this Court dismiss the amended complaint and deny a stay of execution.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Jay Clendenin
JAY CLENDENIN
Assistant Attorney General
State Bar No. 24059589
Southern District Admission No. 920324

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
email: *jay.clendenin@oag.texas.gov*

s/ Edward Sandoval
EDWARD SANDOVAL
First Assistant District Attorney, Cameron
County, Texas
State Bar No. 24063779
Southern District Admission No. 1057169

964 East Harrison St.
Brownsville, Texas 78520
email: *appellate@co.cameron.tx.us*

s/ Rene De Coss
RENE DE COSS
City Attorney, Brownsville, Texas
State Bar No. 00795315
Southern District Admission No. 20563

914 E. Van Buren
Brownsville, Texas 78520
email: *renedecoss@cob.us*

*Counsel for Defendants*

74

## CERTIFICATE OF SERVICE

I do herby certify that on May 12, 2020, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" (NEF) to the following counsel of record, who consented in writing to accept the NEF as service of this document by electronic means:

Peter Walker
Federal Community Defender
for the Eastern District of Pennsylvania
601 Walnut St., Suite 545 West
Philadelphia, PA  19106
peterwalker@fd.org

Richard Rogers, III
3636 S. Alameda St., Suite D191
Corpus Christi, Texas 78411
rwrogersiii@aol.com

s/ Jay Clendenin
JAY CLENDENIN
Assistant Attorney General

75