United States District Court
Southern District of Texas
**ENTERED**
November 24, 2020
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RUBEN GUTIERREZ, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL NO. 1:19-CV-00185 |
| | § | |
| LUIS V. SAENZ, *et al*, | § | |
| | § | |
| Defendants. | § | |

On September 26, 2019, Ruben Gutierrez filed this civil-rights action under 42 U.S.C. § 1983 to have what was guaranteed before a 2019 change in Texas Department of Criminal Justice policy: a prison chaplain's presence in the execution chamber during his final moments. Alternatively, Gutierrez asked for the presence of a spiritual advisor who is not employed by the prison system. The United States Supreme Court has jurisdiction over this case but has asked this Court to develop a narrow factual issue. This Court must "promptly determine, based on whatever evidence the parties provide, whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution." *Gutierrez v. Saenz*, 207 L. Ed. 2d 1075 (June 16, 2020).

The parties have submitted extensive evidence and briefed their positions concerning the question posed by the Supreme Court.[1] The Court

---

[1] Evidence relating to the matters now before the Court has been submitted by Gutierrez and the Defendants who are Texas Department of Criminal Justice officials: Bryan Collier, Executive Director of the TDCJ; Bobby Lumpkin who recently replaced Lorie Davis ("Davis") as director of the Correctional Institutions Division of the TDCJ; and Billy Lewis ("Lewis"), the senior warden of the Huntsville Unit where inmates are executed.

considers the evidence in the context of the change TDCJ made to its execution protocol as a result of a similar lawsuit filed by a Buddhist inmate.[2]

The Court determines that the change by TDCJ officials of the execution chamber policy involving spiritual advisors was not driven by research, careful study, or meaningful evaluation, but their interpretation of a concurring statement of a Supreme Court Justice. There is no evidence of any security incident regarding TDCJ clergy and Defendants have only raised speculative concerns about the presence of outside spiritual advisors not employed by TDCJ. Based on the evidence, the Court concludes that no serious security problems would result if a prisoner facing execution is permitted to have his chosen spiritual adviser in his immediate presence during the execution.

## I.   Policy of the State of Texas on Executions

### a.   TDCJ Policy Pre-*Murphy*[3]

After the nationwide hiatus in executions caused by *Furman v. Georgia*, 408 U.S. 238 (1972), the State of Texas adopted lethal injection as its sole method of execution in 1982. A TDCJ-employed chaplain attended the first execution by lethal injection that year. Dkt. No. 109 at A877.[4] In 1985, TDCJ adopted a policy and promulgated its official procedure for executions. *Id*. at A712-13; *see also* Texas Department of Criminal Justice—Correctional Institutions Division, Execution Procedure (as amended July 9, 2012), *Id*. at A1025. In 1985, "multiple" prison officials developed a prison execution procedure "through multiple drafts." *Id*. at A837. One such official is Steve J. Martin ("Martin") former TDCJ general counsel and now a

---

[2]      The Court takes judicial notice of (1) *Texas v. Gutierrez*, 98-CR-1391 (Tex. 107th Judicial Dist. Ct. Feb. 28, 2020); (2) the district court and appellate proceedings in *Murphy v. Collier*, 4:19-cv-1106 (S.D. Tex.); *Murphy v. Collier*, 139 S. Ct. 1475 (2019) and (3) the Texas Executed Offenders information available on TDCJ's website https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html.

correctional consultant with 48 years of experience,  who testified by deposition in this case. *See id.* at A831-32.

The official pre-*Murphy* policy required a TDCJ-employed chaplain's presence in the execution chamber to attend to the condemned inmate's spiritual needs:

> The CID Director or designee, the Huntsville Unit Warden or designee *and* the Huntsville Unit Chaplain or a designated approved TDCJ Chaplain *shall* accompany the offender while in the Execution Chamber.

*Id.* at A1032 (as amended in 2012) (emphasis added).

### b. Executions in State of Texas before *Murphy*

Between 1982 and March 2019 Texas conducted 560 executions.  Dkt. No. 109 at A490-91.[5]  The presence of a chaplain in the execution chamber did not cause any security incident during those years.  *Id.* at A492.  Before *Murphy*, an inmate had never requested the presence of a spiritual advisor who was not a TDCJ employee.

In his lawsuit, Murphy complained that TDCJ protocol would not allow the spiritual advisor of his choice in the execution chamber.  *Murphy v. Collier*, 4:19-cv-1106 (S.D. Tex.).   Murphy alleged that while incarcerated, he had become a Pure Land Buddhist.  He also alleged that TDCJ did not employ any Buddhist clergy.  Murphy's civil-rights lawsuit under 42 U.S.C. § 1983 is similar to the one before this Court.  Because TDCJ's pre-*Murphy* policy allowed inmates to have a TDCJ chaplain of their religion in the

---

[3]      TDCJ execution policy prior to April 2, 2019 is referred to as "pre-*Murphy*" and after April 2, 2019 as "post-*Murphy*" due to a change made in response to litigation by Texas death-row inmate Patrick Henry Murphy ("Murphy"), *Murphy v. Collier*, 4:19-cv-1106 (S.D. Tex.), discussed *infra*.

[4]      Gutierrez attaches extensive exhibits to his briefing.  The Court will cite to his exhibits by referring to the Bates Numbers stamped at the bottom of each page as follows: Dkt. No. 109 at A____.

[5]      *Executed Offenders*, Death Row Information: Texas Department of Criminal Justice, (available at https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html).

execution room, Murphy argued that the state policy which did not allow a Buddhist clergy was discriminatory and  violated the Constitution and federal law.

The United States Supreme Court stayed Murphy's execution on March 28, 2019. *Murphy v. Collier*, 139 S. Ct. 1475 (2019).  That same day, Justice Kavanaugh entered a concurring statement which proposed that "there would be at least two possible equal-treatment remedies available to the State going forward: (1) allow all inmates to have a religious adviser of their religion in the execution room; or (2) allow inmates to have a religious adviser, including any state-employed chaplain, only in the viewing room, not the execution room." *Murphy v. Collier*, 139 S. Ct. 1475 (2019) (Kavanaugh, J., concurring).

### c. TDCJ Policy Post-*Murphy*

Five days later, on April 2, 2019, TDCJ revised its execution protocol. Texas Department of Criminal Justice—Correctional Institutions Division, Execution Procedure April 2019 (effective April 2, 2019), Dkt. No. 110, Ex. A ("post-*Murphy* policy").[6]  The post-*Murphy* policy was enacted under TDCJ-CID Director Lorie Davis' ("Davis") signature.  The relevant portion of the April 2019 policy now states:

> Only TDCJ security personnel shall be permitted in the execution chamber.   The [TDCJ-CID] Director or designee and the Huntsville Unit Warden or designee shall accompany the offender while in the Execution Chamber.  TDCJ Chaplains and

---

[6]     Defendants argue that "TDCJ followed the Supreme Court's *directive* and amended the execution procedure in the manner *prescribed* by the Court."  Dkt. No. 110 at 10 (italics added).  This Court has already addressed Defendants' argument that the Supreme Court's action in *Murphy* and Justice Kavanaugh's statements carried any precedence in this proceeding.  Dkt. No. 48 at 24 ("[A] statement by a Supreme Court Justice does not carry binding precedential effect."); *see also Gutierrez v. Saenz*, 818 F. App'x 309, 314, 2020 WL 3250040, at *3 (5th Cir. 2020) (referring to the statements as "a suggestion by one justice").

> Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness rooms.

*Id.* at 8.  No spiritual advisors—not even the TDCJ employed chaplains—are now allowed at the inmate's side during his execution.  *See id.*

## II. Gutierrez § 1983 Lawsuit Challenging TDCJ's Post-*Murphy* Policy

On September 26, 2019, Gutierrez filed a complaint under 42 U.S.C. § 1983 claiming that the TDCJ post-*Murphy* policy violates the First Amendment's Establishment Clause (claim four) and Free Exercise Clause (claim five), as well as the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq (claim six).[7]  On February 28, 2020, the 107th Judicial District Court for Cameron County, Texas entered an order setting Gutierrez's execution for June 16, 2020. *Texas v. Gutierrez*, 98-CR-1391 (Tex. 107th Judicial Dist. Ct. Feb. 28, 2020).

In the instant case, Gutierrez's execution-chamber claims survived Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b). Dkt. No. 48.  On June 9, 2020, this Court entered an order staying Gutierrez's execution to allow this litigation to proceed.  Dkt. No. 57.  The Fifth Circuit reversed, *Gutierrez v. Saenz*, 818 F. App'x 309 (5th Cir. 2020), and Gutierrez sought certiorari review in the United States Supreme Court.[8]

---

[7]    Gutierrez's complaint also raised claims relating to the testing of genetic material related to the crime. These claims are not being addressed by the Court at this time.

[8]    Gutierrez sought certiorari review on two questions:

> 1.    Under the RLUIPA, does the State's decision to deprive Mr. Gutierrez of the opportunity to be accompanied during his execution by a religious adviser employed by the prison substantially burden the exercise of his religion, so as to require the State to justify the deprivation as the least restrictive means of advancing a compelling governmental interest?

> 2.    For purposes of the Free Exercise Clause, does the State's blanket policy of denying all prisoners the aid of a religious adviser at the time of the execution—

The Supreme Court stayed Gutierrez's execution and retains jurisdiction on these issues. *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). The petition for certiorari to the Supreme Court remains pending. On June 16, 2020 the Supreme Court gave this Court a specific task:

> Application for stay of execution of sentence of death presented to Justice Alito and by him referred to the Court granted pending the disposition of the petition for writ of certiorari. Should the petition for writ of certiorari be denied, this stay shall terminate automatically. In the event the petition for writ of certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court. **The District Court should promptly determine, based on whatever evidence the parties provide, whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution**.

*Gutierrez v. Saenz*, 207 L. Ed. 2d 1075 (June 16, 2020) (emphasis added).

At this stage, this Court will not decide whether Gutierrez has shown an entitlement to relief under RLUIPA or the First Amendment. Ultimate resolution of Gutierrez's execution-chamber claims must wait until it has full jurisdiction over this action. This Court's singular task is to respond to the Supreme Court's directive.[9]

## III.   Parties' Briefing and Evidence

The list of evidence submitted by the parties is attached as an appendix below. The Court has reviewed the whole of the material submitted by the

---

adopted for the acknowledged purpose of avoiding the obligation to allow such a minister to a Buddhist prisoner—burden Mr. Gutierrez's exercise of religion without legitimate justification?

*Gutierrez v. Saenz*, 19-8695, Petition for a Writ of Certiorari.

[9]      The Court will limit this inquiry to the questions presented by Gutierrez and respond to the Supreme Court's directive without offending the fundamental rule that "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *See Briggs v. Pennsylvania R. Co.*, 334 U.S. 304, 306 (1948).

parties and that of which it has taken judicial notice.  Below is a summary of the evidence that is relevant to the question posed by the Supreme Court.

### a. Evidence Regarding TDCJ Change in Execution Chamber Security Policy

After Justice Kavanaugh entered a concurring statement which proposed that religious advisers be allowed only in the viewing room, not the execution chamber, Davis and other TDCJ officials interpreted the concurring statement as a "directive… from the Supreme Court." *Murphy v. Collier*, 139 S. Ct. 1475 (2019) (Kavanaugh, J., concurring); Dkt. No. 109 at A217-26, 314.

The April 2, 2019 change in TDCJ execution protocol stands in stark contrast to the development of the 1985 policy.  Martin, who helped develop the pre-*Murphy* policy, testified that it was "developed through multiple drafts by multiple managers over several months."  Dkt. No. 109 at A837. By contrast, TDCJ implemented its April 2019 policy without any comprehensive study or intense review.  Davis explained that TDCJ "made the decision to change the execution procedures . . . as a result of the Supreme Court's ruling that we received the night of Murphy's stay."  *Id*. at A312-13.  Davis discussed the change to  TDCJ's pre-*Murphy* policy with a few prison officials and TDCJ legal counsel.  Dkt. No. 109 at A314-15.  Davis testified, without elaborating, that some discussion was had about security risks that would arise if volunteer spiritual advisors assisted in the execution chamber.  Dkt. No. 110, Ex. G at 11-12.  The evidence gives little insight other than a general characterization about the discussion, but there is no evidence as to the specific security concerns discussed. *See id.*

That same day, Texas promulgated the new execution procedure.

### b. Identity of the Lethal-Injection Team Evidence

Defendants have raised the issue of security in relation to the Texas law which shields the identity of the members of the lethal-injection team. Tex. Code of Crim. Pro. art. 43.14; *see also Tex. Dep't of Crim. Just. v. Levin*, 572 S.W.3d 671, 680-85 (2019). Davis opined that the use of a non-TDCJ employee spiritual advisor could compromise the anonymity of the lethal-injection team. Dkt. No. 110, Ex. O. Photographs of the execution chamber show a small room. Dkt. No. 110, Ex. F. The door to the room used by the lethal-injection team is only a few feet from the head of the execution gurney. *Id.* It is reasonable to infer that the physical layout of the chamber creates some risk of disclosing the identity of the lethal-injection team. *See id.*

Martin, however, testified in his deposition that the door used by the lethal-injection team is opened slightly only for a moment during the execution. Dkt. No. 109 at A723-24. Only a person standing directly at the door would be able to see the lethal-injection team members. *Id.* Richard Lopez ("Lopez"), former TDCJ Director of Chaplaincy from 2000 to 2012 who participated in over 80 executions, explained:

> When the condemned is moved from the cell to the execution chamber, he or she is given the choice to walk or be carried to the chamber. The Chaplain does not enter the chamber at this time. When the condemned enters the chamber, the security team ties him or her down to the gurney. The Chaplain and Warden then walk into the chamber together. They do not enter the chamber until the condemned has been tied down. Also, during the execution there are officers posted for securing [sic] along two of the walls outside the chamber with a view into the chamber.

Dkt. No. 109 at A826.

### c. Evidence Regarding Chaplains and Spiritual Advisors

The inmates in TDCJ custody practice a wide variety of denominational affiliations and spiritual beliefs.  Dkt. No. 110 at Ex. BB.  TDCJ employs around 120 chaplains throughout the prison system.  Dkt. No. 109 at A19, A310.   TDCJ hires Christian, Muslim, Jewish and Native American chaplains.   *Id.* The parties provide evidence about the different religious advisors who provide for inmates' other religious needs. Many religious chaplains volunteer, and there are "Certified Volunteer Chaplain Assistants (CVCA)" who have "received additional security and chaplaincy policy training." Dkt. No. 109 at A1010.

Inmates on Texas' death row have self-identified as belonging to around twenty-five different faith groups. Dkt. No. 109 at A1020-24. Pre-*Murphy*, the TDCJ chaplains who participated in the execution chamber were selected by the TDCJ Director.  Dkt. No. 109 at A275.  Traditionally, the TDCJ Director selected only the TDCJ Director of Chaplaincy, the Assistant Director of Chaplaincy, and the chaplain of the Huntsville Unit for participation in the execution chamber.  Dkt. No. 109 at A15.  At the time of the change in TDCJ policy, all three chaplains approved to participate in an execution were Christian.  *Murphy v. Collier*, 4:19-cv-1106. Dkt. No. 57 at 7.

Defendants submit evidence about a few disruptions during executions by witnesses in the viewing area or by the condemned themselves.  Dkt. No. 109 at A293-95. Defendants submit no evidence of any disruption caused by the spiritual advisors. *See id.*

Gutierrez is a Catholic who wishes to have an "ordained minister" present during his execution.   Dkt. No. 109 at A342-43, A347, A374. Gutierrez states that after spoke with TDCJ employees he filed an I-60 "Offender Request to Official" form.   Thereafter, his attorneys emailed

TDCJ's General Counsel on July 30, 2019 requesting a reasonable accommodation. Dkt. No. 1-1 at 16-17; Dkt. No. 109 at A420. At an unspecified date, Gutierrez learned that his request had been denied. Dkt. No. 109 at A381.

On August 19, 2019, Gutierrez filed an "Offender Grievance" request to have a Christian chaplain present in the execution chamber "to ensure his path to the afterlife." Dkt. No. 1 at A16. Gutierrez testified that TDCJ "Chaplains J. Guy [sic] and Wayne Moss" each told him that he would be willing to attend his execution. Dkt. No. 1 at A16; *see also* Dkt. No. 109 at A385 ("I'd asked Chaplain Guy [sic]. He said he would be willing to do it provided that he would be allowed to."). When prison officials did not respond to Gutierrez's grievance, he filed this lawsuit on September 26, 2019. Dkt. No. 1.

Gutierrez's lawsuit complains that "TDCJ already has chaplains who have been approved to enter execution chambers, have been present in the chamber for past executions, and are willing to do so for Mr. Gutierrez's execution." Dkt. No. 1 at 31. In his amended complaint, Gutierrez alleges that "TDCJ's policy will prohibit Mr. Gutierrez's free exercise of his Christian faith in the crucial moments leading to his passage to the afterlife." Dkt. No. 45 at 34. Gutierrez argues that prohibiting him "from being guided at the time of death by a Christian chaplain is an explicit and substantial burden on religious exercise." Dkt. No 45 at 35-36.

In his deposition, Gutierrez testified that, as the State conducts his execution, he wants a Christian minister with him to "guide [his] soul into the afterlife." Dkt. No. 109 at A406; *see also* Dkt. No. 1 at 16-17 (requesting a minister to help "help secure [his] path to the hereafter"). Gutierrez explained that religious guidance is critical at that moment because, "at that

instant when the soul leaves the body, it purifies the soul, it absolves you of all sin, which therefore [sic] his prayers guide your soul into the afterlife." Dkt. No. 109 at A406.   Gutierrez bases his belief on life-long religious teaching.   Dkt. No. 109 at A399 ("[T]hat's what was told to us even since Bible school when I was little. I mean, it's–I've been told that all my life").

Gutierrez testified in his deposition that he would like his spiritual advisor to place his hand on Gutierrez's shoulder and pray out loud throughout the execution. Dkt. No. 109 at A402.   Gutierrez calls what he expects of his spiritual advisor "Last Rites." Dkt. No. 109 at A406. Gutierrez explained that his spiritual advisor's presence in the witness area would not suffice because he "wouldn't be able to hear him" and "he's supposed to have his hand on my shoulder to do it properly."  Dkt. No. 109 at A409.

On April 6, 2020, Gutierrez availed himself of the TDCJ prison grievance procedure a second time.   This time Gutierrez requested the presence of his outside spiritual advisor, William Miles, in the execution chamber.   While Gutierrez expressed preference for his own personal spiritual advisor, in his deposition he made clear that a TDCJ-approved chaplain would sufficiently meet his spiritual needs.  Dkt. No. 109 at A380 ("During the execution, I would prefer Mr. Miles to be present with me. If that's not available, a TDCJ employee would be just fine.").[10]

The parties have provided testimony from TDCJ chaplains Lopez, Thomas Brouwer ("Brouwer"), and Timothy Jones ("Jones") who have

---

[10]    Defendants repeatedly argue that Gutierrez "wants his outside spiritual advisor in the chamber," Dkt. No. 110 at 15, but ignore Gutierrez's repeated statement that he would accept the presence of a TDCJ-employed clergy member.  Gutierrez specified that a TDCJ employee is not "a second best accommodation," it is "just a request."  Dkt. No. 109 at A385. Before the Supreme Court, Gutierrez clarified: "Mr. Gutierrez challenges Texas's revised execution protocol on narrow, specific grounds: it deprives him of the religious consolation that a State-employed Christian chaplain could provide him in the execution chamber."  Reply in Support of Petition for a Writ of Certiorari, No. 19-8695 at 3.  "A few minutes with a chaplain a few hours before execution through a thick wire mesh screen is no substitute for the presence of a chaplain in the room at the time of execution."  Reply in Support of Petition for a Writ of Certiorari, No. 19-8695 at 3.

previously participated in executions. Dkt. No. 109 at A1, A544, A826. The clergy members described the extensive training they received for their employment. Dkt. No. 109 at A8.    Each chaplain testified about the importance of having spiritual comfort and support in the final moments of life. Dkt. No. 109 at A306. However, the chaplains likewise each testified he received minimal preparation for his part in an execution. Dkt. No. 109 at A626-29, A729

Lopez opined that an accommodation for the choice of religious advisor could be made:

> I cannot see any security risk with the Chaplain being in the chamber.
>
> In my experience, the Chaplain's presence helped the process go more smoothly because the Chaplain is there as a calming and comforting presence for the condemned.  During my 22 years as a TDCJ chaplain, I never experienced, witnessed, or learned of any security issues relating to a Chaplain being present in the execution chamber.

Dkt. No. 109 at A826.

### d. Evidence Regarding Federal Bureau of Prisons Policy on the Presence of Spiritual Advisors in the Execution Chamber

The United States government has recently resumed conducting executions, and in doing so has approved requests for outside spiritual advisors during executions. Martin points to the Federal Bureau of Prisons ("BOP")  example of how it is possible to allow outside spiritual advisors of an inmate's choice under specific guidelines and accompanied by security escorts.  Dkt. No. 109 at A804, A839-40.

The evidence in the record shows that the United States government scheduled Daniel Lewis Lee's ("Lee") execution for July 13, 2020.  On July 1, 2020, Lee requested the presence of "Ms. Donna Donovan, an Asatru

Priestess to provide pastoral case before, during, and after [his] execution."
Dkt. No. 109 at A864.  In a memorandum signed on July 3, 2020, the warden
T.J. Watson explained the advisor's role and cautioned her as follows:

> [O]n the day of your execution, Ms. Donovan will be permitted to
> provide spiritual services to you during your time in the
> execution facility.  After you are transferred to the execution
> room, she will be escorted into the room for a brief non-contact
> visit with you in the presence of an assigned BOP staff member,
> which will provide an opportunity to engage in final prayers or
> other end-of-life spiritual rites.  She will be permitted to remain
> in the execution room with the assigned BOP staff member
> during the execution procedure. Any disruptive physical or verbal
> behavior will result in her immediate removal from the room for
> the remainder of the procedure. Should any of the confidential
> staff need to enter the room during the procedure, she will be
> escorted out of the room while the confidential staff are present.
> Upon completion of the execution, she will be given brief access to
> your body to say additional prayers or perform appropriate
> spiritual rites if you so choose. We will be in contact with Ms.
> Donovan in advance of the execution to further discuss logistical
> details and answer any questions.

*Id*.  While there is no evidence of the training or direction BOP gave Lee's
spiritual advisor in the short days before the execution, it is reasonable to
infer that it was not nearly as extensive as the training given to TDCJ-
employed chaplains or the Certified Volunteer Chaplain Assistants.

BOP informs inmates of their right to a spiritual advisor in the
execution chamber through memoranda. Dkt. No. 109 at A864-66.  On June
20, 2020, Dustin Honken requested that Father Mark O'Keefe ("O'Keefe"),
who was not employed as a chaplain in BOP, attend his execution which took
place on July 17, 2020.  Dkt. No. 109 at A829. O'Keefe explained that his
presence in the execution chamber did not pose a security concern: "At no
time was there any hint that I posed a problem to the executioners or
administrators or anyone else, whether as a matter of security, safety,

accommodation, distraction, or any other circumstance. My entry into the prison from the gate outside to the execution chamber was straightforward and easily managed by the head chaplain of the facility and other personnel." Dkt. No. 109 at A829.  There is no evidence before this Court that an inmate's chosen spiritual advisor posed any security concern during a BOP execution.

## IV.   Legal Standards That  Will Govern Gutierrez's Claims

After outlining the relevant legal standards, the Court will discuss the evidence before it about the participation of a TDCJ-employed chaplain during an execution, as well of that pertaining to an inmate's request for a spiritual advisor not employed by TDCJ.

### a. RLUIPA

RLUIPA provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." RLUIPA "alleviates exceptional government-created burdens on private religious exercise."   *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005).  Specifically, RLUPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> > (1)   is in furtherance of a compelling governmental interest; and
> >
> > (2)   is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  RLUIPA "alleviates exceptional government-created burdens on private religious exercise," without "elevat[ing] accommodation of

religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 720.

Applying RLUIPA, courts must account for the burdens an accommodation imposes on nonbeneficiaries, and courts must be satisfied that the Act's prescriptions are neutrally applied among different faiths. *Id*. Courts give deference to the experience of prison administrators. *Id*. at 723. Yet prison administrators do not receive total deference, and courts have determined that security concerns should be more than generalized hypotheticals; that the security concerns should be viewed in light of whether the issue can be mitigated; and security practices can be compared to the practice of other jurisdictions. *Holt v. Hobbs*, 574 U.S. 352, 368 (2015); *Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (assessing security interests); *Chance v. Texas Dep't of Criminal Justice*, 730 F.3d 404, 419 (5th Cir. 2013) (noting deference to TDCJ has limits).

### b. First Amendment

Following the Fifth Circuit's decision that is on appeal in this case, the Court applies the reasonableness test from *Turner v. Safley*, 482 U.S. 78 (1987) to Gutierrez's First Amendment claims. *See Gutierrez v. Saenz*, 818 F. App'x 309, 313 (5th Cir. 2020). Under *Turner*, a court considers:

> (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether there exist "alternative means of exercising the fundamental right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there is an "absence of ready alternatives" to the regulation in question.

*Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 89-90).   Under *Turner*: "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90.

## V.   Analysis of Security Issues

The Defendants contend that the presence of non-prison employees would (1) cause security concerns and (2) jeopardize the confidentiality of the lethal-injection team.

"[A]ny exercise of religion, whether or not compelled by, or central to, a system of religious belief" of an inmate is protected by RLUIPA. 42 U.S.C. § 2000cc-5(7)(A). At the adjudication of Gutierrez's claim, TDCJ has the burden of showing that prison policy "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000-cc-1(a). This Court would be required "to scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context."   *Holt*, 574 U.S. at 363 (citations and quotation marks omitted). TDCJ's burden is all the more difficult in this case because, while Gutierrez would prefer a minister of his choice, his initial choice was a TDCJ employed chaplain, which was his right under the pre-*Murphy* policy.

### a. Security Concerns from Permitting the TDCJ-Employed Chaplain

As this Court previously observed, "Defendants do not argue that their previous policy that allowed TDCJ clergy to be present created a security risk, nor could they given its long history."   Dkt. No. 48 at 29.   Further,

"Defendants do not suggest that the relief Gutierrez requests . . . will pose any security threat in his own execution. " Defendants only argue that other risks "may occur in other executions." *Id*. at 46.

That question is not central to RLUIPA jurisprudence which "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 363 (internal quotation marks and citations omitted); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014) (focusing on whether the government "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties"). Thus, RLUIPA requires federal courts to "scrutinize the asserted harm of granting exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged governmental action in that particular context." *Holt*, 574 U.S. at 363 (internal quotation marks and citations omitted). Additionally, many of Defendants' speculations are too abstract and not sufficiently ripe. The ripeness justiciability doctrine keeps courts from premature adjudication and entanglement in abstract disagreements. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807, (2003).

Other cases with sufficient factual records and legal briefing could address the potential equal-protection concerns. *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) ("Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition. In that event, adjudication in as-applied challenges would be in order.").

For the first time in this litigation, Defendants claim that "[i]n addition to his capital murder conviction, Gutierrez has received multiple disciplinaries for assaulting TDCJ employees been [sic] staff assaultive and has committed various acts of violence during his incarceration. Thus, in addition to its legitimate penological interest in maintaining control of who is permitted inside the execution chamber, TDCJ has a particularized security interest with regard to Gutierrez in controlling the individuals [sic] permitted people who will be inside the execution chamber during his execution."  Dkt. No. 104 at 13-14. While there is evidence of Gutierrez's disciplinary history, there is no evidence that TDCJ has ever excluded a chaplain from the chamber because of an inmate's behavior while incarcerated, nor is there evidence that this concern was discussed by officials before the April 2019 change.  Dkt. No. 109 at A157-58. Dkt. No. 110-27.  The fact remains that there is no evidence of any security incident due to a chaplain in an execution chamber, no matter the disciplinary history of an executed inmate.

The Court concludes the evidence overwhelmingly demonstrates that no serious security problems would result if a TDCJ-employed chaplain is allowed in the execution chamber.

### b. Security Concerns from Permitting the Choice of Non-TDCJ Spiritual Adviser

Over the nearly four decades since Texas enacted its modern execution protocol only three inmates have sought an accommodation for the presence of an non-TDCJ employed spiritual advisor in the execution chamber.[11]  Since

---

[11]     Murphy requested an accommodation for his Buddhist spiritual advisor to chant with him during his execution.  Murphy's case is still being litigated.  *Murphy v. Collier*, 4:19-cv-1106 (S.D. Tex.).  Texas inmate John Henry Ramirez recently filed a civil case requesting that his spiritual advisor, Pastor Dana Moore, be present during his execution.  *Ramirez v. Collier*, 2:20-cv-205 (S.D. Tex.).  Ramirez alleged that "TDCJ previously cleared Pastor Moore to be in its execution chamber when another condemned prisoner, Joseph Christopher Garcia, was executed in December 2018."  *Ramirez v. Collier*, 2:20-cv-205, Dkt. No. 1.  Ramirez reached an agreement with the State of Texas to withdraw his execution date in return for voluntarily dismissing his lawsuit.  *Ramirez v. Collier*,

Murphy filed his lawsuit, Texas has conducted ten executions, although several other execution dates were set and withdrawn or stayed.[12]  Of all the other litigation and administrative requests filed by death-row inmates facing an execution date during that time, Gutierrez is the only inmate other than Murphy who is currently litigating his right to have access to a spiritual advisor of his choice.  The concerns raised by this lawsuit are neither regular nor pervasive.

The Court does not minimize TDCJ's interest in maintaining an orderly, safe, and effective process when carrying out an irrevocable and emotionally charged procedure.  Heightened tensions and concerns for security drove executions from the public eye a century ago.[13]  While governments now conduct executions inside the highly secure penitentiaries, crowds may still gather outside the prison walls in protest.  *See id.*  Potential last-minute legal maneuvers keep nerves on edge.  Emotions run high among witnesses.  *See id.*  The feelings of a man soon to die add a layer of unpredictability to events.  *See id.*  The Court is cognizant that precaution requires precisely crafted policy to navigate the tension and passion attendant to carrying out the irreversible act of taking a person's life. A State has the authority to fashion intricate and exacting protocols to minimize the unknowns and thereby reduce risk.  The Constitution affords a "measure of

---

2:20-cv-205, Dkt No. 2.  The parties in *Murphy* recently filed a joint status report indicating that they "are not aware of any document or witness that could provide support for Ramirez's allegation that a non-TDCJ employed pastor was cleared to be in the execution chamber when Joseph Garcia was executed in December 2018."  *Murphy v. Collier*, 4:19-cv-1106, Dkt. No. 95 (S.D. Tex.).

[12]      *Executed Offenders*, Death Row Information: Texas Department of Criminal Justice, (available at https://www.tdcj.texas.gov/death_row/dr_executed_offenders.html).

[13]      For many years after the founding of this Nation, society "[c]ountenance[d] the spectacle of public executions" as a "deterrent to criminal behavior by others."  *Furman v. Georgia*, 408 U.S. 238, 297 (1972) (Brennan, J., concurring).  By 1923, execution-day mobs had become so unruly that the Texas legislature ordered all executions to occur in the Huntsville prison.  *See* James W. Marquart, Sheldon Ekland Olson, & Jonathan R. Sorensen, *The Rope, the Chair, and the Needle: Capital Punishment in Texas*, 1923-1990, 18 (1994).  In 1924, Texas conducted its first execution outside the public eye.  *Id.* at 19.

deference to a State's choice of execution procedures" and does not authorize courts to serve as "boards of inquiry charged with determining 'best practices' for executions." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125, 203 L. Ed. 2d 521 (2019).

In 1985, Texas crafted a policy that has been effective in curtailing security concerns throughout the execution process. Even though executions are emotionally charged, Texas has demonstrated an ability to control disturbances and reduce unknowns. As Davis explained:

> In Texas, we have been successful in minimizing the disruptions and the distractions and any aggression in the execution chamber because we have stayed true to our best correctional practices and our policies, and we've minimized the opportunity for any of those things to happen. And so we've been able to prevent or deter any such event in the actual execution chamber.

Dkt. No. 109 at A293-94.

Defendants argue that "there is no circumstance in which it would be safe or controlled for a non-TDCJ employee to be present in the execution chamber during an execution. The risks of permitting an unknown person in the execution chamber are significant." Dkt. No. 110 at 19. There is no evidence in the record of security problems in the execution chamber caused by clergy.[14]

 Defendants allege the possible security concerns are "manifold," but their briefing takes two paths: 1) TDCJ has an interest in "ensuring that individuals who attend an execution in the execution chamber are able to conduct themselves in a stressful situation with control, professionalism and good judgment" and 2) TDCJ has an interest in "maintaining the anonymity

---

[14]  Defendants identify only one security issue inside the execution chamber: "During the execution of Ponchai Wilkerson, after being secured to the gurney in the execution chamber, the offender spit a handcuff key out of his mouth." Dkt. No. 110, Ex. O.

of the execution team, which could be jeopardized by the presence of an outsider during the execution process." *Id.* at 26 n.11.

### i. Conduct and Training of Non-TDCJ Employed Chaplains

Security is an overarching and ever-present concern in the prison setting, but as correctional consultant Martin emphasized, some risk will always attend prison administration:

> You can never in this business eliminate risk. You can manage risk, you can minimize risk, you can control risk, but you cannot—when you walk through the port door, the fort door on a prison, there's risk.

> This is another enterprise in which you identify what risk exists, whether you can address those and minimize them to a comfort level that you can need as a manager to say "We can do this safely and securely."

Dkt. No. 109 at A808.

The duty the Supreme Court has given this Court is not to decide whether, within the wide realm of possibilities that may disrupt an execution, serious security concerns *could* arise. This Court must assess whether "serious security problems *would* result . . .." *Gutierrez*, 207 L. Ed. 2d 1075 (emphasis added). This assessment requires an evaluation of the concerns on which TDCJ made its hasty alteration of its execution protocol, the realistic possibilities that may disrupt that protocol, and the experiences of other jurisdictions with a different protocol. *See Holt*, 574 U.S. at 368; *Yellowbear*, 741 F.3d at 60; *Chance*, 730 F.3d at 419.

Defendants argue that

> Gutierrez suggests TDCJ could use background checks, security escorts, credentialing, training, and 'agreements to abide by TDCJ policy' to 'manage a clergy person in the execution

> chamber.' These alternatives, however, were carefully considered and ultimately rejected by TDCJ's decision-makers following the stay in Murphy, because such measures were wholly insufficient to mitigate the risk of allowing a non-TDCJ employee in the chamber.

Dkt. No. 115 at 8. Defendants' evidence of the discussions had before the change in execution policy does not support a finding of careful or extensive consideration by TDCJ officials of whether training or vetting outside clergy could minimize the risk. *See* Dkt. No. 109 at A220.  The process of changing the execution procedure was not extensive and took place over only a few days.   Ultimately according to Davis, prison officials believed that the Supreme Court had ruled that "[y]ou either had to let everybody in or you let nobody in."  Dkt. No. 109 at A216.  By hastily taking that route, TDCJ relied on the "classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).

TDCJ's change to the pre-*Murphy* policy does minimize risk in executions, but  it does so at the expense of an inmate's sincere religious beliefs. *See Holt*, 574 U.S. at 364. In fact, the change came to the surprise TDCJ chaplain Lopez who had been involved in over 80 executions.  Dkt. No. 109 at A826.   Martin, who as TDCJ counsel decades ago helped develop Texas's first execution protocol, supported Lopez's opinion.[15]  Martin agreed that security is a primary and constant concern in the execution process, but described how that security can allow for the presence of a spiritual advisor:

---

[15]     Defendants argue: "Mr. Martin lacks the experience and training specific to the issue of security in the execution process to justify giving credence to the opinions he has offered in this matter." Dkt. No. 115 at 4.  Martin testified that he not only helped develop the Texas protocol but that he participated in executions.  Defendants provided no evidence which rebuts the qualifications of Martin.

> In the context of prison management, the TDCJ execution process, from a safety and security standpoint, is not materially laden with greater risks of harm to staff, prisoners, and the public than any number of other commonplace activities, processes, practices, protocols and regulations that are present and occur on a daily basis in the prison setting. Because it is a fully self-contained secure area with strictly limited ingress/egress, enveloped by a trained security force, the risks of harm to staff, the public, and a fully immobilized condemned prisoner, are less than the potential risks of harm to civilian personnel and staff who may be present in a high security housing unit without barriers between them and the prisoners. The most distinguishing security feature of the execution process is that it is conducted with extreme precision and each step is temporally sequenced and predictable, thus minimizing risk of harm or disruption during the execution process. Security managers, in matters relating to custody and control, constantly strive to achieve predicable outcomes in order to maintain safe settings for personnel and prisoners. The TDCJ execution process, including the presence of a spiritual advisor of the condemned prisoner's choosing, represents the most predictable and highly controlled environment in a prison setting.

Dkt. No. 109 at A836. It is reasonable to infer that the structure and tight control of TDCJ's execution protocol provides prison officials parameters by which careful accommodation can be made to an inmate's sincere religious rights.

Defendants argue that the choice "to permit chaplains and spiritual advisors in the witness room," but not the execution chamber "was, and remains, the only tenable choice." Dkt. No. 115 at 3. The experience of BOP shows otherwise. *See supra,* p. 12. There is no evidence that the presence of outside spiritual advisors during executions performed by BOP has resulted in any security problems. Defendants make no effort to distinguish between the circumstances surrounding a federal execution and one in Texas.[16]

---

[16]    Defendants argue that "[t]he single execution carried out by the Federal BOP wherein a spiritual advisor was permitted in the execution chamber is not evidence that allowing outsiders in

In lieu of evidence, Defendants' allegations speculate about the hypothetical malfeasance a spiritual advisor could inflict: "The unknown outsider could pull the intravenous lines out of the offender, could taunt the victim's family, could create a disruption, or assault the warden. The non-TDCJ employee could also attempt to gain access to the execution drug room and jeopardize exposing the identities of the confidential drug team members." Dkt. No. 110 at 22. Defendants argue that these are not "hypothetical concerns" by pointing to evidence of security breaches by religious volunteers in prisons throughout Texas. Dkt. No. 110 at 22; *see* Dkt. No. 110, Ex. S at 1.

Gutierrez concedes that "[t]he non-TDCJ employees who enter TDCJ facilities every day, including the thousands of volunteers, create a security risk." Dkt. No. 110 at 15. The role of prison administration, however, is to manage that risk. Gutierrez argues that the evidence, when placed in the proper context, shows that of the "145,000 visits to more than 120 TDCJ units each year, often with one-on-one contact with inmate" only 20 incidents involved a breach of security protocol such as "a volunteer bringing in an illegal or unapproved item, such as illegal substances, cologne, jewelry, or love letters." Dkt. No. 109 at 17; *see* Dkt. No. 110, Ex. S at 1. Defendants do not raise any historical issue that created a genuine security concern that the prisons could not ameliorate. *See Holt*, 574 U.S. at 368; *Yellowbear*, 741 F.3d at 60; *Chance*, 730 F.3d at 419.

---

the execution chamber is a less restrictive alternative that furthers security interests. At best, it suggests that the Federal BOP was fortunate not to have a security breach involving the outsider in the chamber." Dkt. No. 110 at 44-45. Defendants limit their argument to a single federal execution and did not revise their argument in their reply brief. In fact, Defendants' reply brief conspicuously avoids discussing the evidence of the federal executions conducted in the presence of an outside spiritual advisor. Dkt. No. 115 at 6 (acknowledging that Martin based his opinion on federal executions, but then failing to present evidence that would distinguish or contradict his opinion on that point).

Defendants fear that granting relief to Gutierrez would force TDCJ "to permit spiritual advisors from any and all denominations, irrespective of TDCJ's inability to ensure those persons are suited for the task of being there." Dkt. No. 115 at 3.  The evidence does not support the conclusion that TDCJ sufficiently explored reasonable alternatives such as security accompaniment, training, and vetting that would minimize those concerns. Relying primarily on the fact that Texas previously only allowed TDCJ chaplains into the execution chamber who received extensive training similar to other correctional professionals, Defendants argue that "[t]here are no alternative vetting or training policies that would sufficiently mitigate the security risks of permitting  non-TDCJ employee in the execution chamber . . ." Dkt. No. 110 at 10.

Davis' testimony demonstrates that the actual execution-related training is not extensive:

> [i]t entails . . . going through the process involved and the logistics involved of carrying out an execution.  . . .  It would involve going to the death house.  It would involve conversations about the preparation and the execution and the timing and the totality of the events of the execution of that day, what your responsibilities are when you move, what's important, the details of . . . the process.

Dkt. No. 109 at A277.   Davis' greatest concern is "dependent on their maturity level.  It's dependent on their professionalism.  It's dependent on their experience." Dkt. No. 109 at A279.

Davis testified that she possessed the ability to determine whether an individual possessed the intangible qualities necessary to minimize their risk during an execution: "It can be the . . . totality of that person.  It can be my personal interaction with them, their demeanor, their tone, their professionalism, their commitment, their work history, my observation of how

they conduct themselves.  All of those things can go in together to be part of the consideration." Dkt. No. 109 at A283.  If a person is not employed by TDCJ, Davis expressed concern because she would "not have the ability to assess them prior to their participation in the execution process.  An execution is a very stressful and intense event.  I have no way of knowing how a person that has never been exposed to that's going to react during . . . the process of the execution." Dkt. No. 109 at A280.

Yet, the evidence shows that TDCJ's execution-specific training in the past has been minimal.  TDCJ Chaplain Brouwer testified that the only training he received for executions was when another chaplain "kind of walked [me] through—through the day, what would happen, what kind of transpires.  That was about it." Dkt. No. 109 at A30.

Even recognizing an inmate's right to the assistance of a spiritual advisor under RLUIPA or the First Amendment, a prison could place certain requirements on that individual such as passing a background check or receiving training. *See Cutter*, 544 U.S. at 722.

In light of the experience of BOP requiring minimal training for spiritual advisors in the execution chamber, it is reasonable to infer that TDCJ could implement some means of training and vetting of an outside spiritual advisor that would effectively minimize security concerns. *See supra*, p. 13.  The federal government approved the participation of a spiritual advisor days before an execution.  *See id.* What was an easy accommodation for BOP is considered an insurmountable barrier by TDCJ. Defendants have not identified a material difference between how the two governmental bodies handle the execution process.

This Court's role is not to establish a bullet-point plan that sets out specific policies for TDCJ to adopt.  *See Bucklew*, 139 S. Ct. at 1125.  The

dearth of problems in the execution chamber, the experience of the Bureau of Prisons, the opinions of chaplains who have participated in executions and the  opinion of a prison expert, weaken TDCJ's reliance on hypothetical examples of what could disrupt an execution. *See Holt*, 574 U.S. at 368; *Yellowbear*, 741 F.3d at 60; *Chance*, 730 F.3d at 419.  Defendants have shown that, in the universe of things that may happen, possibilities exist for problems occurring in an execution, as they do in any human endeavor. *See id.* But they have not shown that they cannot take meaningful steps to minimize the possibility of risk. *See id.*

The Court concludes the evidence demonstrates (1) the amount of risk involved in allowing non-prison officials into the execution chamber is not so great that prison administration can summarily dismiss that alternative and (2) adequate processes and security can control the risk. *See id.*

### ii.  Identity of the Lethal-Injection Team

As a separate concern, Defendants argue that the presence of a spiritual advisor not employed by TDCJ could reveal the identity of some participants in the execution process.[17]  While Texas law mandates concealment of the identity of the lethal-injection team, Defendants have not submitted evidence that shows  reasonable accommodations to mitigate the risk of that occurring cannot be made.  Defendants' concern centers on a brief moment, when a member of the lethal-injection team advises the warden that the execution will proceed.

To the extent that opening the door may place the identity of the team members at risk, the evidence does not show that it is an unmanageable

---

[17]     Secrecy surrounding those carrying out the execution is not new or unique.  "The traditional hooding or masking of the executioner in Europe was to conceal his identity from the community so that the executioner would not be an outcast, a pariah, or the object of fear or retaliation."  Leigh B. Bienen, *Anomalies: Ritual and Language in Lethal Injection Regulations*, 35 Fordham Urb. L.J. 857, 875 (2008).  The parties have not discussed whether the traditional hooding or masking of an executioner would easily solve the concerns about the identity of the lethal-injection team members.

security concern that would prevent any religious accommodation. *See Holt*, 574 U.S. at 361.  As Martin testified, the team members open the door only briefly—and then only slightly—after a chaplain enters the chamber.  Martin explained:

> But I don't recall that door, at least in the ones which I participated, it was just barely cracked.  It was just open a bit, enough for, you know, a thumbs up, good to go.  And I doubt, that unless a person had been standing right there directly at that door, they would not have seen who the person was administering the drugs.

Dkt. No. 109 at A725.[18]

"TDCJ has broad latitude to implement any measures that it deems appropriate."  Dkt. No. 116 at 9 (citations omitted). Although Defendants express concern about preserving the anonymity of the lethal-injection team members, Defendants have not presented evidence explaining why basic precautions are too burdensome and instead make broad statements that "a security escort would not mitigate the risk of a non-TDCJ employee seeing and disclosing the identities of the confidential drug team or tie down team as those members enter and exit the execution chamber."  Dkt. No. 115 at 11.

The evidence supports a finding that TDCJ's concern could be addressed by taking steps as simple as careful placement of the chaplain in relation to the door or by requiring an agreement binding the non-prison employee, by civil or criminal penalty, from disclosing any protected information that accidentally came within his or her sight. Nor do Defendants distinguish their procedure from that implemented by the federal government which, apparently, has not resulted in any security concerns for lethal-injection team members.

---

[18]     Martin further elaborated: "the door would be opened enough to where the Warden knew there was—he could proceed, in other words, there were no commutations or stays or—and then the execution would proceed."  Dkt. No. 109 at A723.

In short, while Defendants identify hypothetical security risks, the Court concludes there is insufficient evidence that *serious* security problems *would* result from allowing a chaplain into the execution chamber adjacent to the lethal-injection team. *See Gutierrez*, 207 L. Ed. 2d 1075; *Holt*, 574 U.S. at 368; *Yellowbear*, 741 F.3d at 60; *Chance*, 730 F.3d at 419.

## VI.   Conclusion

The Supreme Court gave this Court a  specific responsibility: to "promptly determine, based on whatever evidence the parties provide, whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution." *Gutierrez*, 207 L. Ed. 2d 1075.  The Court concludes that the extensive evidence submitted by the Parties does not demonstrate that serious security concerns would result from allowing inmates the assistance of a chosen spiritual advisor in their final moments. Speculative hypotheticals without evidentiary support do not create an unmanageable security risk.  *See Holt*, 574 U.S. at 365; *Yellowbear*, 741 F.3d at 60.  TDCJ's decision based on its interpretation of a statement from a Supreme Court Justice does not deserve unwavering deference.  The Texas prison administration cannot blindly abdicate its obligation to safeguard an inmate's religious rights in the spiritually charged final moments of life.

SIGNED this 24th day of November, 2020.

_____
Hilda Tagle
Senior United States District Judge

# APPENDIX

## Evidence Submitted by Gutierrez

**I.    Depositions, Declarations, and Affidavits**
- Thomas Brouwer, TDCJ Religious Support Services, Chaplain III, (Deposition June 24, 2019), *Murphy v. Collier*, 4:19-cv-1106
- Christopher George Carter, Region Director for TDCJ Rehabilitation Program (Videoconference Deposition Aug. 11, 2020), *Gutierrez v. Saenz*, 1:19-cv-185
- Lorie Davis, Texas Department of Criminal Justice—Correctional Institutions Division Director (Videoconference Deposition Aug. 19, 2020), *Gutierrez v. Saenz*, 1:19-cv-185
- Lorie Davis, Director TDCJ-CID (Deposition June 24, 2019), *Murphy v. Collier*, 4:19-cv-1106
- Ruben Gutierrez, Plaintiff (Videoconference Deposition Aug. 6, 2020), *Gutierrez v. Saenz*, 1:19-cv-185
- Billy Hirsch, Deputy Director TDCJ-CID (Confidential Videoconference Deposition Aug. 21, 2020), *Gutierrez v. Saenz*, 1:19-cv-185
- Timothy Jones, TDCJ Manager for Director of Chaplaincy (Deposition Aug. 13, 2020), *Gutierrez v. Saenz*, 1:19-cv-185
- Timothy Clyde Jones, Manager for Director of Chaplaincy (Deposition June 24, 2019), *Murphy v. Collier*, 4:19-cv-1106
- Steve J. Martin, Expert on Security (Videoconference Deposition Aug. 18, 2020), *Gutierrez v. Saenz*, 1:19-cv-185
- Richard Lopez, Former TDCJ Director of Chaplaincy, (Declaration of July 2, 2020)
- Father Mark O'Keefe, Roman Catholic Priest (Declaration of July 24, 2020)
- Steve J. Martin, Expert on Security (Report of Aug. 14, 2020)

**II.   Interrogatories**
- David Collier's Responses to Plaintiff's First Set of Interrogatories, *Murphy v. Collier*, 4:19-cv-1106 (June 24, 2019)
- Defendant Davis's Response to Plaintiff Murphy's First Set of Interrogatories to Defendant Lorie Davis, *Murphy v. Collier*, 4:19-cv-1106 (June 24, 2019)
- Defendant's Response to Plaintiff's First Request for Admissions, *Gutierrez v. Saenz*, 1:19-cv-185 (July 23, 2020)

**III.  Records**

- Texas Department of Criminal Justice—Administrative Directive AD-07.35 (rev.7), Administration of Volunteer Services
- Chaplaincy Department Manual—Native American Religious Services and Practices in the Texas Department of Criminal Justice (Jan. 2020)
- Texas Department of Criminal Justice, Chaplaincy Department Manual—Freeworld Volunteers (Jan. 2020)
- Texas Department of Criminal Justice—Volunteer Services Handbook for Volunteers
- Texas Department of Criminal Justice—Rule § 152.51: Authorized Witnesses to the Execution of an Offender Sentenced to Death
- Texas Department of Criminal Justice—Chaplaincy File for Ruben Gutierrez
- Execution Witness Lists for Executions Carried out by TDCJ from February 2020 through July 2020
- Texas Department of Criminal Justice—Administrative Directive AD-07.30 (June 30, 2014)
- Religious Preference for Death Row Offender's Incarcerated in TDCJ on May 31, 2019
- Texas Department of Criminal Justice—Execution Procedure (July 9, 2012)
- United States Department of Justice - Memorandum for Daniel Lee (July 3, 2020)
- U.S. Department of Justice - Amended Memorandum for Dustin Honken (July 6, 2020)
- Defendant's Privilege Log - August 13, 2020, *Gutierrez v. Saenz*, 1:19-cv-185

## Evidence Submitted by Defendants

## I.    Depositions, Declarations, and Affidavits
- Lorie Davis, TDCJ-CID Director (Relevant Portion of Videoconference Deposition Aug. 19, 2020)
- Lorie Davis, TDCJ-CID Director, (Relevant Portion of Deposition June 20, 2019), *Murphy v. Collier*, No. 4:19-cv-1106
- Christopher Carter, Region Director for TDCJ Rehabilitation Program (Relevant Portion of Videoconference Deposition Aug. 11, 2020)
- Billy Hirsch, Deputy Director TDCJ-CIS (Relevant Portion of Videoconference Deposition Aug. 21, 2020)
- Timothy Jones, TDCJ Manager for Director of Chaplaincy (Relevant Portion of Videoconference Deposition Aug. 13, 2020)

- Timothy Jones, Manager for Director of Chaplaincy (Relevant Portion of Deposition June 24, 2019), *Murphy v. Collier*, No. 4:19-cv-1106
- Ruben Gutierrez, Plaintiff (Relevant Portion of Videoconference Deposition Aug. 6, 2020)
- Wayne Moss, TDCJ Chaplain II (Relevant Portion of Deposition June 24, 2019), *Murphy v. Collier*, No. 4:19-cv-1106
- Lorie Davis, TDCJ-CID Director (Declaration Aug. 19, 2020)
- Lorie Davis, TDCJ-CID Director (Declaration Mar. 26, 2019), *Murphy v. Collier*, No. 4:19-cv-1106
- Lorie Davis, TDCJ-CID Director (Affidavit Regarding Contraband July 19, 2019), *Murphy v. Collier*, No. 4:19-cv-1106
- Jeremy Desel, TDCJ Communications Director (Affidavit July 11, 2019) *Murphy v. Collier*, No. 4:19-cv-1106

## II.   Interrogatories

- Lorie Davis, TDCJ-CID Director (Relevant Portion of Interrogatory Responses) *Murphy v. Collier*, No. 4:19-cv-1106

## III.   Records

- Texas Department of Criminal Justice—Execution Procedure (July 9, 2012)
- Texas Department of Criminal Justice—Execution Procedure (April 2, 2019)
- Relevant Portion of Ruben Gutierrez's TDCJ Grievances
- Relevant Portion of the TDCJ Offender Orientation Handbook: Grievances
- Photographs of the TDCJ Execution Chamber
- TDCJ-CID Volunteer Incidents – Working Papers
- Relevant Portion of the TDCJ Chaplaincy Manual, Code of Conduct
- Chaplain I Job Description
- Execution protocols for various other States
- 2020 Salary Schedule for TDCJ
- 2021 Chaplaincy Budget for TDCJ
- 2021 Operational Budget for TDCJ
- Disciplinary Records for Ruben Gutierrez
- Relevant Portion of Ruben Gutierrez's TDCJ Chaplaincy File
- TDCJ Offender Religious Preferences as of 08.31.20
- Relevant Portion of the TDCJ Administrative Directive 07.30 (rev. 7) Religious Programming.